1    **Sean Reis (SBN 184044)**
     Edelson McGuire, LLP
2    30021 Tomas Street, Suite 300
     Rancho Santa Margarita, CA 92688
3    949-459-2124 (phone)
     949-459-2123 (fax)
4    sreis@edelson.com

5    *Counsel for Plaintiffs*
     [additional counsel appear on signature page]
6

7              **IN THE UNITED STATES DISTRICT COURT**

8           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

9                    **SAN FRANCISCO DIVISION**

10   JOSEPH ROLING and ALEXANDER        )    Case No.: 3:10-cv-00488-MHP
     LANDVATER, individually and on behalf of all )
11   others similarly situated,               )    **PLAINTIFFS' OPPOSITION TO**
                                              )    **DEFENDANT E*TRADE'S**
12              Plaintiffs,                    )    **MOTION TO DISMISS**
                                              )    **PURSUANT TO FEDERAL**
13   v.                                       )    **RULE OF CIVIL PROCEDURE**
                                              )    **12(b)(6)**
14   E*TRADE SECURITIES LLC, a Delaware Limited )
     Liability Company, and DOES 1-50, inclusive, )    Judge:  Hon. Marilyn Hall Patel
15                                            )    Date:   July 26, 2010
                Defendants.                   )    Time:   2:00 p.m.
16   _____)    Court:  Courtroom 1

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

ARGUMENT ................................................................................................................. 3

I.   THE BROKERAGE CUSTOMER AGREEMENT IMPROPERLY PURPORTS TO ALLOW E*TRADE TO CHANGE KEY TERMS WITHOUT NOTICE. ..................... 4

II.  IN ANY CASE, THE PRESENT RECORD IS INSUFFICIENT TO ALLOW THE COURT TO CONCLUDE THAT THE MSI SCHEDULE, AS OPPOSED TO THE PLAINTIFFS' FEE SCHEDULE, APPLIED TO THE PLAINTIFFS OR THE PUTATIVE CLASS MEMBERS AS A MATTER OF LAW ........................................ 5

   A.  Contrary To E*Trade's Assertions, This Court Cannot Conclude As A Matter Of Law That The Plaintiffs' Fee Schedule – Which Is Current, Available, And Posted On E*Trade's Website – Applies Only To Former Brown Co. Customers. ......................... 6

      1.  E*Trade's website is designed to lead customers, if anywhere, to the Plaintiffs' Fee Schedule. ...................................................................................................... 6

      2.  Plaintiffs' Fee Schedule does not restrict its application solely to former Brown Co. customers. ...................................................................................................... 6

   B.  E*Trade Fails To Establish That The MSI Schedule Ever Applied To So As Bind Either Plaintiff. ......................................................................................................... 9

III. IN ANY CASE, E*TRADE'S CHARGING OF A $40.00 QUARTERLY "INACTIVITY FEE" REQUIRES THAT THE PLAINTIFFS MAKE AT LEAST ONE TRADE EACH QUARTER AND IMPOSES AN UNLAWFUL PENALTY UNDER CALIFORNIA CIVIL CODE § 1671. ......................................................... 11

   A.  E*Trade fails to show that the inactivity fees are a rational alternative method of performance as opposed to an inferior and coercive penalty. ........................... 11

   B.  None of E*Trade's authorities suggest paying the inactivity fees presented a rational choice to customers. .......................................................................................... 13

IV.  PLAINTIFFS MAY MAINTAIN AN ALTERNATIVE CLAIM FOR UNJUST ENRICHMENT/RESTITUTION IN THE EVENT NO CONTRACT ULTIMATELY GOVERNS THE IMPROPER ASSESSMENT OF INACTIVITY FEES. .................. 15

V.   E*TRADE'S CHARGING OF $40.00 INACTIVITY FEES WITHOUT ANY AUTHORITY TO DO SO, ITS LIQUIDATION OF CUSTOMER ACCOUNTS WITHOUT NOTICE, AND ITS FALSE STATEMENTS OF MATERIAL FACT ARE ALL PROHIBITED UNDER THE CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200 (THE "UCL"). ........................................ 17

CONCLUSION .............................................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

**UNITED STATES SUPREME COURT CASES**

*Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998) .............................. 3

**UNITED STATES COURT OF APPEALS CASES**

*Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042 (9th Cir.2000) ................................. 17
*Comedy Club, Inc. v. Improv West Assocs.*, 553 F.3d 1277 (9th Cir. 2009)................................ 8
*Douglas v. U.S. Dist. Court for Cent. Dist. Of Cal.*, 495 F.3d 1062 (9th Cir. 2008)............. 4, 5, 15
*Evangelista v. Inlandboatmen's Union of Pac.*, 777 F.2d 1390 (9th Cir.1985) .......................... 10
*Gilliam v. Nev. Power Co.*, 488 F.3d 1189 (9th Cir. 2007) ...................................................... 9
*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 102 F.3d 1524 (9th Cir.1996) ................ 3
*In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir.1999)....................................... 9
*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ................................................................. 9
*Matanuska Val Farmers Cooperating Ass'n v. Monaghan*, 188 F.2d 906 (9th Cir. 1951)............. 4
*Miller v. U.S.*, 363 F.3d 999 (9th Cir. 2004) ...................................................................... 8
*S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003)......................................... 4, 15
*Spiegel, Inc. v. F.T.C.*, 540 F.2d 287 (7th Cir. 1976)............................................................ 17
*Union Pac. R.R. v. Chi., Milwaukee, St. Paul & Pac. R.R.*, 549 F.2d 114 (9th Cir.1976)............... 4

**UNITED STATES DISTRICT COURT CASES**

*Gerlinger v. Amazon.com, Inc.*, 311 F. Supp. 2d 838 (N.D. Cal. 2004) ....................................... 15
*Guadagno v. E\*TRADE Bank*, 592 F. Supp. 2d 1263 (C.D. Cal. 2008)........................................ 16
*Hutchinson v. AT&T Internet Servs., Inc.*, No. CV07-3674 SVW (JCx), 2009 WL 1726344 (C.D.
    Cal. May 5, 2009)................................................................................... 11, 12, 14
*Janda v. T-Mobile, USA, Inc.*, No. C 05-03729, 2009 WL 667206 (N.D. Cal. Mar. 13, 2009) ..... 18
*Malcolm v. JPMorgan Chase Bank, N.A.*, No. 09-4496-JF (PVT), 2010 WL 934252 (N.D. Cal.
    Mar. 15, 2010)................................................................................................. 15
*Ruwe v. Cellco P'ship*, 613 F. Supp. 2d 1191 (N.D. Cal. 2009)......................................... 13-14
*Seraphin v. SBC Internet Servs., Inc.*, No. CV 09-131-S-REB, 2010 WL 1326820 (D. Idaho Mar.
    29, 2010).......................................................................................................... 12
*Speigler v. Home Depot U.S.A., Inc.*, 552 F. Supp. 2d 1036 (C.D. Cal. 2008) ............................. 17
*Walter v. Hughes Commc'ns, Inc.*, 682 F. Supp. 2d 1031 (N.D. Cal. 2010) ................................. 16

**STATE SUPREME COURT CASES**

*Blank v. Borden*, 11 Cal.3d 963 (Cal. 1974) ...................................................................... 12
*Garrett v. Coast & S. Fed. Sav. & Loan Ass'n*, 511 P.2d 1197 (Cal. 1973) ............................ 11, 12
*Nedlloyd Lines B.V. v. Superior Court*, 834 P.2d 1148 (Cal. 1992) .......................................... 16
*Perdue v. Crocker Nat'l Bank*, 38 Cal. 3d 913 (Cal. 1985) .................................................... 14
*Trimble v. N.Y. Life Ins. Co.*, 255 N.Y.S. 292 (1932) ......................................................... 4

**STATE COURT OF APPEALS CASES**

*Daugherty v. Am. Honda Motor Co.*, 51 Cal. Rptr. 3d 118 (Cal. Ct. App. 2006)........................... 18
*Morris v. Redwood Empire Bancorp*, 27 Cal. Rptr. 3d 797 (Cal. Ct. App. 2005) ........................ 14
*Oceanside 84, Ltd. v. Fid. Fed. Bank*, 66 Cal. Rptr. 2d 487 (Cal. Ct. App. 1997) ......................... 8
*Trend Homes, Inc. v. Superior Court*, 131 Cal. App. 4th 950 (2005) ....................................... 16
*People v. Casa Blanca Convalescent Homes Inc.*, 206 Cal. Rptr. 164 (Cal. Ct. App. 1984) ........ 17

**FEDERAL STATUTES, RULES AND REGULATIONS**

28 U.S.C. § 1404 ........................................................................................................ 1
Fed. R. Civ. P. 12(d)................................................................................................. 10

**CALIFORNIA STATUTES, RULES AND REGULATIONS**

Cal. Civil Code § 1671 ........................................................................................ 3, 11
California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et. seq* ............................ 3

**OTHER SOURCES**

1 Williston on Contracts § 4:13, at 365 (4th ed.1990) .............................................. 4
11 Williston on Contracts § 31:5, at 299 (4th ed.1999) ............................................ 9
Plaintiffs' Fee Schedule, URL https://us.etrade.com/e/t/estation/pricing?id= 1209080000#__ (last visited July 5, 2010)…………........................................................................ 7
Web Print Out, URL http://web.archive.org/web (last visited June 11, 2010) ................ 5

## INTRODUCTION

This case challenges Defendant E*Trade Securities LLC's ("E*Trade") practice of imposing fees on its customers that its customers literally did nothing to incur. Indeed, E*Trade charged a $40.00 "inactivity" fee for each fiscal quarter where an E*Trade brokerage account customer neglected to use his or her E*Trade account to make at least one trade. The Amended Complaint alleges that E*Trade had no right – contractual or otherwise – to impose or collect such fees and that, irrespective of any contract, the charges are improper penalties under California law.

E*Trade disagrees and has moved for dismissal.[1] Denigrating the Plaintiffs' claims as "frivolous" and "simple," E*Trade argues this Court may "easily dismiss" the case because it purportedly had the contractual authority to charge the inactivity fees. In doing so, E*Trade goes well beyond the pleadings and asserts that Plaintiffs Roling and Landvater (collectively the "Plaintiffs") rely on the wrong fee schedule in laying out their claims. The applicable fee schedule, according to one of E*Trade's lawyers, is the Main Street Investor Schedule ("MSI Schedule")—a document that was supposedly located somewhere on one of E*Trade's websites and "in effect during all relevant periods in this lawsuit." (Decl. of Atty. Whitty Somvichian ("Somvichian Decl.") Dkt. 21 ¶ 3.) Based on that, and a handful of mundane alternative arguments, E*Trade asserts that none of the Plaintiffs' claims can withstand Rule 12(b)(6).

E*Trade is mistaken. Ninth Circuit precedent prohibits the way E*Trade structured and supposedly modified its fee schedule to include the inactivity fees. Put simply, companies are not allowed to post contracts on their websites and require their customers to constantly check in for changes. In any case, to the extent E*Trade attempted to change its schedule, E*Trade fails to show it ever notified the Plaintiffs of such changes or that the Plaintiffs ever accepted them. Furthermore, E*Trade ignores the coercive purpose of the inactivity fees—no rational customer would choose a $40 inactivity fee over a $12.99 trade. Ultimately, the allegations of the Complaint warrant a denial of E*Trade's Motion to Dismiss in its entirety.

---

[1] Despite repeatedly calling this case "frivolous," E*Trade has also moved to transfer venue to New York under 28 U.S.C. § 1404, a request that this Court should deny for the reasons set forth in Plaintiffs' concurrently filed Opposition to E*Trade's Motion to Transfer.

Pls. Opp. to E*Trade's Rule 12(b)(6) Mot. to Dism.
Case No.: 3:10-cv-00488-MHP

1

**STATEMENT OF FACTS**

Though E*Trade seeks to re-write the facts, the Amended Complaint alleges as follows: Plaintiffs Roling and Landvater each opened E*Trade brokerage accounts, in 1999 and 2006 respectively, for the purchase of various stocks and securities. (Amd. Compl. ¶¶ 9-10, Dkt. 14.) Each Plaintiff started by depositing $1,000 in his account. (Amd. Compl. ¶¶ 9-10.) Upon account activation, the Parties entered into a contract – the E*Trade "Brokerage Customer Agreement" – that E*Trade maintains on its website. (Amd. Compl. ¶ 3; *see also* Amd. Compl. Ex. A.)

E*Trade's Brokerage Customer Agreement provides that E*Trade may charge certain fees and states: "A schedule of the current fees and commissions is available on the E*TRADE Securities Web site. E*TRADE Securities may modify the fee structure at any time by posting a modified schedule on its Web site." (Amd. Compl. ¶ 3.) It is unclear from the Brokerage Customer Agreement which fee schedule (among many one stumbles across on E*Trade's website) is the "current" or "available" schedule, or where any "modified schedule" is supposedly "posted"—E*Trade fails to provide any hyperlink to connect the Brokerage Customer Agreement to the applicable fee schedule and instead leaves customers to search for it. (Amd. Compl. ¶ 3.)

At some point, E*Trade began charging the Plaintiffs quarterly fees for "inactivity." (Amd. Compl. ¶¶ 17, 26, 44.) E*Trade provided no notice to either Plaintiff of this change. (Amd. Compl. ¶ 48.) Rather, the Plaintiffs first learned that E*Trade was assessing inactivity fees when they signed into their online accounts via E*Trade's website. (Amd. Compl. ¶¶ 22, 27.) For Plaintiff Roling, E*Trade had even sold his shares to pay itself the fees it claimed were purportedly due. (Amd. Compl. ¶ 22.) When the Plaintiffs contacted E*Trade to complain, E*Trade's representatives stated they were allowed under their customer agreement to impose such fees. (Amd. Compl. ¶¶ 22, 28.)

*The Plaintiffs' Fee Schedule*

Plaintiffs allege that at all times relevant, E*Trade posted and made available a current fee schedule (the "Plaintiffs' Fee Schedule") that expressly prohibited E*Trade from assessing inactivity fees. (Amd. Compl. ¶ 4, Ex. A.) E*Trade disputes that the Plaintiffs' Fee Schedule

Pls. Opp. to E*Trade's Rule 12(b)(6) Mot. to Dism.
Case No.: 3:10-cv-00488-MHP

2

1    applies and, instead, asserts a different schedule called the Main Street Investor Schedule ("MSI

2    Schedule") was the operative schedule.  (Def. Mot. 4, Dkt. 20.)  As explained throughout this

3    brief, E*Trade fails to substantiate this position, and this Court should either reject E*Trade's

4    assertion outright or order discovery on the issue.

5    *Plaintiffs' Alternative Claims*

6           Alternatively, Plaintiffs allege that the way E*Trade structured its fee schedule was

7    improper insofar as it purports to allow E*Trade to change its terms whenever E*Trades feels like

8    it.  (Amd. Compl. ¶ 55.)  In the event no fee schedule applies, Plaintiffs allege E*Trade has been

9    unjustly enriched by its retention of the fees and should be required to cease charging the fees[2] and

10   make restitution.  (Amd. Compl. ¶ 56.)  Additionally, Plaintiffs allege that even if E*Trade was

11   allowed to charge some amount of inactivity fees, the $40.00 quarterly charges amount to

12   excessive penalties under Cal. Civil Code § 1671.  (Amd. Compl. ¶¶ 59-66.)  Plaintiffs further

13   allege that the charges violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §

14   17200, *et. seq* (the "UCL").  (Amd. Compl. ¶¶ 67-84.)  As explained below, these allegations

15   survive E*Trade's Motion to Dismiss.

16                                         **ARGUMENT**

17          Although it labels its filing a "Motion to Dismiss," in reality E*Trade seeks summary

18   judgment[3] on some of the central issues of this lawsuit—which fee schedule, if any, applied to the

19   Plaintiffs and the putative class members and whether E*Trade's inactivity fees were unlawful

20   penalties.  E*Trade's arguments are untenable.  Ninth Circuit precedent prohibits the enforcement

21   of contracts that companies simply post online and change – without notice to or acceptance by

22   their customers – at their whim.  Further, even if E*Trade were able to structure its contract the

23   way that it did, E*Trade has failed to show, under either Rule 12(b)(6) or Rule 56, that the MSI

24   _____

     [2]       Two days following the filing of this lawsuit, E*Trade announced it was discontinuing its
25   inactivity fees for all brokerage account customers.  (*See* Decl. of Attorney Rafey Balbanian
     ("Balabanian Decl." ¶ 3.) a true and accurate copy of which is attached hereto as Ex. A.)
     [3]       Unless a court converts a Rule 12(b)(6) motion into a motion for summary judgment, a
26   court cannot consider material outside of the complaint (*e.g.,* facts presented in briefs, affidavits,
     or discovery materials).  *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.* 102 F.3d 1524,
27   1537 (9th Cir.1996), *rev'd on other grounds sub nom Lexecon, Inc. v. Milberg Weiss Bershad
     Hynes & Lerach,* 523 U.S. 26 (1998).

28

Schedule would apply instead of the Plaintiffs' Fee Schedule. The Plaintiffs' Fee Schedule does not, unambiguously or otherwise, limit its scope to former Brown Co. customers, and E*Trade does not show that the MSI Schedule ever applied to either Plaintiff. Alternatively, even if E*Trade had shown that the MSI Schedule applied to the Plaintiffs, which it has not, the fees are coercive and function only to compel customers to make trades and their imposition violates the UCL's unlawful, unfair and fraudulent prongs. As none of E*Trade's arguments warrant dismissal, this Court should deny E*Trade's Motion to Dismiss in its entirety.

## I.     THE BROKERAGE CUSTOMER AGREEMENT IMPROPERLY PURPORTS TO ALLOW E*TRADE TO CHANGE KEY TERMS WITHOUT NOTICE.

As a threshold matter, E*Trade's argument that the MSI Schedule permitted it to charge inactivity fees lacks merit because the agreement improperly purports to allow E*Trade to make changes whenever it wants. "[A] contract that allows one party to unilaterally rewrite central terms is not a contract at all." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 894 (9th Cir. 2003). Where a company maintains its customer agreement on its website, consumers have no "obligation to check the terms on a periodic basis to learn whether they have been changed by the other side." *Douglas* v. *U.S. Dist. Court for Cent. Dist. Of Cal.*, 495 F.3d 1062, 1066 (9th Cir. 2008). This is because "a party can't unilaterally change the terms of a contract; it must obtain the other party's consent before doing so." *Id.* (*quoting Union Pac. R.R. v. Chi., Milwaukee, St. Paul & Pac. R.R.* 549 F.2d 114, 118 (9th Cir.1976)). As the *Douglas* court explained:

> A revised contract is merely an offer and does not bind the parties until it is accepted. *Matanuska Val Farmers Cooperating Ass'n v. Monaghan,* 188 F.2d 906, 909 (9th Cir. 1951). And generally "an offeree cannot actually assent to an offer unless he knows of its existence." 1 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 4:13, at 365 (4th ed.1990); *see also Trimble v. N.Y. Life Ins. Co.,* 234 A.D. 427, 255 N.Y.S. 292, 297 (1932) ("An offer may not be accepted until it is made and brought to the attention of the one accepting.")

495 F.3d at 1066. In *Douglas*, the plaintiff alleged that his long distance carrier posted a revised contract on its website adding new service charges and other provisions without notifying him that the contract had changed. *Id.* Holding that the changes were unenforceable, the court reasoned that the failure to provide notice placed an unfair burden on the Plaintiff to visit the website every day and examine the contract for possible changes. *Id.* at 1069, n. 1.

The same is true here. E*Trade's Brokerage Customer Agreement requires the Plaintiffs to constantly monitor the site for changes, stating: "E*TRADE Securities may modify the fee structure at any time by posting a modified schedule on its Web site." (Amd. Compl. ¶ 3.) Compounding the problem is that E*Trade provides no hyperlink to the fee schedule and instead forces customers to "go fish" for it.[4] (Amd. Compl. ¶ 3.) Plaintiffs allege that insofar as E*Trade modified its fee schedule to include inactivity fees, it failed to give them notice or the ability to reject the proposed changes. (Amd. Compl. ¶¶ 17, 26, 44, 48.) To be sure, the putative addition of the fees was material, requiring the Plaintiffs to transform from passive investors to active traders. Under this scheme, the burden on customers is too onerous to enforce. Thus, similar to the contract changes in *Douglas*, E*Trade's attempt to add inactivity fees plausibly failed. *See* 495 F.3d at 1066-69.

## II. IN ANY CASE, THE PRESENT RECORD IS INSUFFICIENT TO ALLOW THE COURT TO CONCLUDE THAT THE MSI SCHEDULE, AS OPPOSED TO THE PLAINTIFFS' FEE SCHEDULE, APPLIED TO THE PLAINTIFFS OR THE PUTATIVE CLASS MEMBERS AS A MATTER OF LAW.

Assuming for the sake of argument that E*Trade was allowed to structure its website agreement so that it could require customers to constantly check for changes – which it could not – dismissal remains inappropriate because E*Trade has failed to show that the MSI Schedule, as opposed to the Plaintiffs' Fee Schedule, applied to the Plaintiffs and the putative class members. E*Trade makes two arguments: First, E*Trade argues that the Plaintiffs' Fee Schedule applies only to former customers of Brown Co. Second, E*Trade asserts that the MSI Schedule was the schedule in effect at all times. Neither argument has merit.

---

[4] This is especially cumbersome given that E*Trade apparently changes its website every few days. According to the Internet Archive WayBack Machine, which stores historical information about dates that website addresses experience changes (URL http://web.archive.org/web), E*Trade's website has been modified **751** times since Plaintiff Roling activated his account in 1999 and **194** times since Plaintiff Landvater opened his account in 2006. (*See* Web Print Out, URL http://web.archive.org/web (last visited June 11, 2010) a copy of which is attached as Ex. 1 to the Balabanian Decl., Ex. A hereto.) Without any information regarding the substance of these changes, the number related to the Brokerage Agreement, or the type of any notice provided, the record simply cannot support dismissal.

**A.** **Contrary To E\*Trade's Assertions, This Court Cannot Conclude As A Matter Of Law That The Plaintiffs' Fee Schedule – Which Is Current, Available, And Posted On E\*Trade's Website – Applies Only To Former Brown Co. Customers.**

Seizing upon a single sentence that indicates *some* of the terms in the Plaintiffs' Fee Schedule apply to former customers of Brown Co., E\*Trade argues that the Plaintiffs' Fee Schedule applies *only* to former Brown Co. customers. (Def. Mot. 2.) Because neither Plaintiff was a former Brown Co. customer, so E\*Trade asserts, this Court should refuse to consider it at all. This argument falls apart. E\*Trade's website search "leads" customers to the Plaintiffs' Fee Schedule which is not limited to former Brown Co. customers.

**1.** **E\*Trade's website is designed to lead customers, if anywhere, to the Plaintiffs' Fee Schedule.**

As explained above, the Brokerage Customer Agreement provides that the relevant fee schedule is available, posted and current on E\*Trade's website. Because E\*Trade fails to provide any hyperlink to what it considers the current fee schedule, customers must scour the website for it. (Amd. Compl. ¶ 3.) E\*Trade's website search tool readily leads brokerage account customers to the Plaintiff's Fee Schedule (along with several additional fee schedules), which is undeniably current, available and posted on the E\*Trade website.[5] Accordingly, a customer charged for his or her inactivity who searches for the fee schedule that is currently available or posted on E\*Trade's website will happen upon the Plaintiffs' Fee Schedule.

**2.** **Plaintiffs' Fee Schedule does not restrict its application solely to former Brown Co. customers.**

Unable to challenge that the Plaintiffs' Fee Schedule was current, available and posted on

---

[5] For example, a search for the term "inactivity fee" produces 16 search results—none of which mention Brown Co. or link to the MSI Schedule. (*See* "Search Results" a true and accurate copy of which is attached hereto as Ex. 2 to the Balabanian Decl., Ex. A hereto.) Rather, the first result is a hyperlink labeled "View Commissions and Fees," that includes the following preview:

View Commissions & Fees -- Forms & Applications
. 1 No Minimum Transaction Requirement There are no minimum transaction requirements; you can trade as often or as infrequently as you like. No *Inactivity Fees* E\*TRADE Securities will not charge *fees* when your account is *inactive* for a period of time. (Emphasis in original.)

No mention of Brown Co. is contained in the search results, the hyperlink, or the preview, nor is there any indication the link applies only to Brown Co. customers. (Balabanian Decl., Ex. 2.)

1    E*Trade's website as required by the Brokerage Customer Agreement, E*Trade argues that the

2    schedule itself makes clear that it applies only to former Brown Co. customers.  (Def. Mot. 5.)

3    According to E*Trade, the sentence "As a ***former Brown Co. customer***,[6] you qualify for special

4    stock, options, mutual fund commissions and margin rate plans," appearing on the "first page"[7] of

5    the Plaintiffs' Fee Schedule, limits the schedule to former Brown Co. customers.  (Def. Mot. 5.)

6         E*Trade takes the statement entirely out of context.  Although the language pertaining to

7    Brown Co. customers appears on the first page, the sentence's placement actually demonstrates

8    that it is limited to the subheading "Brown Co Special Pricing."  (Def. Mot. 5.)  Above the

9    sentence, at the top of the Plaintiffs' Fee Schedule, is written "View Commissions & Fees", under

10   which appears:  "An E*TRADE Securities brokerage account offers outstanding value.  In

11   addition to low commissions, you get valuable free features like unbiased research, real-time

12   quotes, personal service seven days a week, and more."  (Amd. Compl. Ex. B (Dkt. 14-2).)  No

13   mention is made at the top of the page about Brown Co. customers whatsoever, let alone a

14   statement limiting the document to such customers as would support a restricted interpretation.

15        Brown Co. is not mentioned at all until the viewer scrolls past the heading "Transaction

16   Pricing" which, given the font and style of type used (white type against a gray banner

17   background), appears to cover five distinct sub-headings of equal prominence (i.e., all using the

18   same light gray font, size, style and print type).  "Brown Co Special Pricing" is one of these sub-

19   headings, along with Complex Options, Global Trading, Mutual Funds, and Bonds.  (Amd.

20   Compl. Ex. B (Dkt. 14-2).)  The sentence about former Brown Co. customers appears directly

21   underneath the "Brown Co Special Pricing" subheading and is limited to that subheading.

22   Nothing indicates that the information found under the "Brown Co Special Pricing" subheading –

23

24   [6]    Though perhaps attributable to mere inadvertence, E*Trade fails to properly state
     "Emphasis supplied" or similar language, when it uses italic and bold-face type for the phrase
25   "former Brown Co. customer" in its brief when quoting the Plaintiffs' Fee Schedule.  This is
     misleading given that the actual wording contained in the Plaintiffs' Fee Schedule that appears
26   online (the version customers supposedly see) uses no italics or noticeable emphasis.  The
     importance of font use, color, and text style on the webpage cannot be overstated.
27   [7]    The Plaintiffs' Fee Schedule as displayed at URL https://us.etrade.com/e/t/estation/
     pricing?id=1209080000#__ (last visited July 5, 2010) provides full details of the placement, color
28   type, font and style of the various headings used on the Plaintiffs' Fee Schedule webpage.

which sets forth special pricing for Brown Co customers – applies to the information in the other subheadings or that the information provided under the other subheadings (Complex Options, Global Trading, Mutual Funds and Bonds) applies to former Brown Co. customers at all. (Amd. Compl. Ex. B (Dkt. 14-2).)

Similar to the umbrella heading "Transaction Pricing," three other headings appear as one scrolls down the webpage[8]: Margin Rates, Account Activity Fees, and Special Request Fees. The prohibition on charging inactivity fees appears under the umbrella heading Account Activity Fees. (*See* Amd. Compl. Ex. B (Dkt. 14-2).) ("No inactivity fees. E*TRADE Securities will not charge fees when your account is inactive for a period of time.") None of these other umbrella headings contain any text mentioning former Brown Co. customers. Hence, it is by no means "clear" or "unambiguous" that the single phrase pertaining to former Brown Co. customers applies to the entire document. If anything, the opposite conclusion is more reasonable—the statement about Brown Co. customers applies only to the text under the "Brown Co Special Pricing" subheading.[9]

To be sure, E*Trade could have drafted the Plaintiffs' Fee Schedule so that it expressly stated "This Fee Schedule Applies Only to Former Brown Co. Customers." Those words do not appear anywhere. Likewise, E*Trade could have named the schedule "Former Brown Co Customers Commissions & Fees" or otherwise referenced the Brown Co. acquisition.[10] There are countless ways E*Trade could have drafted the Plaintiffs' Fee Schedule so that it applied only to former Brown Co. customers. It failed to do so, and this Court should decline to re-write the

---

[8] Links also appear at the very top of the page allowing users to jump directly to "Transaction Pricing," "Margin Rates," "Account Activity Fees, and "Special Request Fees," making the connection between these headings and any reference to Brown Co. even more tenuous. (*See* Amd. Compl. Ex. B (Dkt. 14-2).)

[9] Even though it appears the Plaintiffs' Fee Schedule is not limited to former Brown Co customers, the fact finder could ultimately conclude that the Parties' competing interpretations are both reasonable. In that case, the Plaintiffs' Fee Schedule would be ambiguous in its applicability. *See Comedy Club, Inc. v. Improv West Assocs.*, 553 F.3d 1277, 1285 (9th Cir. 2009) ("[I]f a contract is capable of two different reasonable interpretations, the contract is ambiguous."); *see also Oceanside 84, Ltd. v. Fid. Fed. Bank,* 66 Cal. Rptr. 2d 487, 492 (Cal. Ct. App. 1997). Given that E*Trade drafted and designed its website, the documents would necessarily be construed against E*Trade. *Miller v. U.S.*, 363 F.3d 999, 1005-06 (9th Cir. 2004). Because such a determination is better left for summary judgment or trial, at this point in the litigation it suffices to say that Rule 12(b)(6) dismissal is inappropriate.

[10] It is worth noting that the URL for Plaintiffs' Fee Schedule contains no apparent reference to Brown Co. customers whatsoever.

1  contract to provide supposedly missing clarity.  *See Gilliam v. Nevada Power Co.*, 488 F.3d 1189,

2  1195 (9th Cir. 2007) (*citing* 11 Williston on Contracts § 31:5, at 299 (4th ed.1999)) (Courts "may

3  not make a new contract for the parties or rewrite their contract. . . .").

4        Accordingly, E*Trade is incorrect when it argues that this Court may, as a matter of law,

5  find that the Plaintiffs' Fee Schedule does not apply to them because they were not former Brown

6  Co. customers.  To the contrary, E*Trade's website is set up so that ordinary customers find the

7  Plaintiffs' Fee Schedule which is at best ambiguous with respect to whether it applies strictly to

8  former Brown Co. customers.  This Court should therefore reject E*Trade's arguments for

9  dismissal premised on the grounds that the Plaintiffs' Fee Schedule cannot apply to the Plaintiffs.

10  **B.  E*Trade Fails To Establish That The MSI Schedule Ever Applied So As To Bind Either Plaintiff.**

11
12        In its attempt to show that the Plaintiffs' Fee Schedule is inapplicable, E*Trade asserts that

13  a different schedule, the MSI Schedule, governs the Plaintiffs' accounts.  E*Trade argues that this

Court may consider the MSI Schedule because "it is an integral part of E*TRADE's Customer

14  Agreement."  (Def. Mot. 4.)  This argument fails because the "incorporation by reference"

15  doctrine cannot be used as a basis for considering the MSI Schedule here.  *See Knievel v. ESPN*,

16  393 F.3d 1068 (9th Cir. 2005) ("Incorporation by reference" doctrine only allows consideration of

17  documents "whose contents are alleged in a complaint and whose authenticity no party questions,

18  but which are not physically attached to the [plaintiff's] pleading.") (*citing In re Silicon Graphics*

19  *Inc. Sec. Litig.,* 183 F.3d 970, 986 (9th Cir.1999) (internal quotations omitted)).  As Plaintiffs

20  dispute whether the Brokerage Customer Agreement refers to the MSI Schedule[11] as opposed to

21  the Plaintiff's Fee Schedule, the incorporation by reference doctrine cannot be used to substantiate

22  the conclusion at the pleadings stage that it was the operative schedule.

23        To the extent that E*Trade seeks to verify or authenticate the applicability of the MSI

24  Schedule by submitting the Declaration of Whitty Somvichian (one of E*Trade's attorneys at the

25  Cooley LLP law firm who swears that the MSI Schedule was "in effect during all relevant periods

26
27  [11]    To be sure, the Brokerage Customer Agreement makes no reference to any "Main Street Investor Schedule" and searching "main street investor schedule" on E*Trade's website produces no search results leading to the MSI Schedule.  (Balabanian Decl. ¶ 6.)

28

in this lawsuit," (Somvichian Decl. ¶ 3)) its attempt fails.[12]  First, attorney Somvichian's statement

that the MSI Schedule was "in effect" is a legal conclusion that deserves little deference.  *See*

*Evangelista v. Inlandboatmen's Union of Pac.*, 777 F.2d 1390, 1398 n. 3 (9th Cir. 1985).  Second,

attorney Somvichian says nothing about the MSI Schedule's current availability, whether

modifications were ever posted, or the manner of notice.[13]  He never discloses how a customer is

supposed to locate the MSI Schedule—the version he attaches does not even provide a full URL

address.  Put simply, he fails to provide any other facts that would substantiate his statement.

     Without such details, this Court should exclude his testimony or require that he sit for a

deposition to provide these details.[14]  *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule

12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the

motion must be treated as one for summary judgment under Rule 56.  All parties *must* be given a

reasonable opportunity to present all the material that is pertinent to the motion.") (emphasis

added).  Dismissal at this point would be without sufficient support.

     In the end, Ninth Circuit precedent generally prohibits the use of internet contracts that

change without notice and push the burden onto the customer to constantly monitor a website.

Even if E*Trade could overcome this hurdle, it has failed to show that the MSI Schedule, and not

the Plaintiffs' Fee Schedule, would apply to the Plaintiffs.  The Plaintiffs' Fee Schedule is not

restricted to former Brown Co. customers as a matter of law.  Moreover, neither the "incorporation

by reference" doctrine nor Mr. Somvichian's conclusory assertions allow this Court to conclude

---

[12]    Again, in support of its Motion to Transfer only, E*Trade has filed the Declaration of John Matos, an E*Trade employee who also verifies that the MSI Schedule applied to Plaintiffs.  (Dkt. 25.)  Mr. Mato's allegations similarly lack any explanation for how the MSI Schedule applies.  In complying with this Court's prohibition on discovery prior to the CMC, Plaintiffs have been unable to question Mr. Matos regarding his declaration as well.

[13]    Likewise, attorney Somvichian's reference to portions of E*Trade's Form 10-K for 2005 say nothing about any activity fees or the applicable fee schedule, but merely indicate Brown Co. customers would get non-specific "grandfathered . . . trade pricing." (Somvichian Decl., Dkt. 21.)

[14]    On June 4, 2010, counsel for Plaintiffs issued a subpoena for deposition to attorney Somvichian regarding his declaration.  (Dkt 31-1.)  In response, E*Trade filed a Motion to Quash.  (Dkt. 30.)  On June 22, 2010, this Court issued an email notice through the Courtroom Deputy to the parties stating that no discovery subpoenas would be allowed prior to the July 26, 2010 case management conference.  Without the details surrounding the MSI Schedule's implementation and various modifications, the record is insufficient to conclude the MSI Schedule was in effect during "all times relevant."

that the MSI Schedule applies in this case.  At this stage of the proceedings it is plausible that E*Trade lacked the contractual authority to charge the inactivity fees and which schedule applied is an issue of fact.  Accordingly, E*Trade's Motion to Dismiss should be denied.

**III.    IN ANY CASE, E*TRADE'S CHARGING OF A $40.00 QUARTERLY "INACTIVITY FEE" REQUIRES THAT THE PLAINTIFFS MAKE AT LEAST ONE TRADE EACH QUARTER AND IMPOSES AN UNLAWFUL PENALTY UNDER CALIFORNIA CIVIL CODE § 1671.**

E*Trade argues that the $40.00 inactivity fee does not violate Cal. Civ. Code § 1671's prohibition on liquidated damages because the contract does not "require customers to have trades" to support a breach of contract and because the fees merely represent an alternative method of performance.  (Def. Mot. 9.)  E*Trade's analysis falls apart.  E*Trade ignores the coercive purpose of its inactivity fees and the authority it cites fails to support its arguments.  Ultimately, even if E*Trade was able to show that the MSI Schedule applied and allowed it to charge *some* amount of inactivity fees, the fees are excessive and prohibited penalties under California law.

**A.    E*Trade fails to show that the inactivity fees are a rational alternative method of performance as opposed to an inferior and coercive penalty.**

As an initial matter, E*Trade cannot escape liability under Section 1671 merely by classifying the inactivity fees as "fees" as opposed to – as alleged in the pleadings (Amd. Compl. ¶ 61) – a penalty for breach of a contractual provision requiring customers to make trades each quarter.  *Citing Garrett v. Coast & S. Fed. Sav. & Loan Ass'n,* 511 P.2d 1197, 1201-02 (Cal. 1973) ("We have consistently ignored form and sought out the substance of arrangements which purport to legitimate penalties and forfeitures…[as to do otherwise] would be to condone a result which, although directly prohibited by the Legislature, may nevertheless be indirectly accomplished through the imagination of inventive minds."); *see also Hutchinson v. AT&T Internet Servs., Inc.*, No. CV07-3674 SVW (JCx), 2009 WL 1726344 (C.D. Cal. May 5, 2009).

Rather than look at labels, the Court must determine the inactivity fees' true function— whether they act as a coercive penalty or whether they merely provide an alternative means of performance.  *See Id.* at *3 ("If the Court finds that the [fee's] true function was as an alternative performance provision, then Section 1671 would be inapplicable."); *see also Garrett*, 511 P.2d at

1200-01; *Blank v. Borden*, 11 Cal.3d 963 (Cal. 1974). The central question is whether, at the time the contract is formed, the fees provide "a true option or alternative" and a "realistic and rational choice" as to how the party may perform, or, on the other hand, if "one mode of performance had been clearly inferior to the other at the time of the contract, and had existed merely to coerce the owner to choose the first mode" such that "the element of rational choice would have been lacking." *Hutchinson*, 2009 WL 1726344 at *4 (*citing Blank*, 11 Cal. 3d at 971 n. 7).

*Hutchinson* is instructive. 2009 WL 1726344 at *4. In that case, the Court found Section 1671 inapplicable to a $200 early termination fee ("ETF") in a contract for internet services because the provision gave customers two realistic and rational ways of performing. *Id.* Customers could either: "1) retain the full year of service for approximately $40 a month, or 2) retain service for less than a year and pay the monthly rate for the service received in addition to the $200 ETF." *Id.* at *5. Critical to this finding was the fact that:

> Plaintiffs could foresee, at the time of the contract, rationally choosing either performance option depending on the particular circumstances before it. Furthermore, Plaintiffs could view having the choice presented by the Agreement as potentially reducing their contractual obligation just as probably, if not more probably, than potentially increasing it. If Plaintiffs desired to end their service early in the year, after only three months for example, they could choose to do so and pay the ETF, resulting in an approximately $160 reduction in their obligation. On the other hand, if Plaintiffs desired to cancel their service more than approximately seven months into the year, as Plaintiffs ultimately did, they could only do so at the cost of increasing their contractual obligation. The fact that Plaintiffs ultimately found themselves in the latter situation does not alter the fact that, at the time of the Agreement, the ETF presented a potentially rational and beneficial option for performance.

*Id.* Hence, because it was possible that canceling and paying the ETF could actually benefit the customer, the ETF was not a "mode of performance [that] would be at all or at most times inferior"—it was a legitimate and rational alternative means of performing under the agreement. *Id.*; *cf. Seraphin v. SBC Internet Servs., Inc.*, No. CV 09-131-S-REB, 2010 WL 1326820, at *4 (D. Idaho Mar. 29, 2010) (distinguishing *Hutchinson* and finding "the $200 ETF in the present case was *always* more than the remaining payments under Seraphin's term commitment, even if he cancelled in the first month of his twelve month commitment. Thus, the parties here did not enter

Pls. Opp. to E*Trade's Rule 12(b)(6) Mot. to Dism.
Case No.: 3:10-cv-00488-MHP

12

"into an agreement wherein alternative modes of performance were stipulated that could each benefit either party depending on subsequent circumstances.")

Applying these principles to the instant case exposes the inactivity fees as coercive. It is never a rational choice for the Plaintiffs. Even if the inactivity fees were in effect when the Plaintiffs opened their accounts,[15] both Plaintiffs allege that they started with $1,000. (Amd. Compl. ¶¶ 16, 25.) The cost of making a trade – buying or selling shares of stock – is only $12.99 plus the customer actually gains the value of the shares. (Amd. Compl. ¶ 65.) The cost of failing to make a trade, on the other hand, is $40.00 each quarter, (or 4.00% a quarter and 16% for the year) and the value of the shares is lost. No one who knew of the inactivity fees would ever forfeit such a large percentage of their money when the alternative was a $12.99 trade. This is even more apparent if the Court accepts E*Trade's assertion that a customer may avoid the fee by using his or her account to make at least two bill payments, a costless option. When coupled with the fact that E*Trade ultimately collects the inactivity fees by liquidating the customer's account, it is more than plausible that this was not "an agreement wherein alternative modes of performance were stipulated that could each benefit either party depending on subsequent circumstances." Only E*Trade can benefit. At the very least, this Court cannot conclude as a matter of law on the present record that Section 1671 does not apply.

**B.    None of E*Trade's authorities suggest paying the inactivity fees presented a rational choice to customers.**

E*Trade's cases are inapposite. In *Ruwe v. Cellco P'ship*, 613 F. Supp. 2d 1191, 1196 (N.D. Cal. 2009), Judge White found that a "reconnect fee" imposed on mobile phone customers who sought reinstatement of their suspended accounts (their accounts having been suspended in response to repeated late payments) could constitute a prohibited penalty. Rejecting the argument that no breach had triggered the fee – since the fee was only levied when a customer requested reinstatement – the Court, relying on *Garrett*, found that "the most prudent approach is to ascertain

---

[15]    Because Plaintiffs allege that E*Trade did not charge inactivity fees when they activated their accounts (Amd. Compl. ¶¶ 17, 26, 44) and that, insofar as E*Trade supposedly modified its fee schedule at some point to include inactivity fees, it failed to give them notice of the changes, (Amd. Compl. ¶ 48) it cannot be said that Plaintiffs were provided a "realistic and rational choice" *at the time the contract was formed*. They were provided no choice whatsoever.

the substance of the parties' arrangements. In sum, Plaintiffs have sufficiently alleged that the reconnect fee is triggered by breach." *Id*. Similarly, in substance E*Trade has imposed a requirement on customers to either make trades (or, accepting E*Trade's assertion, use their accounts to pay bills) and the failure to do so is a breach that results in stiff penalties.

*Morris* likewise offers no help to E*Trade. In that case, the plaintiff's contract indicated the charge at issue was inevitable. *Morris v. Redwood Empire Bancorp*, 27 Cal. Rptr. 3d 797, 803 (Cal. Ct. App. 2005) ("[T]he fee is merely a deferred charge attended to initiating the account."). Unlike here, there was no supposed choice at issue to examine. Hence, the fee's "inevitability [took] the provision out of the realm of liquidated damages." *Id*. E*Trade's inactivity fees are not inevitable as the customer may avoid them by electing a clearly superior method of performance.

Finally, the case of *Perdue v. Crocker Nat'l Bank*, 38 Cal. 3d 913, 931-32 (Cal. 1985) does not suggest dismissal is appropriate either. The *Hutchinson* court rejected a similar argument that *Perdue* had dispensed with *Garrett's* "true function" test, explaining:

> It seems highly unlikely that the California Supreme Court intended to reverse its holding in *Garrett* without any explanation. The better view, supported by the language of *Perdue,* is that the court did not intend to repudiate its earlier decisions in *Garrett* or *Blank,* but simply concluded that, in light of the clear lower court authority on the issue before it, the searching analysis outlined in *Garrett* was not required. *Morris* recognized as much in its actual review of the credit card termination fee at issue, which sought to determine the termination fee's true function in light of the overall agreement.

2009 WL 1726344 at *4. Hence, *Perdue* did not do away with the requirement that the analysis should focus on the actual substance of the fees at issue, it avoided the issue altogether.

Try as it may, E*Trade has failed to show as a matter of law that the inactivity fees are not prohibited by Section 1671. To the contrary, the fees are highly coercive and, had E*Trade provided proper notice to the Plaintiffs of their existence, neither Plaintiff could have rationally elected to incur the fees as opposed to making a trade (or paying two bills). As a result, this Court should refuse to dismiss the Section 1671 claim.

## IV.  PLAINTIFFS MAY MAINTAIN AN ALTERNATIVE CLAIM FOR UNJUST ENRICHMENT/RESTITUTION IN THE EVENT NO CONTRACT ULTIMATELY GOVERNS THE IMPROPER ASSESSMENT OF INACTIVITY FEES.

E*Trade's argument – that the existence of an express contract prohibits Plaintiffs' unjust enrichment/restitution claim as a matter of law – also fails.  (Def. Mot. 8.)  Plaintiffs have set forth their claims in the alternative in the event that this Court concludes E*Trade's contract was unenforceable.  *Gerlinger v. Amazon.com, Inc.*, 311 F. Supp. 2d 838, 856 (N.D. Cal. 2004) ("[A]n alternative claim might be stated if…plaintiff alleged that no express agreement existed between plaintiff and either defendant."); *see also Malcolm v. JPMorgan Chase Bank, N.A.*, No. 09-4496-JF (PVT), 2010 WL 934252, at *7 (N.D. Cal. Mar. 15, 2010) ("The existence of an express contract is not dispositive as Plaintiff clearly has pled in the alternative.").

As explained in Section I *supra*, "[A] contract that allows one party to unilaterally rewrite central terms is not a contract at all."  *S. Cal. Gas Co.*, 336 F.3d at 894.  Furthermore, parties have no "obligation to check the terms [of a website contract] on a periodic basis to learn whether they have been changed by the other side."  *Douglas*, 495 F.3d at 1066.  In this case, the Plaintiffs allege: "the provision that allows E*Trade to unilaterally change the types and amounts of fees it may charge to its customers' accounts by posting a separate fee schedule on its website is further unconscionable and unenforceable because customers are required to scour E*Trade's website for the terms of the agreement."  (Amd. Compl. ¶ 54.)  Furthermore, where E*Trade changes the Brokerage Customer Agreement or the schedule:

> E*Trade fails to provide adequate notice of the specific changes to its customers.  The online version of the Brokerage Customer Agreement does not contain a hyperlink to the fee schedule or otherwise instruct customers how to find the fee schedule.  Customers are responsible for keeping themselves apprised of the current schedule by locating the schedule through E*Trade's voluminous website.

(Amd. Compl. ¶ 55.)  Hence, as was the case in *Douglas*, the contract in this case may ultimately be deemed unenforceable because it requires customers to monitor the website for changes.

Furthermore, E*Trade has been plausibly unjustly enriched in the amount of any overcharges its collected as a result of its inactivity fees having been excessive penalties.  As a result, dismissal of the unjust enrichment claim is premature.[16]

---

[16]    The Amended Complaint further alleges that other provisions, including the choice-of-law

E*Trade's reliance on general unconscionability cases is misplaced. Relying on *Walter v. Hughes Commc'ns, Inc.*, 682 F. Supp. 2d 1031, 1046-47 (N.D. Cal. 2010) and *Trend Homes, Inc. v. Superior Court*, 131 Cal. App. 4th 950, 956 (2005), E*Trade asserts that "[a]sking customers who wish to review their fees to type "fees"[17] into a search engine on a homepage is not so "harsh or oppressive," or one-sided as to "shock the conscience." (Def. Mot. 8.) Neither *Walter* nor *Trend Homes* addressed an ever-changing website contract with key terms that customers were made to search for on their own.

Likewise, the case of *Guadagno v. E*TRADE Bank*, 592 F. Supp. 2d 1263, 1272 (C.D. Cal. 2008) is inapposite. *Guadagno* addressed a different E*Trade contract involving a different E*Trade entity at a different point in the contractual relationship—the time the contract was first entered, not allegedly changed without notice. Further, unlike the fee schedule here, the terms and conditions on the website were presented to the customer via "a highlighted, bullet-pointed, underlined link to the Agreement" and customers were required to accept the agreement by checking a box signifying acceptance. *Id*. at 1267. The contract was not procedurally unconscionable because the terms were not presented on a take-it-or-leave-it basis. Rather, customers had the opportunity to opt-out of the agreement within 60 days. *Id*. at 1268. The record at this time does not show that the Plaintiffs in this case were offered any similar ability to opt-out.

Hence, E*Trade cannot circumvent the discussion in *Douglas* by pretending it does not exist. Accepting the allegations of the Amended Complaint as true, it is plausible that the contract changes are unenforceable. In that case, Plaintiffs' claim for unjust enrichment would survive.

---

clause and the arbitration provision, add to the agreement's unconscionable nature. E*Trade is correct in stating that it may not invoke the arbitration clause here due to the pleading of a class action. (Def. Mot. 8, n. 3 (Dkt. 20).) As for the choice of law provision, E*Trade offers no support for the application of New York law, and fails to argue that any claim fails if New York law applies. In the event E*Trade changes course and seeks to have this Court apply New York law, the Plaintiff respectfully requests leave to file supplemental authority on the issue. *See e.g. Nedlloyd Lines B.V. v. Superior Court,* 3 Cal.4th 459, 834 P.2d 1148, 1153 (Cal. 1992).

[17] E*Trade never explains how customers are supposed to know the correct search term that will lead to the correct fee schedule. E*Trade's search term, "fees," produces 805 results. 7 of the top 10 search results consist of various fee schedules, including the MSI Schedule and the Plaintiffs Fee Schedule. *None* of the results provide any indication as to which is the applicable schedule for brokerage account customers. (*See* "'Fees' Search Results," Exhibit 3 to the Balabanian Decl., Ex. A hereto.) Again, a hyperlink connecting the appropriate schedule to the Brokerage Customer Agreement could have resolved this confusion.

**V. E*TRADE'S CHARGING OF $40.00 INACTIVITY FEES WITHOUT ANY AUTHORITY TO DO SO, ITS LIQUIDATION OF CUSTOMER ACCOUNTS WITHOUT NOTICE, AND ITS FALSE STATEMENTS OF MATERIAL FACT ARE ALL PROHIBITED UNDER THE CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200 (THE "UCL").**

E*Trade's entire attack on the Plaintiffs' UCL claims depends on its arguments to dismiss the Plaintiffs' other counts. As alleged, E*Trade's inactivity fees imposed unlawful penalties. *Chabner v. United of Omaha Life Ins. Co.,* 225 F.3d 1042, 1048 (9th Cir. 2000) (violations of other laws are treated as unlawful practices that are independently actionable under the UCL). Hence, insofar as this Court finds Plaintiff has stated a claim under Section 1671, Plaintiffs' allegations of unlawful conduct under the UCL necessarily survive as well.

Likewise, E*Trade's charging of the inactivity fees was patently unfair. *See People v. Casa Blanca Convalescent Homes Inc.,* 206 Cal. Rptr. 164, 177 (Cal. Ct. App. 1984) ("[A]n 'unfair' business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.") (*citing Spiegel, Inc. v. F.T.C.,* 540 F.2d 287, 293 (7th Cir. 1976)). Though E*Trade argues it merely charged the fees as provided for in its contract, as described throughout this brief, E*Trade was not allowed under *Douglas* to structure its contract so as to allow it to change its fee schedule and other terms whenever E*Trade felt the urge to do so, let alone begin charging fees – and collecting them by liquidating its customers' accounts – without any notice. Likewise, the established public policy of California, as expressed through laws like Section 1671, prohibits the fees because they are penalties. Hence, although E*Trade argues there can be no unfair conduct where it complied with the terms of a contract, it cannot sustain such arguments where the contract and procedure on which it relies were themselves oppressive and substantially injure consumers.

E*Trade's reliance on cases refusing to apply the UCL where the defendants complied with the express terms of their contracts is misplaced. First, the enforceability of the parties' contract was never challenged in *Speigler v. Home Depot U.S.A., Inc.,* 552 F. Supp. 2d 1036, 1045 (C.D. Cal. 2008) ("In essence, plaintiffs' claim that the UCL requires defendants to charge them in accordance with the allegedly more accurate measurements taken by the Measurement Technician.

However, that is not the deal that plaintiffs struck.")  The not-to-be-cited decision in *Janda v. T-Mobile, USA, Inc.*, No. C 05-03729, 2009 WL 667206, at *9 (N.D. Cal. Mar. 13, 2009) is also inapposite.  In that case, after analyzing all the facts surrounding the fees at issue – including the fact the fees were conspicuously disclosed on several occasions to the plaintiffs – the Court expressly upheld T-Mobile's regulatory and service fees.  *Id.*  Absent a finding that similarly blesses E*Trade's inactivity fees as a matter of law, *Janda* provides no support.  Likewise, *Daugherty v. Am. Honda Motor Co.*, 51 Cal. Rptr. 3d 118, 130 (Cal. Ct. App. 2006) offers no help to E*Trade, as the Court in that matter found that an engine that performed "precisely as warranted throughout the term of its express warranty cannot be characterized as causing a substantial injury to consumers."  This is a far cry from the instant case where E*Trade's disclosure of its inactivity fees is a central issue in dispute.

Finally, E*Trade's argument that Plaintiffs claim for fraudulent conduct – charging fees where it represented in the Plaintiffs' Fee Schedule that no such fees would be charged – only prevails if this Court accepts, as a matter of law, that the MSI Schedule applied instead of the Plaintiffs' Fee Schedule.  As explained above, the record is simply too sparse at this point in the litigation to allow the Court to make such a conclusion.  It is unclear if any fee schedule applies, let alone the MSI Schedule.  Accordingly, E*Trade's arguments for dismissal of the Plaintiffs' UCL claims fall apart, and this Court should deny E*Trade's Rule 12(b)(6) motion.

### CONCLUSION

None of E*Trade's arguments warrant dismissal of any claims as a matter of law—to the contrary, the Plaintiffs can plausibly prevail on each of their alternative causes of action.  Which fee schedule applied, if any, is a central issue in this lawsuit, meaning E*Trade cannot point to its unsubstantiated MSI Schedule to defeat the pleadings.  Discovery will reveal – insofar as E*Trade is allowed to change its customer agreement willy nilly – when E*Trade began charging the inactivity fees, whether it changed its fee schedule at that time, and what notice and opportunity to reject, if any, it provided to its customers.  Likewise, E*Trade has failed to show that paying the inactivity fees presented customers with a rational alternative method of performance.  Quite the

1  opposite, discovery will expose the fees as coercive penalties. Plaintiffs' alternative unjust

2  enrichment claims and derivative UCL claims similarly withstand E*Trade's attacks.

3      In the final analysis, there is a disconnect between what E*Trade tried to do and what it

4  actually did. Though E*Trade could have linked the appropriate fee schedule(s) directly to its

5  Brokerage Customer Agreement, instead E*Trade leaves customers to guess as to what search

6  terms will take them to what E*Trade considers the appropriate fee schedule (among several that

7  are apparently available, posted and current on its website). This Court should refrain from

8  correcting E*Trade's mistakes. Accordingly, this Court should deny the Motion to Dismiss in its

9  entirety.

10                             Respectfully submitted,

11

12                             /s/ Rafey S. Balabanian

13                             Rafey Balabanian (*pro hac vice*)
                              Jay Edelson
14                             Steven L. Lezell (*pro hac vice*)
                              Michael J. Aschenbrener (*pro hac vice*)
15                             Edelson McGuire, LLC
                              350 North LaSalle, Suite 1300
16                             Chicago, IL 60654
                              (312) 589-6370
17                             jedelson@edelson.com
                              slezell@edelson.com
18                             rbalabanian@edelson.com
                              maschenbrener@edelson.com

19                             Sean Reis (SBN 184044)
20                             Edelson McGuire, LLP
                              30021 Tomas Street, Suite 300
21                             Rancho Santa Margarita, CA 92688
                              949-459-2124 (phone)
22                             949-459-2123 (fax)
                              sreis@edelson.com

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Rafey S. Balabanian, an attorney, hereby certify that on July 6, 2010, I served the above and foregoing ***Plaintiffs' Opposition to Defendant E\*Trade's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6),*** by causing true and accurate copies of such paper to be filed and transmitted to the persons shown below via the Court's CM/ECF electronic filing system, on this the 6th day of July, 2010.

Whitty Somvichian
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Email: wsomvichian@cooley.com

_/s/ Rafey S. Balabanian_