UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH ROLING and ALEXANDER LANDVATER, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>    v.<br><br>E*TRADE SECURITIES, LLC,<br><br>                Defendant.<br>_____/ | No. C 10-0488 MHP<br><br>**MEMORANDUM & ORDER**<br><br>**Re: Defendant's Motion to Transfer Venue and Motion to Dismiss** |

   Plaintiffs Joseph Roling and Alexander Landvater brought this putative class action against E*Trade Securities LLC ("E*Trade") alleging breach of contract, unjust enrichment, and violations of California Civil Code sections 1671 and 17200 *et seq.* Now before the court are E*Trade's motion to transfer venue and motion to dismiss. Having considered the parties submissions and arguments, and for the reasons set forth below, the court enters the following memorandum and order.

BACKGROUND

   E* Trade is an online broker-dealer of stocks and securities. In 1999 and 2006, respectively, Rolling and Landvater each opened and deposited $1,000 into an E*Trade brokerage account. Docket No. 14 (First Amended Complaint ("FAC")) ¶¶ 16, 25. Upon activation, plaintiffs entered into the "Brokerage Customer Agreement," which provided that plaintiffs "agree to pay brokerage commissions, charges and other fees set forth in E*TRADE Securities' then-current fee schedule . . . ." *Id.*, Exh. A (Brokerage Agreement) § 4(b). The brokerage agreement further stated

that "a schedule of the current fees and commission is available on the E*TRADE Securities Web site." *Id.* Plaintiffs allege that it is unclear which fee schedule of the many then-available on E*Trade's website was "current" or "available." Nonetheless, they allege that the operative fee schedule prohibited the assessment of fees. *Id.* ¶ 4, Exh. B (Plaintiffs' Fee Schedule) at 3. Despite this agreement, plaintiffs claim E*Trade began assessing them a quarterly fee of $40 for each fiscal quarter in which they did not make at least one trade. *Id.* ¶¶ 17, 26, 44. Once the amount of inactivity fees reached plaintiffs' account balance, E*Trade liquidated plaintiffs' accounts by selling plaintiffs' stock and used the proceeds to collect the inactivity fees. *Id.* ¶¶ 22, 30.

On February 3, 2010, Roling, who maintains his primary residence Chicago, filed a class action complaint in this court alleging four causes of action. *See* Docket No. 1 (Complaint). Specifically, Rolling alleged that: 1) E*Trade breached its contract with plaintiff by charging the $40 inactivity fee; 2) E*Trade was unjustly enriched through these fees; 3) the inactivity fee was a liquidated damage in violation California Civil Code section 1671; and 4) charging a $40 inactivity fee constituted an unlawful, unfair, and fraudulent business practice in violation of California's Unfair Competition Law ("UCL"). Roling then amended his complaint to add Landvater as a named plaintiff. *See generally* FAC. Landvater maintains his primary residence in San Francisco. *Id.* ¶ 10.

## LEGAL STANDARD

I.    Motion to transfer

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). A motion to transfer venue lies within the broad discretion of the district court. *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)).

District courts use a two-step analysis to determine whether a transfer is proper. The threshold question under Section 1404(a) requires the court to determine whether the case could have been brought in the forum to which the transfer is sought. 28 U.S.C. § 1404(a); *Hatch v.*

*Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985). If venue would be appropriate in the would-be transferee court, then the court must make an "individualized, case-by-case consideration of convenience and fairness." *Jones*, 211 F.3d at 498. Among the non-exclusive factors that a district court may consider in deciding whether a transfer is in the interest of justice are: the location where any relevant agreements were negotiated and executed; the state that is most familiar with the governing law; the plaintiff's choice of forum; the respective parties' contacts with the forum; the contacts relating to the plaintiff's cause of action in the chosen forum; the differences in the costs of litigation in the two forums; the availability of compulsory process to compel attendance of unwilling non-party witnesses; the ease of access to sources of proof; any forum selection clause; and relevant public policy of the forum state. *Id.* at 498-99 (citing *Stewart*, 487 U.S. at 29-31).

II.     Motion to dismiss

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against a defendant for failure to state a claim upon which relief can be granted against that defendant. A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal may be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1988). A motion to dismiss should be granted if a plaintiff fails to pled "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, ___U.S.___,___, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556).

Allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). "[A] court may take judicial notice of 'matters of public record'" and may also consider "[d]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading," without converting a motion to dismiss under Rule 12(b)(6)

3

into a motion for summary judgment. *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001) (quoting *Mack v. South Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986)). The court need not, however, accept as true pleadings that are no more than legal conclusions or the "formulaic recitation of the elements" of a cause of action. *Iqbal*, 129 S. Ct. at 1950. "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

DISCUSSION

This court has original jurisdiction over this case. 28 U.S.C. § 1332(d)(2). The Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), imposes only the minimal diversity requirement, that one plaintiff be a citizen of a different state from the defendant. Defendant is an unincorporated association, and "an unincorporated association shall be deemed to be a citizen of the state where it has its principal place of business and the State under whose laws it was organized." 28 U.S.C. § 1332(d)(10); *see Davis v. HSBC Bank Nev., N.A.*, 557 F.3d 1026, 1028 (9th Cir. 2009) (holding that LLCs are unincorporated associations for the purposes of CAFA); *see Abrego v. Dow Chem. Co*, 443 F.3d 676, 684 (9th Cir. 2006) (stating that CAFA "departs from the rule that frequently destroys diversity jurisdiction, that a limited partnership's or unincorporated association's citizenship for diversity purposes can be determined only by reference to all of the entity's members." (citations and internal quotations omitted)). The minimal diversity requirement is satisfied here because the plaintiff class is comprised of citizens of California and Illinois, and E*Trade is a citizen of Delaware, under whose laws E*Trade was organized, Curcio Decl., at ¶ 2, and New York, E*Trade's primary place of business, *id*. at ¶ 3. The putative class contains more than 100 members and satisfies the amount in controversy requirement, claiming aggregate damages in excess of $5,000,000.

This court ordered the parties to brief the question of whether jurisdiction could be asserted in light of the Eleventh Circuit's recent holding in *Cappuccitti v. DirectTV*, 611 F.3d 1252, 1256 (11th Cir. 2010), *overruled by Cappuccitti v. DirectTV*, 2010 WL 4027719 at *2 (11th Cir. Oct. 15,

4

1  2010) (panel rehearing). In the interim, the Eleventh Circuit panel reversed itself, rendering further
2  jurisdictional analysis by this court unnecessary.

3  I.     Motion to transfer

4       E*Trade moves to transfer this action to the Southern District of New York for the
5  convenience of the parties and witnesses, and in the interests of justice.

6       Under the Class Action Fairness Act, 28 U.S.C. section 1332(d), every district court has
7  subject matter jurisdiction over this action. Further, because E*Trade's corporate headquarters are
8  located within the Southern District of New York, that court has personal jurisdiction over E*Trade
9  and venue would therefore be proper there. 28 U.S.C. § 1391. Accordingly, this action could have
10 been brought in the Southern District of New York. The court now turns to whether transfer is in the
11 interests of justice.

12      A.     Choice of forum

13       A plaintiff's choice of forum generally receives deference in a motion to transfer venue.
14 *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986). In class actions,
15 however, a plaintiff's choice of forum is often accorded less weight. *Lou v. Belzberg*, 834 F.2d 730,
16 739 (9th Cir. 1987) ("Although great weight is generally accorded plaintiff's choice of forum . . .
17 when an individual . . . represents a class, the named plaintiff's choice of forum is given less
18 weight."). Nonetheless, even in a class action, "[i]n judging the weight to be accorded [plaintiff's]
19 choice of forum, consideration must be given to the extent of both [plaintiff's] and the [defendant's]
20 contacts with the forum, including those relating to [plaintiff's] cause of action . . . ." *Id.* at 739
21 (internal citations omitted). In part, the reduced weight on plaintiff's choice of forum in class
22 actions serves as a guard against the dangers of forum shopping, especially when a representative
23 plaintiff does not reside within the district. *Foster v. Nationwide Mut. Ins. Co.*, No. C 07-04928 SI,
24 2007 WL 4410408, at *2 (N.D. Cal. Dec. 14, 2007) (Illston, J.) ("Where forum-shopping is evident .
25 . . courts should disregard plaintiff's choice of forum."); *Royal Queentex Enters. v. Sara Lee Corp.*,
26 No. C 99-04787, 2000 WL 246599, at *3 (N.D. Cal. Mar. 1, 2000) (Jenkins, J.) ("Circumstances in

which a plaintiff's chosen forum will be accorded little deference include cases of anticipatory suits and forum shopping.").

There is no evidence of forum shopping here. E*Trade argues that plaintiffs erroneously filed suit in the Northern District of California because plaintiffs thought E*Trade's corporate headquarters were located here. This does not demonstrate forum shopping; instead, it demonstrates the opposite. When choosing where to file this action, plaintiffs appear to have filed suit where they thought it would be easiest for E*Trade to defend itself. In any event, even though E*Trade's corporate headquarters may have moved to New York, it still maintains a physically larger office in California than it does in New York. *See* United States SEC, Form 10-K, E*TRADE Financial Corp. (December 31, 2009), *available at* http://www.sec.gov/Archives/edgar/data/1015780/000119312510038928/d10k.htm (76,000 square foot office in Menlo Park, California versus a 53,000 square foot office in New York). Moreover, one of the named plaintiffs, Landvater, lives within the Northern District of California. Because there is no evidence that plaintiffs engaged in forum shopping and both plaintiffs and defendant have significant contacts with the Northern District of California, plaintiffs' choice of forum carries significant weight.

B. <u>Convenience</u>

E*Trade claims that five of its witnesses likely to testify at trial are located in New York; however, this argument ignores Landvater's location. If this action proceeds in the Southern District of New York, Landvater will have to travel from California to New York for trial. If it proceeds in this court, then the New York witnesses would have to travel to California for trial. Although this potential five to one imbalance does suggest that transfer would be appropriate, the actual inconvenience to the parties is minimal as E*Trade concedes that the depositions of the New York witnesses will be taken in New York, without any inconvenience to these witnesses. Therefore, the slight imbalance, which will only manifest itself at trial, if at all, is not sufficient to overcome the plaintiffs' choice of forum.

E*Trade's argument that transfer would be more convenient for Roling is irrelevant. Roling chose to pursue this action in the Northern District of California, and opposes this motion.

6

Likewise, E*Trade's argument regarding the attorneys' convenience is also irrelevant. *Pralinsky v. Mutual of Omaha Ins.*, No. C 08-03191 MHP, 2008 WL 4532563, at *2 (N.D. Cal. Oct. 9, 2008) (Patel, J.) ("convenience of counsel is not considered in ruling on a section 1404(a) transfer motion"). Finally, the location of E*Trade's data processing center in Georgia, which is neither New York or California, does not weigh in favor of transfer of this action to New York.

### C.     Familiarity with governing law

Plaintiffs' breach of contract claim is subject to New York law. *See* Brokerage Agreement § 12(m). However, two of plaintiffs' four claims require the interpretation of California law. FAC ¶¶ 59-66 (Count III: liquidated damages in violation of California Civil Code section 1671); *id.* ¶¶ 67-84 (Count IV: Violation of California UCL). E*Trade argues that New York courts are best equipped to adjudicate claims under New York law. While this may be true, E*Trade fails to recognize that the converse is also true. E*Trade's own argument that courts outside of California are fully capable of applying California law also holds true of this court's ability to interpret New York law. *See Metz v. U.S. Life Ins. Co.*, 674 F. Supp. 2d 1141, 1148 (C.D. Cal. 2009) (holding that judges in both New York and California are fully capable of deciding issues arising under both California and New York law). E*Trade's claim that plaintiffs' "primary" claims are based on New York law does not change this analysis. Since plaintiffs have pled claims in the alternative, it is currently unclear which claims are primary and which are secondary. This factor is therefore neutral.

### D.     Efficiency

Finally, E*Trade claims that the interests of justice are best served by transfer because cases are resolved more quickly in the Southern District of New York. The difference, however, is marginal: on average, cases in the Southern District of New York are resolved in 6.4 months instead of 9.4 months in the Northern District of California. This difference in the average length of time of all filed actions does not lend itself to useful extrapolation to accurately predict the outcome in this specific action. Accordingly, this factor does not weigh in favor of transfer.

7

E.  Summary

By E*Trade's own admission, none of the other factors weigh in favor of transfer. Because evidence will be produced electronically, transfer will provide no greater access to evidence. There is no potential for consolidation with other cases, and the local interests in this case are equal in both New York and California. E*Trade's only support in favor of transfer is therefore travel-related inconvenience a few party witnesses may suffer if this action proceeds to trial in California. In light of plaintiffs' choice of forum, which does not evidence forum shopping, E*Trade's arguments are insufficient to demonstrate that transfer is in the interests of justice. The motion to transfer is denied. The Court now turns to E*Trade's motion to dismiss.

II.  Motion to dismiss

A.  Breach of contract

The brokerage agreement between the parties is to be "construed, and the rights and the liabilities of the parties determined, in accordance with the internal laws of the State of New York." Brokerage Agreement § 12(m). Under New York law, the following elements must be pled for a cause of action for breach of contract: the existence of a binding contract, plaintiff's performance of the contract, defendant's material breach of the contract and damages. *Furia v. Furia*, 498 N.Y.S.2d 12, 13 (App. Div. 1986).[1] Only the breach prong is challenged.

Plaintiffs allege that E*Trade materially breached the brokerage agreement by charging plaintiffs a $40 fee for each fiscal quarter that plaintiffs did not make a trade. FAC ¶ 45. Attached to the complaint are the brokerage agreement and the fee schedule that plaintiffs allege E*Trade breached. *See* Brokerage Agreement; Plaintiffs' Fee Schedule. E*Trade argues the fee schedule identified by plaintiffs applies only to a subset of E*Trade customers whose accounts it absorbed after it purchased another online brokerage, Brown Company, in 2005. Indeed, a statement on the first page of plaintiffs' fee schedule states, "[a]s a former Brown Co. customer, you qualify for special stock, options, mutual fund commissions and margin rate plans," and purportedly limits the application of the fee schedule only to former Brown Company customers absorbed by E*Trade.

8

1 Plaintiffs, however, allege that this limiting statement applies only to fees listed directly below it, 2 and does not apply to the section titled "Account Activity Fees."[2] This is sufficient to state a claim.

3     Contract interpretation is a matter of law. "When interpreting a contract, the construction 4 arrived at should give fair meaning to all of the language employed by the parties, to reach a 5 practical interpretation of the parties' expressions so that their reasonable expectations will be 6 realized." *Fernandez v. Price*, 880 N.Y.S.2d 169, 169 (App. Div. 2009). It is possible that when 7 read as a whole, the contract has two reasonable interpretations. In such cases, the contract is 8 ambiguous and it may be necessary to refer to material extrinsic evidence of the parties' intent. 9 *Omni Berkshire Bank Corp. v. Wells Fargo Bank, N.A.*, 307 F. Supp. 2d 534, 540 (S.D.N.Y. 2004).

10     Plaintiffs' fee schedule contains four discrete sections: Transactional Pricing, Margin Rates, 11 Account Activity Fees and Special Request Fees. Plaintiffs' Fee Schedule at 1. The limiting 12 statement in plaintiffs' fee schedule appears only within the Transactional Pricing section. *Id.* This 13 section is composed of different sub-headings. The limiting statement appears directly below the 14 first sub-heading, which reads "Brown Co. Special Pricing." *Id.* Immediately after the Brown Co. 15 Special Pricing sub-heading and its accompanying limiting statement, the fee schedule lists prices 16 for various types of trades. *Id.* Immediately following this pricing, the second sub-heading reads 17 "Complex Options." *Id.* Both sub-headings, as well as all the other sub-headings in the 18 Transactional Pricing section, are set in the same typeface, font, color and size, which could create 19 the impression that each sub-heading refers to the pricing that follows immediately thereafter. Thus, 20 a reasonable person could conclude that the special pricing for former Brown Company customers 21 includes only those fees listed in the Transactional Pricing section, or only the Transaction Pricing 22 and Margin Rates sections, as the prohibition on charging inactivity fees appears under the "Account 23 Activity Fees" section. *Id.* ("No inactivity fees. E*TRADE Securities will not charge fees when 24 your account is inactive for a period of time."). However, a reasonable person could also conclude 25 that the limiting statement applies to the entirety of plaintiffs' fee schedule because the limiting 26 language is an overarching substantive provision in plaintiffs' fee schedule. This conclusion is 27 strengthened if the main street investor schedule ("MSI fee schedule"), which authorizes E*Trade to

28

9

charge the $40 dollar fee in question, is also considered.  Docket No. 21 (Somvichian Dec.), Exh. 2 (MSI Fee Schedule).[3]  Because there are two reasonable interpretations of this provision, the contract is ambiguous.  Since no extrinsic evidence can be considered at this stage, the motion to dismiss the breach of contract claim must be denied.  *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d. 275, 304-05 (S.D.N.Y. 1998); *see also Weiss v. Weinreb & Weinreb.*, 793 N.Y.S.2d 100, 100 (App. Div. 2005) ("Since the provision in question was susceptible to two different interpretations, the resolution of this ambiguity was for the trier of fact and may be based on extrinsic evidence.").[4]

E*Trade claims that only the MSI fee schedule, and not plaintiffs' fee schedule, applies to plaintiffs.  Consideration of the MSI fee schedule, which is similar to plaintiffs' fee schedule, except that it authorizes the fee, does not compel a different result.  It appears that E*Trade intended the MSI fee schedule to apply to plaintiffs; however, E*Trade's intent is not determinative here.  Although the MSI fee schedule demonstrates weaknesses in plaintiffs' allegations and bolsters the possibility that the limiting statement applies to the entirety of plaintiffs' fee schedule, it does not conclusively demonstrate, at this stage, that plaintiffs' fee schedule is without ambiguity.  For instance, it does not specify that it, and only it, applies to all non-Brown company investors.  Consequently, plaintiffs' allegations, taken as true, are sufficient to state a claim.

B.  <u>Unjust enrichment</u>

E*Trade cites California law in its opening brief to argue that plaintiffs have not properly alleged a claim for unjust enrichment.  When plaintiffs cite California law in opposition, E*Trade in its reply claims that plaintiffs fail to cite New York authority.  Neither party discusses which law should apply to this cause of action.  Without deciding which law applies, the court holds that the cause of action survives dismissal independent of the law applied.

While the existence of an express contract indisputably precludes allegations regarding an implied contract for the same subject matter, plaintiffs allege unjust enrichment in the alternative, i.e., where an express contract provision regarding inactivity fees does not exist or is found unenforceable.  The gravamen of plaintiffs' claim lies in the unconscionability, both procedurally

10

and substantively, of the provision of the brokerage agreement that allows for E*Trade to unilaterally, and without notice, change the operative fee schedule. FAC ¶¶ 55-56.[5] Therefore, plaintiffs claim that E*Trade was not allowed to impose fees, and was unjustly enriched by its collection of inactivity fees. The sword of Damocles does not hang over E*Trade's head as plaintiffs seek to invalidate only the inactivity fees provision, and not the entire brokerage agreement. *See* FAC ¶ 54 ("the provision that allows E*Trade to unilaterally change the types and amounts of fees it may charge to its customers' accounts by posting a separate fee schedule on its website is further unconscionable and unenforceable because customers are required to scour E*Trade's website for the terms of the agreement.").

The brokerage agreement states that "E*TRADE Securities may modify the fee structure at any time by posting a modified structure on its Web site." Brokerage Agreement § 4(b). The agreement also requires plaintiffs to check E*Trade's website for modifications to the agreement:

> I understand that this Agreement may be amended from time to time by E*TRADE Securities, with revised terms posted on the E*TRADE Financial Web site. I agree to check for updates to this Agreement. I understand that by continuing to maintain my Securities Brokerage Account without objecting to revised terms of this Agreement, I am accepting the terms of the Revised Agreement and I will be legally bound by its terms and conditions.

*Id.* § 1. Allegations of such contractual provisions are sufficient to state a claim for unjust enrichment based on unenforceability.

None of E*Trade's authorities addresses whether a contract is enforceable as a matter of law where it allows a contracting party to change the provisions of the contract without notice. In *Walter v. Hughes Commc'ns, Inc.*, 682 F. Supp. 2d 1031, 1046-47 (N.D. Cal. 2010) (Conti, J.), plaintiffs "simply state[d] that the imposition of the fee was unconscionable, without explaining how it 'shocked the conscience' or was 'harsh or oppressive' at the time the agreements were entered into." In contrast, plaintiffs allege that E*Trade's unilateral ability to change contract terms, without notice, and the requirement that they periodically check the terms of the contract is problematic. Although magic words are not used, the allegations are sufficient to allege a claim for unenforceability.

11

E*Trade's remaining authorities are likewise inapposite, distinguishable or unpersuasive. *Lawlor v. Cablevision Sys. Corp.*, No. 12308-06, 2008 WL 4212442, at *5 (N.Y. Sup. Ct. Sept. 8, 2008), did not discuss the provision that allowed defendant to "in its sole discretion, change, modify, add or remove portions of this Agreement at any time;" instead, it dismissed on other grounds. *Guadagno v. E*TRADE Bank*, 592 F. Supp. 2d 1263, 1271-72 (C.D. Cal. 2008), also did not discuss the one-sided provision that allowed the defendant to change the terms of the contract at will and without notice. *DeBlasio v. Merrill Lynch & Co., Inc.*, No. 07 Civ 318 (RJS), 2009 WL 2242605, at *39 (S.D.N.Y. July 27, 2009), is distinguishable because the contract here does not provide for "advance written notice of the modifications that would become effective on a later date." Similarly, in *Missing Link, Inc. v. eBay, Inc.*, No. C-07-4487 RMW, 2008 WL 3496865, at *2 (N.D. Cal. Aug. 12, 2008) (Whyte, J.), the defendant had announced that it would increase its rate. And the defendant was allowed to unilaterally modify the terms of the contract in *TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 374 (S.D.N.Y. 2010), only because use of the service "after notice that Terms have changed indicate[d] acceptance of the Terms." The allegations here refer to the unconscionability associated with *unannounced* fee increases. Indeed, the *TradeComet* court specifically stated that "'the fact that one party reserves the implied power to terminate or modify a unilateral contract is not fatal to its enforcement, if the exercise of the power is subject to limitations, such as fairness and reasonable notice.'" *Id.* (quoting *Asmus v. Pacific Bell*, 23 Cal. 4th 1, 16 (2000)).

In *MySpace, Inc. v. The Globe.com, Inc.*, No. CV 06-3391, 2007 WL 1686966, at *9-*10 (C.D. Cal. Feb. 27, 2007), the court found a lack of unconscionability on summary judgment because "[d]efendant had a reasonable alternative or meaningful choice in the matter, in that marketing through MySpace using the method employed was not its only choice. In fact, Plaintiff's evidence shows that Defendant had, in fact, considered purchasing advertising space on the MySpace website." *Id.* at *9 (internal citation omitted). Moreover, the court found the unilateral changes were not unconscionable because defendant had notice. Specifically, defendant there created new MySpace accounts after the change in the terms of service, and therefore "it knew, or

12

1 should have known, that all messages, even those sent from pre-March 17 accounts, were subject to
2 the liquidated damages provision." *Id.* at \*10. *MySpace* is therefore distinguishable both on
3 procedural and substantive grounds. Finally, *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 575 F.
4 Supp. 2d 696, 706 (D. Md. 2008), is inapposite as it interpreted Mississippi law. Moreover, it is
5 distinguishable on the facts as the party that unilaterally modified the agreement sought to withdraw
6 its modification during the litigation; there was no claim of unconscionability.

7 In sum, E\*Trade is unable to cite to any case, whether under New York law or California
8 law, that undercuts plaintiffs' allegation that a contractual provision that allows a party to
9 unilaterally change the terms of the contract without notice is unenforceable. The unjust enrichment
10 claim stands.

11     C.     <u>Liquidated damages</u>

12 E\*Trade claims the inactivity fee is not a liquidated damage and is therefore proper. Under
13 California Civil Code section 1671, "a provision in a contract liquidating damages for the breach of
14 the contract is void except that the parties to such a contract may agree therein upon an amount
15 which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the
16 nature of the case, it would be impracticable or extremely difficult to fix the actual damage." Cal.
17 Civ. Code § 1671(d). Essential to plaintiffs' claim under Section 1671 is that their own breach of
18 contract led to the assessment of such fees. *Leong v. Square Enix of Am. Holdings, Inc.*, No. CV 09-
19 4484, 2010 WL 1641364, at \*6 (C.D. Cal. Apr. 20, 2010) (". . . a claim under § 1671 and for 'illegal
20 penalties' requires a showing that the contractual penalty (1) assesses liquidated damages (2) for
21 breach of the contract."). However, by the very terms of the brokerage agreement, plaintiffs have
22 not breached the contract.

23 Plaintiffs allege that "insofar as the imposition of the $40 quarterly inactivity fees is
24 considered to have been properly added as a contractual term to the Brokerage Customer Agreement,
25 the terms of the inactivity fee imposed a contractual obligation on Plaintiffs . . . to use their E\*Trade
26 accounts to make at least one trade during each fiscal quarter, which a customer would supposedly
27 breach by failing to make a trade." FAC ¶ 61. This description need not be accepted as true if it is
28

13

1 undercut by the incorporated documents. The MSI Fee Schedule, which was incorporated by
2 reference into the brokerage agreement, states: "Your account will be reviewed on each quarter's
3 Activity Record Date and a $40 Account Service Fee (ASF) will be assessed, if applicable, on the
4 Fee Date . . . ." MSI Fee Schedule at 3. It goes on to state that a customer "will not be charged an
5 ASF if . . . [she] execute[s] one or more stock, option, or mutual fund trades per quarter." *Id.*
6 Moreover, executing a trade is simply one of many different ways in which a customer can trigger
7 the fee waiver. *Id.* (the fee is also waived if the customer maintains a minimum balance or uses her
8 E*Trade account to pay bills). Thus, the promise made by plaintiffs is that they will pay E*Trade a
9 $40 account service fee each fiscal quarter, not that they will make at least one trade per quarter.
10 Therefore, the payment of the $40 fee is consideration for continuation of the brokerage agreement,
11 which can be waived under the terms of the contract upon the occurrence of certain events, including
12 the execution of one trade in that fiscal quarter. *See Horowitz v. Noble*, 79 Cal. App. 3d 120, 136
13 (1978) (payment of money with no contingency on another event was simply consideration for
14 continuation of original agreement). Accordingly, failure to make a trade does not constitute a
15 breach of contract, and assessment of the $40 fee is not a liquidated damage.

16 Plaintiffs' arguments regarding the irrationality of paying the inactivity fee, if that is the law,
17 also fail. Foregoing the opportunity to save $27.01, $40 less the $12.99 trade fee, by executing a
18 trade every quarter is not irrational. The opportunity cost of the time spent researching, planning
19 and executing a trade may well be worth more than $27.01. Thus, paying the $40 fee is not always
20 inferior to executing a trade. The same analysis applies to the switching and opportunity costs
21 associated with making two electronic bill payments through an E*Trade account. Accordingly,
22 count III of the FAC is dismissed with prejudice.

23 D. UCL

24 The UCL prohibits "unlawful, unfair or fraudulent business act[s] or practice[s]" and "unfair,
25 deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. To state a claim
26 under the UCL, a plaintiff must plead that: 1) defendant engaged in one of the practices prohibited
27 by the statute; and 2) plaintiff suffered actual injury in fact as a result of defendant's actions. *Laster*

28

14

*v. T-Mobile United States, Inc.*, 407 F. Supp. 2d 1181, 1194 (S.D. Cal. 2005).  Plaintiffs allege that the $40 activity fee was unlawful, unfair and fraudulent.  FAC ¶¶ 13-16.

Firstly, plaintiffs allege that the $40 fee was unlawful because E*Trade violated California Civil Code section 1671.  Since the fee is not a liquidated damage, the alleged violation of Section 1671 cannot serve as a predicate for the UCL claim.

Secondly, plaintiffs allege that E*Trade's conduct in charging the $40 fee in the absence of contractual authority to do so constitutes an unfair business practice.  *Id.* ¶ 70.  The appropriate definition of the word "unfair" in the UCL is unclear.  *In re Actimmune Marketing Litigation*, No. C 08-02376, 2009 WL 3740648, at *14 (N.D. Cal. Nov. 6, 2009) (Patel, J.).  In *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 736-37 (9th Cir. 2007), the Ninth Circuit held that, "in the absence of further clarification by the California Supreme Court," district courts may apply either, or both, of the tests for unfair business practices articulated in *Cal-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999), or *South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861 (1999), to determine if a defendant's conduct is "unfair."  Since the parties discuss only the standard for unfair business practices articulated in *South Bay*, that standard is used: "an 'unfair' business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  72 Cal. App. at 886-87.  Plaintiffs allege that E*Trade charged them a $40 fee without contractual authorization to do so.  Such allegations accuse E*Trade of unethical and unscrupulous conduct that is substantially injurious to consumers.  E*Trade is correct that Section 17200 does not give courts *carte blanche* to evaluate the fairness of the contract; however, the basis of plaintiffs' unfair business practice claim relies on monies withheld in accordance with a contractual provision that is either missing or allegedly unenforceable due to the unconscionable nature in which it was imposed.  Accordingly, plaintiffs have sufficiently alleged that E*Trade engaged in "unfair" business practices.

Thirdly, plaintiffs allege that E*Trade engaged in fraudulent conduct when it made false statements regarding the inactivity fees.  FAC ¶ 75.  "The 'fraud' contemplated by section 17200's

15

third prong bears little resemblance to common law fraud or deception. The test is whether the public is likely to be deceived." *South Bay*, 72 Cal. App. 4th at 887 (citing *State Farm Fire & Cas. Co. v. Superior Court*, 45 Cal. App. 4th 1093, 1105 (1996)) (internal quotation omitted). Plaintiffs allege that E*Trade stated it "would not charge any fees for a customer whose account was inactive for a period of time." *Id.* ¶ 75. They further allege they were deceived by these statements when they "reasonably relied on E*Trade's false representations that no inactivity fees would be charged . . . [and] kept their accounts open instead of closing them before E*Trade could liquidate the account balances." *Id.* ¶ 78. Plaintiffs allege both public deception and monetary harm; accordingly, they have properly pled a UCL claim for fraudulent business practices.

Although plaintiffs' UCL claims stand, their allegations appear to be undercut by industry practice. Moreover, their UCL claims are derivative of their other claims, and do not assert an independent basis. Consequently, damages will be limited in accordance with the amount of duplication.

Finally, Roling's UCL claim is dismissed because he does not allege that he is a California resident, or that the UCL otherwise applies to him. The UCL does not create a claim for non-residents where the misconduct or injuries are not alleged to have occurred in California.

CONCLUSION

For the foregoing reasons, defendant's motion to transfer is DENIED and defendant's motion to dismiss is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

Dated: November 22, 2010

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

16

**ENDNOTES**

1. It is unclear why plaintiffs rely upon California and Ninth Circuit law regarding breach of contract.

2. It is unclear what damages, if any, plaintiffs can recover for fees assessed prior to the introduction of plaintiffs' fee schedule on the E*Trade website.

3. The doctrine of incorporation by reference "permits [the court] to consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleadings." *Knieval v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (internal quotations and citations omitted). The doctrine has been extended "to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint." *Id.* (internal quotations and citations omitted). The Brokerage Agreement provides that the "brokerage commissions, charges and other fees . . . [are] set forth in E*Trade Securities' then-current fee schedule. . . ." and that a "[s]chedule of current fees and commissions is available on the E*Trade Securities Web site." Brokerage Agreement § 4(b). Neither party disputes the authenticity of either fee schedule. Nor do the parties dispute that both fee schedules were available on E*Trade's website as a "then-current fee schedule" when the fees at issue were assessed. Because both fee schedules were incorporated under the terms of the Brokerage Agreement, and plaintiffs' claim is dependent on the "then-current" fee schedules, both fee schedules may be considered in adjudicating the motion to dismiss.

4. Extrinsic evidence may include evidence of trade usage. *United States Naval Inst. v. Charter Comm., Inc.*, 875 F.2d 1044, 1048-49 (2d Cir. 1989) ( "Usage and customs may be proved . . . to aid in interpretation of the words of the parties."). It appears that charging inactivity fees may be customary within the brokerage industry. *See* Exhibits to Docket No. 47 (Reply). The court expresses no opinion regarding which interpretation would prevail upon inclusion of extrinsic evidence, i.e., upon a motion for summary judgment.

5. Plaintiffs also allege that the brokerage agreement is unconscionable because E*TRADE drafted it, presented it to prospective customers on a "take it or leave it basis," and included choice of law and arbitration provisions. FAC ¶¶ 53-55. These provisions, individually, have been found to be enforceable by many courts.