EDELSON MCGUIRE LLP
Sean P. Reis (SBN 184044)
(sreis@edelson.com)
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (949) 459-2124
Facsimile: (949) 459-2123

EDELSON MCGUIRE LLC
Jay Edelson (Admitted *Pro Hac Vice*)
(jedelson@edelson.com)
Rafey S. Balabanian (Admitted *Pro Hac Vice*)
(rbalabanian@edelson.com)
Steven L. Woodrow (Admitted *Pro Hac Vice*)
(swoodrow@edelson.com)
Ari J. Scharg (Admitted *Pro Hac Vice*)
(ascharg@edelson.com)
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

*Counsel for Plaintiffs* JOSEPH ROLING and
ALEXANDER LANDVATER,

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH ROLING and ALEXANDER LANDVATER, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> E*TRADE SECURITIES, LLC, a Delaware limited liability company, and DOES 1-50, inclusive, <br><br> Defendants. | Case No.  3:10-cv-00488-EMC <br><br> [Honorable Edward M. Chen] <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND** |

        Plaintiffs Joseph Roling ("Roling") and Alexander Landvater ("Landvater") (together, the

"Plaintiffs"), for their Second Amended Class Action Complaint (the "Complaint"), allege as

follows upon personal knowledge as to their own acts and experiences and, as to all other matters, on

information and belief, including, *inter alia*, investigation conducted by their attorneys:

1

**Introduction**

2      1.     This case is about Defendant E*Trade Securities LLC's ("E*Trade") unlawful

3 practice of charging and collecting account inactivity fees from its customers, including from

4 Plaintiffs.  None of E*Trade's various iterations of its Brokerage Customer Agreement allows

5 E*Trade to charge fees when customers fail to make a given number of trades, use their E*Trade

6 account for bill payments, or take other action.  Despite this lack of contractual authority, E*Trade

7 nonetheless charged its customers inactivity fees (termed at different times either Account

8 Maintenance Fees or Account Service Fees, for convenience all such fees are referred to herein as

9 "inactivity fees") for each quarter in which the customers did not make a trade or perform some

10 alternative act required to avoid the fee.  As a result, E*Trade has wrongfully collected and

11 retained millions of dollars worth of inactivity fees from Plaintiffs and the Class.

12      2.     Each member of the Class was charged at least one inactivity fee.  E*Trade charged

13 Plaintiffs Roling and Landvater inactivity fees and, therefore, Plaintiffs bring this class action on

14 behalf of themselves and the putative class for:  breach of contract; unjust enrichment/restitution

15 (*in the alternative*); violations of California's Unfair Competition Law ("UCL") (Cal. Bus. & Prof.

16 Code § 17200 *et. seq*.); and violations of New York's Consumer Protection Law (N.Y. Gen. Bus.

17 Law § 349).

18

**Nature of the Claim**

19      3.     E*Trade has systematically and routinely charged Plaintiffs and the other members

20 of the Class and Subclasses quarterly inactivity fees without having the legal authority to do so.

21      4.     E*Trade structures its "Brokerage Customer Agreement" – a consumer adhesion

22 contract drafted and imposed on account holders by E*Trade – as an online agreement.

23      5.     Since as early as November 2000, E*Trade has made and sought to enforce

24 unilateral changes to its Brokerage Customer Agreement, including changes to its choice of law

25 provision, as well as the provisions regarding E*Trade's ability to charge fees, provide notice to

26 customers, and liquidate customer accounts.

27      6.     To justify these changes, E*Trade drafts its Brokerage Customer Agreement so as

28 to include language reserving unto itself the ability to change its customer agreement and the

purportedly applicable fee schedule at any time, with or without notice, requiring its customers to constantly monitor E*Trade's entire website for changes.  The version of E*Trade's Brokerage Customer Agreement purportedly effective November 2005 states:

> I understand that this Agreement may be amended from time to time by E*TRADE Securities, with revised terms posted on the E*TRADE Financial Web site.  I agree to check for updates to this Agreement.  I understand that by continuing to maintain my Securities Brokerage Account without objecting to revised terms of this Agreement, I am accepting the terms of the Revised Agreement and I will be legally bound by its terms and conditions.

(*See* "2005 Brokerage Customer Agreement," § 1(b), a true and accurate copy of which is attached as Exhibit A.)

7.       Likewise, the 2005 Brokerage Customer Agreement states:

> **(b) Fees, Commissions and Account Minimums**
> I agree promptly to pay brokerage commissions, charges and other fees as set forth in E*TRADE Securities' then-current fee schedule and as applicable to my Account and the transactions and services I may receive. I also agree to pay all applicable federal, state and local taxes. I authorize E*TRADE Securities automatically to debit my Account for any such brokerage commissions, charges, fees and taxes. **A schedule of the current fees and commissions is available on the E*TRADE Securities Web site. E*TRADE Securities may modify the fee structure at any time by posting a modified schedule on its Web site**.

(*See* Ex. A, § 4(b)) (emphasis added.)

8.       Despite the fact that the Brokerage Customer Agreement is, itself, supposedly made available on the E*Trade Securities Website, it provides no hyperlink to E*Trade's online schedule of then-current fees and commissions, notice, or other instructions that would assist customers in locating the current fee schedule.  Rather, customers must scour and search E*Trade's website to locate the correct fee schedule and its purported terms.  To further complicate matters, E*Trade itself refers to the fee schedule it attempts to enforce against its customers using various titles, including "fee schedule," "fee and commission table," "Main Street Investor Schedule," and "Retail Fee Schedule," among other names.

9.       To further confuse matters, multiple fee schedules were posted and made available via the E*Trade Securities Web Site to consumers.  E*Trade instructs its customers to use the Web Site search feature to locate the applicable schedule.  During the relevant period of time, a "bug" on E*Trade's Web Site caused multiple schedules to become available.  Due to the "bug," a

search for information relating at least to "inactivity," "activity fee," "inactivity fee," and
potentially others during the relevant period of time would produce several search results, at least
one of which – referred to by E*Trade in this lawsuit as the "Brown Co. Addendum" – expressly
stated that "E*TRADE Securities will not charge fees when your account is inactive for a period
of time." (*See* "View Commissions & Fees," at 3, a true and accurate copy of which is attached as
Exhibit B.)

10. Beginning in November 2000, E*Trade made the first of numerous unilateral
changes to its fee schedule that purportedly applied to its customers.  Then, and without notifying
customers that E*Trade's fee schedule had changed and without providing customers an
opportunity to reject the change or cancel without penalty, E*Trade started charging its customers
inactivity fees of $15 per quarter.  In or around February 2002, again without notifying customers
that its fee schedule had changed and without providing customers an opportunity to reject the
change or cancel without penalty, E*Trade raised the inactivity fee and started charging customers
$25 per quarter.  On January 1, 2005, and again without notifying customers that its fee schedule
had changed and without providing customers an opportunity to reject the change or cancel
without penalty, E*Trade raised the inactivity fee and started charging customers $40 per quarter.
Moreover, E*Trade charged inactivity fee increases during times where, on information and
belief, no fee schedule had been posted on E*Trade's website allowing E*Trade to charge such
increased amounts.

11. None of E*Trade's customers consented to any of these supposed changes and
none of the changes were or are enforceable.

12. Nevertheless, and in many cases, E*Trade collected the inactivity fees it claimed
due by liquidating its customers' accounts and/or selling the customers' stocks and other securities
without prior notice.  For example, if E*Trade determined a particular customer owed $160 worth
of inactivity fees for not having made a trade during the 2005 calendar year, E*Trade would, on its
own initiative and without approval from the customer, sell the customer's securities once the
value of those securities declined to approximately $160.  E*Trade would then pay itself the
proceeds of the sale to cover the fees it claimed due.

13.     On information and belief, E*Trade has wrongfully collected and retained millions of dollars in account inactivity fees from Plaintiffs and thousands of other customers.  Because the amounts E*Trade charged and continues to collect is relatively small on an individual basis – ranging from $15 to a few hundred dollars per account, and in light of E*Trade's vast resources and superior bargaining power, E*Trade employs this scheme to obtain small amounts of money from a large number of people with the hope and expectation that its illegal conduct will go unnoticed and, ultimately, unpunished.

**Parties**

14.     **Plaintiff Joseph Roling:**  Plaintiff Roling is a natural person who maintains his primary residence in the City of Madison and is domiciled in the State of Wisconsin.  In or around February 2001, Mr. Roling opened an E*Trade securities brokerage account, and deposited approximately $1,000 in that account for the purchase of various stocks and other securities.  Mr. Roling became bound by the E*Trade Brokerage Customer Agreement attached hereto as Exhibit C, which provided that the agreement was entered into and governed by the laws of California.

15.     **Plaintiff Alexander Landvater:**  Plaintiff Landvater is a natural person who maintains his primary residence in the City of San Francisco and is domiciled in the State of California.  In or around April 2006, Mr. Landvater opened an E*Trade securities brokerage account, and deposited $1000 in that account for the purchase of various stocks and other securities.  Mr. Landvater became bound by E*Trade's then-existing Brokerage Customer Agreement, attached hereto as Exhibit A, which provided that the agreement was entered into and governed by the laws of New York.

16.     **Defendant E*Trade Securities LLC:**  E*Trade is a limited liability company organized and existing under the laws of the state of Delaware with its headquarters and principle place of business located at 135 East 57th Street, 14th Floor, New York, New York 10022. E*Trade is a broker-dealer of stocks and securities.  E*Trade does business throughout the state of California and the nation.

17.     Does 1-50 are other E*Trade entities, subsidiaries, affiliates, predecessors, or successors involved in the creation, marketing, sale, control, and other aspects of securities

brokerage at issue in this Complaint, or who exercised control over E*Trade or are otherwise liable or vicariously liable for the acts and omissions of E*Trade as set forth in this Complaint. Plaintiffs have been unable, despite reasonable efforts, to identify these Doe defendants and anticipate that the identity of the Doe defendants will be uncovered through further discovery. Once discovery reveals the identities and liabilities of the Doe defendants, Plaintiffs will seek leave to amend this Complaint to name them and will serve them according to the Federal Rules of Civil Procedure.  (Collectively, E*Trade and the Doe defendants are referred to as "Defendants," and the allegations against "E*Trade" are deemed to apply to all Defendants.)

**Jurisdiction and Venue**

18.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2).  This Complaint alleges claims on behalf of a national class of E*Trade brokerage account holders who are minimally diverse from the Defendant.  There are well over 100 class members and the aggregate of their claims for wrongfully charged inactivity fees exceeds the sum or value of $5,000,000, exclusive of costs.  This Court has supplemental jurisdiction over the pendent state law claims under 28 U.S.C. § 1367.

19.     Venue is also proper before this Court under 28 U.S.C. § 1391(b)(2) as a substantial part of the events, circumstances, and omissions relating to the decision to charge and the actual charging of Plaintiffs and the Class members for inactivity fees each quarter and otherwise giving rise to these claims occurred in and emanate from this District.  Furthermore, the Brokerage Customer Agreement entered into by Roling expressly stated that California law governs their terms and that the contracts were deemed made and entered into in California.  On November 22, 2010, the Honorable Marilyn H. Patel denied E*Trade's Motion to Transfer Venue to the Southern District of New York finding that this Court was the appropriate venue for the adjudication of this controversy.  (Dkt. 63.)

20.     This Court has personal jurisdiction over E*Trade under Cal. Code Civ. Proc. § 410.10 because some of the acts alleged herein were committed in and emanated from California (specifically in the Northern District of California), and because the Defendant is registered to and actively conducts business in this District.

**Facts Specific to Plaintiff Joseph Roling**

21.    In or around February 2001, Mr. Roling opened an E*Trade securities brokerage account.  Mr. Roling deposited $1,000 into the account, which E*Trade used to purchase $1,000 worth of stocks and other securities that he selected on his behalf.

22.    At the time Mr. Roling opened his account, E*Trade's then-existing Brokerage Customer Agreement provided that California law governed his relationship with E*Trade and that E*Trade was authorized to debit Mr. Roling's account for various fees as determined by the fee schedule "available on the E*TRADE Securities Web site."

23.    Even though the Brokerage Customer Agreement did not state that Mr. Roling would be charged inactivity fees, a fee schedule, purportedly available somewhere on E*Trade's website at that time, stated that E*Trade would charge customers a quarterly $15 inactivity fee for each quarter in which a customer did not make a trade or perform some alternative act that was required to avoid the fee.  Mr. Roling was not aware of the fee schedule and, apart from noting that a schedule of fees and commissions was "available on [its] Web site" in the Brokerage Customer Agreement, E*Trade never directed Mr. Roling to any particular schedule, webpage, or other document or otherwise disclosed the schedule of fees and commissions then in-effect.

24.    As described above, E*Trade unilaterally altered its fee schedule on its website in February 2002 and January 2005, increasing the quarterly inactivity fee from $15 to $25 and $25 to $40, respectively.  E*Trade did not properly notify Mr. Roling of these changes, or communicate to him that the new fee structure would apply to his account.  For example, the notice of the increase to $40 in 2005 was provided more than 30 days *after* the Effective Date of the increase, prohibiting Roling from objecting to the increase under the terms of the Brokerage Customer Agreement.

25.    In or around 2003, Mr. Roling first learned via his E*Trade online account that E*Trade was charging his account quarterly inactivity fees.  Mr. Roling determined that each quarter during which he did not make at least one trade, E*Trade had charged his account a certain amount – depending on when the fee was assessed – representing that quarter's inactivity fee.

26.    Mr. Roling contacted E*Trade customer service to dispute the imposition of, and

1  demand a refund for, such charges on the basis that at no time did E*Trade inform him of any

2  change in his contract allowing E*Trade to impose such charges.  E*Trade's representatives told

3  Mr. Roling that E*Trade was entitled to charge and collect such fees and further told Mr. Roling

4  there was nothing he could do to avoid the charges he had incurred.

5       27.    The stocks Mr. Roling selected decreased in value over time.

6       28.    In or around 2008, the value of the stocks in Mr. Roling's account decreased such

7  that the balance in his account approximately equaled the amount of inactivity fees E*Trade

8  contended was due and owing.  In response to this dip in value, E*Trade liquidated Mr. Roling's

9  account by selling his stocks or other securities.  E*Trade used the proceeds of this sale to pay

10 itself for the inactivity fees.  Following this liquidation, Mr. Roling's account with E*Trade was

11 closed.

12      29.    When Mr. Roling learned of E*Trade's liquidation of his account he contacted

13 customer service.  Mr. Roling requested that E*Trade refund the money and provide him a copy of

14 the document that E*Trade contended gave it the right to charge inactivity fees.  E*Trade insisted

15 that it had the authority to charge quarterly inactivity fees and to liquidate his account if the

16 account balance fell to the amount purportedly owed for such fees.  E*Trade also claimed that it

17 would only provide the document(s) requested in response to a written request by Mr. Roling.

18      30.    E*Trade refused to refund Mr. Roling's money or reverse the liquidation of his

19 securities.

20                 **Facts Specific to Plaintiff Alexander Landvater**

21      31.    In or around April 2006, Mr. Landvater opened an E*Trade securities brokerage

22 account.  Mr. Landvater deposited approximately $1,000 into the account, which E*Trade used to

23 purchase $1,000 worth of stocks and other securities that he selected on his behalf.

24      32.    At the time Mr. Landvater opened his account, E*Trade's then-existing Brokerage

25 Customer Agreement provided that New York law governed his relationship with E*Trade and

26 that E*Trade was authorized to debit Mr. Landvater's account for various fees as determined by

27 the schedule of fees and commissions "available on the E*TRADE Securities Web site."

28      33.    Even though the Brokerage Customer Agreement did not state that Mr. Landvater

would be charged inactivity fees, a fee schedule, purportedly then-available on E*Trade's website, stated that E*Trade charged customers a quarterly $40 inactivity fee for each quarter in which a customer did not make a trade or perform some alternative act required to avoid the fee.  Mr. Landvater was not aware of the fee schedule and, apart from noting that a schedule of fees and commissions was "available on [its] Web site" in the Brokerage Customer Agreement, E*Trade never directed Mr. Landvater to any particular schedule, webpage, or other document.

34.     In or around 2008, Mr. Landvater learned via his E*Trade online account that E*Trade was charging his account $40 "quarterly inactivity fees."  Plaintiff determined that each quarter during which he did not make at least one trade, E*Trade had charged his account $40, representing the quarter's inactivity fee.

35.     After Mr. Landvater noticed the inactivity fees he contacted E*Trade customer service to dispute the imposition of such charges because at no time was he informed of any provision in his contract allowing E*Trade to impose such charges or allowing E*Trade to sell his stock.  E*Trade's representatives told Mr. Landvater that E*Trade was entitled to charge and collect such fees, and that there was nothing Mr. Landvater could do to avoid the charges he had incurred.

36.     The stocks Mr. Landvater selected decreased in value over time.

37.     In or around 2008, Mr. Landvater learned that E*Trade had liquidated his account by selling his stocks so that no money remained in the account.  E*Trade used the proceeds of these sales to pay itself for the inactivity fees.

38.     E*Trade refused to refund Mr. Landvater's money or reverse the liquidation.

## Class Certification Allegations

39.     Plaintiffs seek certification of one class and four subclasses (the "Class" and "Subclasses" are collectively referred to as the "Classes") under Rule 23(b)(3).

40.     **Definition of the Class:**  Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs Roling and Landvater bring this Complaint against Defendants on behalf of a Class consisting of:

> All persons in the United States who were E*Trade Brokerage Account Customers and were charged at least one quarterly inactivity fee any time from February 3, 2004 through the present.

41.  **Definition of the Subclasses:**  Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs Roling and Landvater bring this Complaint against Defendants on behalf of three Subclasses, defined as:

a)  **The "Increased Fee Subclass":**  All Class members who opened an E*Trade securities brokerage account before February 11, 2005, and were charged at least one inactivity fee that was greater than the amount of the inactivity fee, if any, in existence at the time of their account origination.

b)  **The "Conflicting Fee Schedule Subclass":**  All Class members who were charged at least one inactivity fee in or after March 16, 2006.

c)  **The "California Agreement Subclass":**  All Class members who opened an E*Trade securities brokerage account before November 1, 2005.

d)  **The "New York Agreement Subclass":**  All Class members who opened or maintained an E*Trade securities brokerage account on or after November 1, 2005.

42.  Excluded from the Class and Subclasses are 1) any Judge or Magistrate presiding over this action and members of their families; 2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; 3) persons who properly execute and file a timely request for exclusion from the class; 4) the legal representatives, successors or assigns of any such excluded persons; and 5) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendants.

43.  **Numerosity:**  The exact number of the members of the Classes is unknown and is not available to Plaintiffs, but it is clear that individual joinder is impracticable.  Defendants have millions of customers with brokerage accounts, potentially hundreds of thousands of whom, if not more, were charged quarterly inactivity fees.  The members of the Classes can be easily identified through Defendants' records and public records.

44.  **Commonality:**  Common questions of fact and law exist as to all members of the Classes and predominate over the questions affecting only individual members.  These common questions include:

a)  Whether E*Trade was entitled to charge and collect quarterly inactivity fees under

1      its Customer Brokerage Agreement;

2   b)  Whether E*Trade's Customer Brokerage Agreement is an unconscionable adhesion

3      contract;

4   c)  Whether E*Trade's Customer Brokerage Agreement provided for the imposition of

5      quarterly inactivity fees;

6   d)  Whether E*Trade was entitled to alter any applicable fee schedules that pertained

7      to Plaintiffs and the Increased Fee Subclass;

8   e)  Whether E*Trade gave sufficient notice to Plaintiffs and the Increased Fee

9      Subclass when it altered any applicable fee schedules that pertained to Plaintiffs

10      and the Increased Fee Subclass;

11   f)  Whether a fee schedule stating that E*Trade would not charge inactivity fees was

12      posted and made available on the E*Trade Securities Web Site;

13   g)  Whether E*Trade should be allowed to retain the inactivity fees from Plaintiffs and

14      the Class under principles of equity and good conscience;

15   h)  Whether E*Trade's conduct violated California's Unfair Competition Law;

16   i)  Whether E*Trade's conduct violated New York's Consumer Protection Law; and

17   j)  Whether Plaintiffs and the Class are entitled to relief, and the nature of such relief.

18   45.  **Typicality:**  Plaintiffs' claims are typical of the claims of other members of the

19 Class and Subclasses, as Plaintiffs and other members sustained damages arising out of the

20 wrongful conduct of Defendants, based upon the same transactions that were made uniformly to

21 Plaintiffs and the public.  The California and New York laws under which Plaintiffs' claims arise

22 do not conflict with the laws of any other state in any material way.

23   46.  **Adequate Representation:**  Plaintiffs will fairly and adequately represent and

24 protect the interests of the members of the Classes, and have retained counsel competent and

25 experienced in complex class actions.  Plaintiffs have no interest antagonistic to those of the

26 Classes and Defendants have no defenses unique to Plaintiffs.

27   47.  **Predominance and Superiority:**  This class action is appropriate for certification

28 because class proceedings are superior to all other available methods for the fair and efficient

1   adjudication of this controversy, since joinder of all members is impracticable.  The damages

2   suffered by the individual members of the Classes will likely be relatively small, especially given

3   the burden and expense of individual prosecution of the complex litigation necessitated by the

4   actions of Defendants.  It would be virtually impossible for the individual members of the Classes

5   to obtain effective relief from the misconduct of Defendants.  Even if members of the Classes

6   themselves could sustain such individual litigation, it would still not be preferable to a class

7   action, because individual litigation would increase the delay and expense to all parties due to the

8   complex legal and factual controversies presented in this Complaint.  By contrast, a class action

9   presents far fewer management difficulties and provides the benefits of single adjudication,

10  economy of scale, and comprehensive supervision by a single court.  Economies of time, effort,

11  and expense will be fostered and uniformity of decisions will be ensured.

12          48.     **Policies Generally Applicable to the Classes:**  This class action is also

13  appropriate for certification because Defendants have acted or refused to act on grounds generally

14  applicable to the Classes, thereby making appropriate final injunctive relief or corresponding

15  declaratory relief with respect to the Classes as a whole.  The policies of the Defendants

16  challenged herein apply to and affect all members of the Class or, where applicable, Subclasses

17  uniformly, and Plaintiffs' challenge of these policies hinges on Defendants' conduct, not on facts

18  or law applicable only to Plaintiffs.

19                          **Count I:  Breach of Contract**
                            **(On behalf of Plaintiffs and the Class)**
20
21          49.     Plaintiffs incorporate and re-allege paragraphs 1-58 above as if fully set forth

    herein.
22
23          50.     Plaintiffs and E*Trade entered into a contract that E*Trade drafted and controls via

24  its website.  With the exception of certain unconscionable provisions such as the sections

    governing choice of law, arbitration, and E*Trade's supposed ability to unilaterally change the
25
    Agreement's terms, the Brokerage Customer Agreement sets forth the material terms of the
26
    Parties' contract.
27
            51.     The Brokerage Customer Agreement itself does not permit E*Trade to charge
28

Plaintiffs inactivity fees.  Rather, the Agreement provides that E*Trade may only charge fees in accordance with the schedule of fees and commissions "available on the E*Trade Securities Web site."

52.     Apart from noting that it is available on the E*Trade "Web site," the Brokerage Customer Agreement does not instruct customers regarding how to access the fee schedule, provide a hyperlink to the fee schedule (even though the Brokerage Customer Agreement is, itself, available online), provide any detailed description regarding the schedule or the schedule's terms, or otherwise identify or give the specific title of the schedule.  The Brokerage Customer Agreement's use of the terms "fee and commission table" or "then-current fee schedule" fails to reasonably identify the applicable fee schedule "clearly and conspicuously" and beyond any reasonable doubt.

53.     Moreover, due to a supposed "bug" in its programming and code, E*Trade posted and made available multiple fee schedules on its website that state E*Trade will not charge inactivity fees – such as the Brown Co. Addendum – which makes it impossible to determine clearly or conspicuously or beyond doubt which fee schedule, if any, the Brokerage Customer Agreement purports to incorporate.

54.     Plaintiffs could not reasonably or easily identify, or otherwise locate, the fee schedule on E*Trade's massive website; nor could Plaintiffs know of – much less assent to – the terms of that schedule.

55.     As a consequence, and because the fee schedule is extrinsic to the Brokerage Customer Agreement, Plaintiffs were not subject to or otherwise bound by the fee schedule's terms.

56.     On information and belief, E*Trade also charged inactivity fee increases without first posting a fee schedule on its website allowing E*Trade to charge such increases.

57.     Nevertheless, and without contractual authority to do so, E*Trade charged Plaintiffs and the other Class members inactivity fees at the end of each calendar quarter during which the customer did not make a trade.  For example, if a customer did not make a trade during the course of a year, the customer's account would reflect that E*Trade was due to be paid

1 | anywhere from $60 (if E*Trade insisted the inactivity fee was $15) to $160 (if E*Trade insisted
2 | the inactivity fee was $40).

3 |       58.      E*Trade's practice of charging inactivity fees without a contractual basis for doing
4 | so breached the express terms of the Brokerage Customer Agreement regarding the price of
5 | E*Trade's services.

6 |       59.      Further, as the contractual entity with control over its customers' accounts,
7 | including the maintenance and billing of those accounts, E*Trade has an implied contractual duty
8 | to accurately bill its customers according to their actual account activity under the terms of the
9 | Brokerage Customer Agreement.  Such an implied duty is closely connected to a vast majority of
10 | the Brokerage Customer Agreement's material terms.

11 |       60.      As such, when E*Trade charged its customers inactivity fees that were not
12 | expressly authorized by the Brokerage Customer Agreement, E*Trade's breached its implied duty
13 | to accurately bill its customers, as established by the express terms set forth in the Brokerage
14 | Customer Agreement and E*Trade's contractual relationship with its customers.

15 |       61.      Where the value of stocks and/or securities held in a customer's account declined
16 | such that the balance approximately equaled the amount E*Trade claimed that customer owed in
17 | inactivity fees, E*Trade sold those stocks and/or securities.  After such a forced liquidation,
18 | E*Trade would deduct the inactivity fees that it claimed it was owed from the customer's account.

19 |       62.      Where a customer elected to close his/her account prior to forced liquidation,
20 | E*Trade would liquidate the remaining assets held by the customer and deduct the inactivity fees
21 | that it claimed it was owed from the account before returning any remaining monies to the
22 | customer.

23 |       63.      As an actual and proximate result of E*Trade's breaches of its contracts as
24 | described above, Plaintiffs and the Class members suffered damages equal to the inactivity fees
25 | wrongfully charged to them, in addition to lost time they spent fruitlessly trying to get E*Trade to
26 | correct its errors, interest, and other actual and consequential damages

27 |       WHEREFORE, Plaintiffs, individually and on behalf of the putative Class, respectfully
28 | pray for a declaration that E*Trade has breached its contracts with Plaintiffs and the Class, and

entry of a judgment in their favor and against E*Trade on Count I of the Complaint for all actual and consequential damages in an amount to be proven at trial, plus interest and costs.

## Count II:  First Alternative Claim for Unjust Enrichment/Restitution
### (On behalf of Plaintiffs and the Class)

64.    Plaintiffs incorporate and re-allege paragraphs 1-48 as if fully set forth herein.

65.    In the alternative to Count I, E*Trade's Brokerage Customer Agreement is, in whole or with respect to individual provisions of that Agreement, procedurally and substantively unconscionable and unenforceable under applicable law.

66.    The Brokerage Customer Agreement is an adhesion contract drafted by E*Trade and imposed on the customer on a "take-it-or-leave-it basis."  There is no negotiation in the formation or performance of the Brokerage Customer Agreement and E*Trade uses the contract to unlawfully take relatively small sums of money from a large number of people.

67.    Two provisions of the Brokerage Customer Agreement allow E*Trade to unilaterally, first, revise the terms and conditions of the Agreement by posting such revisions on the E*Trade website and, second, modify its account fee structures at any time by posting modified fee schedules on the E*Trade website.  These provisions are unconscionable and unenforceable in their entirety because E*Trade customers are required to constantly scour E*Trade's website for any supposedly modified terms of the Agreement, are given no notice of such modifications when E*Trade chooses to make them, and are given no opportunity to either accept or reject any such modifications to the Agreement.

68.    Apart from the two unconscionable and unenforceable provisions described herein, the Brokerage Customer Agreement does not permit E*Trade to assess or otherwise recover inactivity fees from its customers.

69.    E*Trade's supposed notices of any changes are deficient insofar as they fail to refer back to the Brokerage Customer Agreements or the fee schedules and/or fail to provide customers with the opportunity to reject the purported changes or cancel their agreement without penalty.

70.    In the event this Court finds the Broker Customer Agreement unconscionable, unenforceable or otherwise inapplicable, either in whole or with respect to the above-described

provisions, under principles of equity and good conscience E*Trade should not be permitted to retain the money belonging to Plaintiffs and the Class that E*Trade unjustly received as a result of its charging and collection of quarterly inactivity fees from its customers.

71.    E*Trade knowingly appreciates the benefits of these quarterly inactivity fees and should be required to make restitution to Plaintiffs and the Class.

WHEREFORE, and in the alternative to Count I, Plaintiffs, individually and on behalf of the putative class, respectfully pray for entry of a judgment in their favor and against E*Trade on Count II of the Complaint, and an Order requiring E*Trade to make restitution to Plaintiffs and the putative Class of all monies wrongfully retained relating to E*Trade's imposition of quarterly inactivity fees, plus all other actual and consequential damages in an amount to be proven at trial, plus interest and costs.

**Count III: Alternative Claim for Breach of Contract**
**(On behalf of Plaintiffs Roling and the Increased Fee Subclass)**

72.    Plaintiffs incorporate and re-allege paragraphs 1-48 as if fully set forth herein.

73.    In the alternative to Counts I and II, Plaintiffs and E*Trade entered into a contract that E*Trade drafted and controls via its website.  With the exception of certain unconscionable provisions such as the choice of law provision and the arbitration provision, the Brokerage Customer Agreement sets forth the material terms of the Parties' contract.

74.    The Brokerage Customer Agreement itself does not permit E*Trade to charge Plaintiffs inactivity fees.  Rather, the Agreement provides that E*Trade may only charge fees in accordance with the schedule of fees and commissions "available on the E*Trade Securities Web site."

75.    When Plaintiffs became E*Trade customers, they became subject to the terms of the fee schedule as it existed at the time of account origination.  Those terms included the cost of inactivity fees – if any – to which Plaintiffs might be subject under the terms of their contract with E*Trade.

76.    The terms regarding the costs of purportedly applicable inactivity fees – if any – were material to the Brokerage Customer Agreement.

77.     Subsequently, E*Trade unilaterally altered and increased the cost terms of the online fee schedule but did not give Plaintiffs notice of that alteration and/or an opportunity to either accept or reject the new cost terms without penalty.  For example, E*Trade provided notice of the January 1, 2005 increase from $25 to $40 no earlier than February 11, 2005.  Plaintiffs were unaware of any such changes.  Thus, the new cost terms posted to the fee schedule did not change the contractual obligations or rights of Plaintiffs or E*Trade.  Moreover, on information and belief, E*Trade sought to enforce increases to the inactivity fees against Plaintiffs without first posting a modified fee schedule on its website reflecting the increase.

78.     Nevertheless, and without contractual authority to do so, E*Trade charged Plaintiffs and the other Class members inactivity fees, applying the altered and increased cost terms, at the end of each calendar quarter during which the customer did not make a trade.

79.     E*Trade's practice of charging altered and increased inactivity fees, without a contractual basis for doing so, breached the express terms of the Brokerage Customer Agreement.

80.     Further, as the contractual entity with control over its customers' accounts, including the maintenance and billing of those accounts, E*Trade has an implied contractual duty to accurately bill its customers according to their actual account activity under the terms of the Brokerage Customer Agreement.  Such an implied duty is closely connected to a vast majority of the Agreement's material terms.

81.     As such, when E*Trade charged its customers inactivity fees that were not expressly authorized by the Brokerage Customer Agreement, E*Trade breached its implied duty to accurately bill its customers, as established by the express terms set forth in the Brokerage Customer Agreement and E*Trade's contractual relationship with its customers.

82.     When the value of stocks and/or securities held in Plaintiffs' accounts declined such that the balance equaled the amount E*Trade claimed Plaintiffs owed in inactivity fees, E*Trade sold those stocks and/or securities.  After such a forced liquidation, E*Trade would deduct the inactivity fees that it claimed it was owed from Plaintiffs' accounts.

83.     When a customer elected to close his/her account prior to forced liquidation, E*Trade would liquidate the remaining assets held by the customer and deduct the inactivity fees

1    that it claimed it was owed from the account before returning any remaining monies to the

2    customer.

3        84.    As an actual and proximate result of E*Trade's breaches of its contracts as

4    described above, Plaintiffs and the Subclass members suffered damages equal to the inactivity fees

5    wrongfully charged to them (i.e., to the extent that E*Trade charged such customers at a rate

6    higher than which they were contractually entitled to charge), in addition to lost time they spent

7    fruitlessly trying to get E*Trade to correct its errors, interest, and other actual and consequential

8    damages.

9        WHEREFORE, Plaintiffs, individually and on behalf of the Increased Fee Subclass,

10   respectfully pray for a declaration that E*Trade has breached its contracts with Plaintiffs and the

11   Subclass, and entry of a judgment in their favor and against E*Trade on Count III of the

12   Complaint for all actual and consequential damages in an amount to be proven at trial, plus

13   interest and costs.

14
### Count IV:  Second Alternative Claim for Unjust Enrichment/Restitution
### (On behalf of Plaintiffs Roling and the Increased Fee Subclass)

15       85.    Plaintiffs incorporate and re-allege paragraphs 1-48 as if fully set forth herein.

16       86.    In the alternative to Counts I, II, and III, E*Trade's Brokerage Customer

17   Agreement is, in whole or with respect to individual provisions of that Agreement, procedurally

18   and substantively unconscionable and unenforceable under California law, Cal. Civ. 1670.5(a).

19       87.    The Brokerage Customer Agreement is an adhesion contract drafted by E*Trade

20   and imposed on the customer on a "take-it-or-leave-it basis."  There is no negotiation in the

21   formation or performance of the Brokerage Customer Agreement and E*Trade uses the contract to

22   unlawfully take relatively small sums of money from a large number of people.

23       88.    Two provisions of the Brokerage Customer Agreement purport to allow E*Trade to

24   unilaterally, first, revise the terms and conditions of the Agreement by posting such revisions on

25   the E*Trade website and, second, modify its account fee structures at any time by posting

26   modified fee schedules on the E*Trade website.  These provisions are unconscionable and

27   unenforceable with respect to changes that E*Trade unilaterally made to either the Brokerage

28

Customer Agreement itself or the schedule of fees and commissions on the E*Trade website, because E*Trade customers are required to constantly scour E*Trade's website for the terms of the Agreement, are given no notice of changes when E*Trade chooses to make them, and are given no opportunity to either accept or reject modifications to the Agreement.

89.     Because they receive no proper notification regarding changes, E*Trade customers are apparently expected to constantly monitor and search "the E*Trade Web site" for new, additional, or modified provisions to the Brokerage Customer Agreement (a document that, depending on how it is formatted for printing, can exceed fifty (50) pages in length), and for new, additional, or modified aspects of the fee schedule that purportedly applies to them, which are located somewhere on the E*Trade "Web site."

90.     As a consequence, and only to the extent that the Brokerage Customer Agreement and schedule of fees in existence at the time of customer enrollment is enforceable, subsequent changes to that Agreement and schedule, unilaterally made by E*Trade without the opportunity to reject such changes without penalty, are unenforceable.

91.     In the event this Court finds the changes to the Broker Customer Agreement or fee schedule unconscionable, unenforceable or otherwise inapplicable, under principles of equity and good conscience E*Trade should not be permitted to retain the money belonging to Plaintiffs and the other members of the Subclass that E*Trade unjustly received as a result of charging and collecting quarterly inactivity fees from customers that were greater than the fees that the customers knowingly agreed to be charged.

92.     E*Trade knowingly appreciates the benefits of these increased quarterly inactivity fees and should be required to make restitution to Plaintiffs and the Subclass.

93.     As an actual and proximate result of E*Trade's conduct, Plaintiffs and the Subclass members have suffered damages in the form of altered and increased quarterly inactivity fees they were charged but did not agree to, plus interest, costs, lost opportunity, and consequential damages.

WHEREFORE, and in the alternative to Counts I, II, and III, Plaintiff Roling individually, and on behalf of the Increased Fee Subclass, respectfully prays for entry of a judgment in his favor

1   and against E*Trade on Count IV of the Complaint, and an Order requiring E*Trade to make

2   restitution to Plaintiffs and the putative Subclass of all monies wrongfully retained relating to

3   E*Trade's imposition of quarterly inactivity fees, plus all other actual and consequential damages

4   in an amount to be proven at trial, plus interest and costs.

5   **Count V:  Second Alternative Claim for Breach of Contract**
    **(On behalf of Plaintiffs Roling and Landvater and the Conflicting Fee Schedule Subclass)**

6   94.     Plaintiffs incorporate and re-allege paragraphs 1-48 as if fully set forth herein.

7   95.     In the alternative to Counts I, II, III, and IV, Plaintiffs and E*Trade entered into a

8   contract that E*Trade drafted and controls via its website.  With the exception of certain

9   unconscionable provisions such as the choice of law provision and the arbitration provision, the

10  Brokerage Customer Agreement sets forth the material terms of the Parties' contract.

11  96.     The Brokerage Customer Agreement itself does not permit E*Trade to charge

12  Plaintiffs inactivity fees.  Rather, the Agreement provides that E*Trade may only charge fees in

13  accordance with the schedule of fees and commissions "available on the E*Trade Securities Web

14  site."

15  97.     In or around 2005, E*Trade acquired another online brokerage company named

16  "BrownCo."  As a part of that acquisition, E*Trade created a fee schedule purportedly applicable

17  to those BrownCo customers that retained an account with E*Trade (hereafter, the "BrownCo

18  schedule").

19  98.     The BrownCo schedule was integrated into the E*Trade Securities Web Site in

20  early 2006, and included the following statements under the heading "Account Activity Fees:"

21       "No minimum Account Balance[:]  There are no minimum balances to maintain
         after your account has been opened.  Of course, you must have sufficient cash or
22       equity in your account on trade date whenever you make a trade."  (Ex. B, at 3.)

23       "No Inactivity Fees[:]  E*TRADE Securities will not charge fees when your
         account is inactive for a period of time."  (*Id.*)
24

25  99.     Although E*Trade purportedly designed its website so that the BrownCo schedule

26  would only be applicable to former BrownCo customers, E*Trade styled the BrownCo schedule

27  "View Commissions & Fees."  (*See id.* at 1.)

28  100.    Further, and although E*Trade purportedly intended that the BrownCo schedule

SECOND AMENDED CLASS
ACTION COMPLAINT AND JURY DEMAND            20

CASE NO. 3:10-cv-00488-EMC

would be *exclusively* available to former BrownCo customers via the E*Trade Securities Web Site (i.e., available only to those former BrownCo customers that retained a brokerage account with E*Trade following the acquisition), the BrownCo schedule was in fact available to *any* E*Trade customer via the search feature on the E*Trade Securities Web Site, through public searches using Google, or by other means.

101.   Accordingly, despite the above-discussed provisions regarding Account Activity Fees (*supra*, ¶ 96) and for the period spanning from March 2006 through March 2010, E*Trade breached the express terms of the Brokerage Customer Agreement by causing Plaintiffs and the other Subclass members to be charged inactivity fees at the end of each calendar quarter during which the customer did not maintain a minimum account balance or make a trade.

102.   Further, as the contractual entity with control over its customers' accounts, including the maintenance and billing of those accounts, E*Trade has an implied contractual duty to accurately bill its customers according to their actual account activity under the terms of the Brokerage Customer Agreement.  Such an implied duty is closely connected to a vast majority of the Brokerage Customer Agreement's material terms.

103.   As such, when E*Trade charged its customers inactivity fees that were not expressly authorized by the Brokerage Customer Agreement, E*Trade's breached its implied duty to accurately bill its customers, as established by the express terms set forth in the Brokerage Customer Agreement and E*Trade's contractual relationship with its customers.

104.   Where the value of stocks and/or securities held in a customer's account declined such that the balance approximately equaled the amount E*Trade claimed that customer owed in inactivity fees, E*Trade sold those stocks and/or securities.  After such a forced liquidation, E*Trade would deduct the inactivity fees that it claimed it was owed from the customer's account.

105.   Where a customer elected to close his/her account prior to forced liquidation, E*Trade would liquidate the remaining assets held by the customer and deduct the inactivity fees that it claimed it was owed from the account before returning any remaining monies to the customer.

106.   As an actual and proximate result of E*Trade's breaches of its contracts as

described above, Plaintiffs and the Class members suffered damages equal to the inactivity fees wrongfully charged to them, in addition to lost time they spent fruitlessly trying to get E*Trade to correct its errors, interest, and other actual and consequential damages

WHEREFORE, and in the alternative to Counts I – IV, Plaintiffs Roling and Landvater, individually and on behalf of the BrownCo Fee Schedule Subclass, respectfully pray for a declaration that E*Trade has breached its contracts with Plaintiffs and the Subclass, and entry of a judgment in their favor and against E*Trade on Count V of the Complaint for all actual and consequential damages in an amount to be proven at trial, plus interest and costs.

**Count VI:  Violation of California's Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code § 17200 *et. seq*.**
**(On behalf of Plaintiffs Roling and the California Agreement Subclass)**

107.    Plaintiffs incorporate and re-allege paragraphs 1 – 106 as if fully set forth herein.

108.    At the time Plaintiffs became E*Trade customers, the Brokerage Customer Agreement, which governs their contractual relationship with E*Trade, provided that the Agreement will be deemed to have been made in the State of California and will be construed in accordance with the internal laws of the State of California.

109.    E*Trade's conduct as described above in charging quarterly inactivity fees, where no contractual provision permitted E*Trade to charge or collect such monies, constitutes unfair conduct under the UCL.

110.    As discussed herein, E*Trade's alleged ability to charge inactivity fees relied entirely on a fee schedule that, while purportedly available to customers on the E*Trade "Web site," was not properly incorporated into the Brokerage Customer Agreement and accordingly did not bind Plaintiffs or members of the Subclass.

111.    E*Trade's practice of assessing quarterly inactivity fees where no contractual provision in the Brokerage Customer Agreement permitted E*Trade to charge or collect such monies constitutes unfair conduct under the UCL.

112.    The injury suffered by Plaintiffs and the Subclass members is substantial in both the amount of fees wrongfully collected as well as the lost opportunity from having their investments liquidated.

1    113.    The injury to Plaintiffs and the Subclass members is not outweighed by any

2    countervailing benefits to consumers or competition.  The only entity to benefit from the

3    imposition or increase of the quarterly inactivity fees was E*Trade itself.

4    114.    Plaintiffs and the other Subclass members could not reasonably have avoided the

5    injury.  E*Trade's customer service representatives refused to listen when customers called to

6    complain, and instead simply insisted that E*Trade had the legal right to impose such charges.

7    Furthermore, the injury was unavoidable.  E*Trade acted unilaterally and E*Trade did not collect

8    the fees until the accounts were subject to liquidation, the proceeds of which E*Trade would use

9    to pay itself the inactivity fees.

10    WHEREFORE, Plaintiffs, individually and on behalf of the California Agreement

11    Subclass, respectfully pray for entry of a judgment in their favor and against E*Trade on Count V

12    of the Complaint, a declaration that E*Trade's assessment of purportedly applicable quarterly

13    inactivity fees constitutes unfair business practices in violation of the UCL, an injunction

14    enjoining E*Trade from charging and collecting such fees without a contractual basis,

15    disgorgement of any monies wrongfully retained by E*Trade from the quarterly inactivity fees or

16    increases to such fees, require that E*Trade make restitution to the Subclass, and an award of costs

17    and reasonable attorneys' fees.

18    **Count VII:  Violation of California's Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code § 17200 *et. seq.***

19    **(On behalf of Plaintiffs Roling and the Increased Fee Subclass)**

20    115.    Plaintiffs incorporate and re-allege paragraphs 1 – 106 as if fully set forth herein.

21    116.    At the time Plaintiffs became E*Trade customers, the Brokerage Customer

22    Agreement, which governs their contractual relationship with E*Trade, provided that the

23    Agreement will be deemed to have been made in the State of California and will be construed in

24    accordance with the internal laws of the State of California.

25    117.    E*Trade's contractual ability, if any, to charge and collect quarterly inactivity fees,

26    including the amount of such fees, is a material part of the Brokerage Customer Agreement.

27    118.    Insofar as E*Trade had the contractual ability to charge and collect quarterly

28    inactivity fees, E*Trade's practice of unilaterally increasing such fees – and then charging

1    customers under that altered or increased fee schedule – without providing adequate notice to

2    those customers purportedly affected by such changes and without opportunity for such customers

3    to accept or reject such altered or increased charges without penalty constitutes unfair conduct

4    under the UCL.

5         119.    The injury suffered by Plaintiffs and the Subclass members is substantial in both

6    the amount of fees wrongfully collected as well as the lost opportunity from having their

7    investments liquidated.

8         120.    The injury to Plaintiffs and the Subclass members is not outweighed by any

9    countervailing benefits to consumers or competition.  The only entity to benefit from the

10   imposition or increase of the quarterly inactivity fees was E*Trade itself.

11        121.    Plaintiffs and the other Subclass members could not reasonably have avoided the

12   injury.  E*Trade's alteration of the Brokerage Customer Agreement and online fee schedule was

13   done unilaterally without giving notice to affected customers.  Moreover, E*Trade's customer

14   service representatives refused to listen when customers called to complain, and instead simply

15   insisted that E*Trade had the legal right to impose such charges.  Furthermore, the injury was

16   unavoidable.  E*Trade acted unilaterally and did not collect the fees until the accounts were

17   subject to liquidation, the proceeds of which E*Trade would use to pay itself the inactivity fees.

18        WHEREFORE, Plaintiffs, individually and on behalf of the Increased Fee Subclass,

19   respectfully pray for entry of a judgment in their favor and against E*Trade on Count VI of the

20   Complaint, a declaration that E*Trade's unilateral increase of purportedly applicable quarterly

21   inactivity fees constitutes unfair and fraudulent business practices in violation of the UCL, an

22   order enjoining E*Trade from charging and collecting such fees without a contractual basis,

23   disgorgement of any monies wrongfully retained by E*Trade from the quarterly inactivity fees or

24   increases to such fees, require that E*Trade make restitution to the Subclass members, and an

25   award of costs and reasonable attorneys' fees.

26                    **Count VIII:  Violation of New York Consumer Protection Law**
                               **N.Y. Gen. Bus. Law § 349**
27          **(On behalf of Plaintiffs Roling, Landvater and the New York Agreement Subclass)**

28        122.    Plaintiffs incorporate and re-allege paragraphs 1 – 119 as if fully set forth herein.

123.    In November 2005, and by the time Landvater became an E*Trade customer, the Brokerage Customer Agreement provided that the Agreement will be deemed to have been made in the State of New York and will be construed in accordance with the internal laws of the State of New York.

124.    E*Trade's conduct in charging and collecting quarterly inactivity fees from its customers constituted a deceptive and/or misleading practice under New York's Consumer Protection Law, N.Y. Gen. Bus. Law § 349.

125.    The terms and conditions of E*Trade's Brokerage Customer Agreement are consumer-oriented, as they govern the relationship between E*Trade and its individual customers.

126.    As discussed, E*Trade's Brokerage Customer Agreement did not, itself, authorize E*Trade to charge its customers quarterly inactivity fees.  Rather, E*Trade's purported ability to so charge its customers relied on an extrinsic document that, as explained above, was not properly incorporated into the underlying Agreements.  Thus, E*Trade had no contractual authority to charge inactivity fees.

127.    As such, E*Trade's practice of charging quarterly inactivity fees where no contractual provision in the Brokerage Customer Agreement permitted E*Trade to so charge or collect such monies was likely to deceive and/or mislead a customer acting reasonably under the circumstances.

128.    Plaintiffs and the Subclass members suffered substantial injury as a result of E*Trade's deceptive practices, in both the amount of fees wrongfully collected as well as the lost opportunity from having their investments liquidated.

129.    The injury to Plaintiffs and the Subclass members is not outweighed by any countervailing benefits to consumers or competition.  The only entity to benefit from the imposition or increase of the quarterly inactivity fees was E*Trade itself.

130.    Plaintiffs and the other Subclass members could not reasonably have avoided the injury.  E*Trade's customer service representatives refused to listen when customers called to complain, and instead simply insisted that E*Trade had the legal right to impose such charges.  Furthermore, the injury was unavoidable.  E*Trade acted unilaterally and E*Trade did not collect

1  the fees until the accounts were liquidated by E*Trade or closed by the customer.  Once the

2  accounts were liquidated, E*Trade used the proceeds to pay itself the inactivity fees.

3        WHEREFORE, Plaintiffs Roling and Landvater, individually and on behalf of the putative

4  New York Agreement Subclass, respectfully pray for entry of a judgment in their favor and

5  against E*Trade on Count VII of the Complaint, a declaration that E*Trade's assessment of

6  quarterly inactivity fees constitutes a deceptive business practice in violation of the New York

7  Consumer Protection Law, an Order enjoining E*Trade from charging and collecting such fees

8  without a contractual basis, an award of actual damages, a requirement that E*Trade make

9  restitution to the Subclass members, and an award of costs and reasonable attorneys' fees.

10  **PRAYER FOR RELIEF**

11  **WHEREFORE**, Plaintiffs Joseph Roling and Alexander Landvater, on behalf of

12  themselves and the putative Classes, pray for the following relief in addition to that set forth above

13  specifically under each Count:

14      A.    Certify this case as a class action on behalf of the Classes described above; appoint

15  Roling and Landvater as Class Representatives; and appoint their counsel, Edelson McGuire LLC,

16  Class Counsel;

17      B.    Declare that the actions of E*Trade, as set out above, result in breach of contract,

18  or, alternatively, unjust enrichment requiring restitution, a violation of the UCL warranting the

19  imposition of injunctive relief, and a violation of the New York Consumer Protection Law

20  warranting the imposition of injunctive relief;

21      C.    Enter judgment against E*Trade on all Counts of the Complaint for all damages

22  caused by its conduct;

23      D.    Award restitution against E*Trade for all money that it has to which Plaintiffs and

24  the Class are entitled in equity;

25      E.    Award Plaintiffs and the Class their reasonable litigation expenses and attorneys'

26  fees, to the extent allowable;

27      F.    Award Plaintiffs and the Class pre- and post-judgment interest, to the extent

28  allowable;

1        G.     Enter injunctive or other relief as is necessary to protect the interests of Plaintiffs

2   and the Class; and

3        H.     Award such other and further relief as equity and justice may require.

4   **JURY DEMAND**

5        Plaintiffs request a trial by jury of all issues so triable.

6   Dated: January 27, 2012               Respectfully submitted,

7                            JOSEPH ROLING, and ALEXANDER

8                            LANDVATER, individually and on behalf of all others similarly situated,

9                            By: /s/ Rafey S. Balabanian_____

10                                  One of the Attorneys for Plaintiffs

11   EDELSON MCGUIRE LLC
Jay Edelson (Admitted *Pro Hac Vice*)
(jedelson@edelson.com)

12   Rafey S. Balabanian (Admitted *Pro Hac Vice*)
(rbalabanian@edelson.com)

13   Steven L. Woodrow (Admitted *Pro Hac Vice*)
(swoodrow@edelson.com)

14   Ari J. Scharg (Admitted *Pro Hac Vice*)
(ascharg@edelson.com)

15   350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654

16   Telephone: (312) 589-6370
Facsimile: (312) 589-6378

17

18   EDELSON MCGUIRE LLP
Sean P. Reis (SBN 184044)
(sreis@edelson.com)

19   30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688

20   Telephone: (949) 459-2124
Facsimile: (949) 459-2123

21

22   *Attorneys for Plaintiffs* JOSEPH ROLING and
ALEXANDER LANDVATER, and the putative class

23

24

25

26

27

28

SECOND AMENDED CLASS
ACTION COMPLAINT AND JURY DEMAND       27       CASE NO. 3:10-cv-00488-EMC