Sean P. Reis (SBN 184044)
EDELSON MCGUIRE LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Tel: 949.459.2124
Fax: 949.459.2123
sreis@edelson.com

Jay Edelson (Admitted *Pro Hac Vice*)
Rafey S. Balabanian (Admitted *Pro Hac Vice*)
Steven L. Woodrow (Admitted *Pro Hac Vice*)
Ari J. Scharg (Admitted *Pro Hac Vice*)
Benjamin S. Thomassen (Admitted *Pro Hac Vice*)
EDELSON MCGUIRE LLC
350 North LaSalle, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
jedelson@edelson.com
rbalabanian@edelson.com
swoodrow@edelson.com
ascharg@edelson.com
bthomassen@edelson.com

*Counsel for Plaintiffs*
[additional counsel appear on signature page]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH ROLING and ALEXANDER LANDVATER, individually and on behalf of all others similarly situated, | Case No.: 3:10-cv-00488-EMC |
| Plaintiffs, | [Honorable Edward M. Chen] |
| v. | **PLAINTIFFS' RESPONSE IN OPPOSITION TO E*TRADE'S MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR RELIEF UNDER FEDERAL RULE 56(d)** |
| E*TRADE SECURITIES LLC, a Delaware limited liability company, and DOES 1-50, inclusive, | |
| Defendants. | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION .................................................................................................................. 1

ARGUMENT ......................................................................................................................... 2

I.   E*TRADE'S ARGUMENTS OVERLOOK GENUINE ISSUES OF
     MATERIAL FACT REGARDING E*TRADE'S INCORPORATION OF
     THE RETAIL FEE SCHEDULE, POSTING OF ITS FEE SCHEDULES,
     NOTICE OF INCREASES, AND BUG IN ITS WEBSITE PROGRAMMING ........... 3

     A.   With Respect to Plaintiffs (And The Entire Class), E*TRADE Cannot
          Show As A Matter Of Law That It Properly Incorporated The Retail Fee
          Schedule "Clearly And Conspicuously" And "Beyond Any Doubt." ................ 3

          1.   E*TRADE overstates the sufficiency of its "methods" for
               locating the Retail fee schedule. ...................................................... 4

               a.   E*TRADE incorrectly asserts that the website Help
                    Center allows any website visitor to click on an FAQ
                    "which directly linked to the Fee Schedule applicable to
                    his account." ............................................................... 5

               b.   E*TRADE's pricing tab did not provide immediate
                    access to the fee schedule. ............................................. 6

               c.   Plaintiffs contest the functionality and legal import of E*TRADE's
                    website search platform. ................................................ 7

               d.   E*TRADE actually deleted language stating that the fee schedule
                    was "available upon request" from its BCA
                    starting in 2002. .......................................................... 8

          2.   Additional factual considerations cast further doubt on the
               sufficiency of E*TRADE's methods for locating the Retail fee
               schedule. ...................................................................... 9

     B.   For Plaintiff Roling (And The Increased Fee Subclass), Genuine Issues
          Of Material Fact – Regarding The Date E*TRADE Posted A Modified
          Schedule Allowing For $40 Inactivity Fees And Whether E*TRADE's
          Notices Allowed Customers To Reject The Change – Preclude Entering
          Summary Judgment In E*TRADE's Favor. ...................................................... 12

          1.   The Parties dispute whether E*TRADE charged $40 inactivity
               fees prior to posting a modified fee schedule allowing it to do so. ........ 12

          2.   The Parties disagree as to whether E*TRADE's notices
               properly afforded customers the ability to reject the increase
               to $40... .................................................................... 14

     C.   The Plaintiffs (And The Conflicting Fee Schedule Subclass) Genuinely
          Dispute Both The Availability And Materiality Of The BrownCo. Fee
          Schedule. ...................................................................... 16

1.    **The Court should not adopt E\*TRADE's position that the BrownCo. schedule was only available to Retail customers due to the "bug" and that only unreasonable customers, using "obscure" search terms, would have triggered the bug in the first place.** ........................................................17

2.    **E\*TRADE's argument that any affect the bug had on search results is merely "hypothetical" ignores the fact that none of the Plaintiffs' claims requires proof of reliance or a review of their subjective intent.** ........................................19

3.    **The Court can only enter judgment in E\*TRADE's favor with respect to E\*TRADE's side-by-side comparison if the facts are viewed most favorably to E\*TRADE.** .........................................21

4.    **The Parties genuinely dispute when the BrownCo. addendum first became available to Retail customers.** ..............................23

D.    **The Plaintiffs Have Not, As A Matter Of Law, Waived Their Claims.** ............24

II.    **TO THE EXTENT DISPUTED FACTUAL ISSUES ARE NOT EVIDENT BASED ON THE PRESENT RECORD, PLAINTIFFS CAN, UNDER RULE 56(D), ARTICULATE THE REASONS AND DISCOVERY THEY NEED THAT WOULD REVEAL A GENUINE ISSUE OF MATERIAL FACT FOR TRIAL.** ....................................................................26

A.    **Discovery Would Reveal E\*TRADE's Computer Code—That E\*TRADE's Lawyers Represented To Judge Spero Had Been Preserved—From Which Plaintiffs Can Discern The Date The "Bug" Began Affecting Search Results.** ..............................................27

B.    **Native Data For E\*TRADE's "Do Not Crawl" List And A Follow Up Deposition If Mr. Iqbal On His Supplemental Declaration Would Show What Additional Information E\*TRADE Has Regarding The Bug's Affect On Website Searches.** ......................................................28

C.    **The Deposition Of Mr. Renga Will Allow Plaintiffs To Learn Whether E\*TRADE Can Produce Copies Of The Retail Fee Schedule Allowing For $25 Inactivity Fees And Whether E\*TRADE Can Provide A Definitive Date For When E\*TRADE Posted The Schedule Reflecting The Increase To $40 On Its Website.** ....................................................29

D.    **Further Discovery Will Identify Individuals At E\*TRADE With Relevant Knowledge Of Key Issues, Including The Dates That Modified Fee Schedules Were Posted To The Website And E\*TRADE's Change Logs.** ..................29

E.    **Discovery Will Reveal Further Information Regarding The Online Securities Brokerage Industry And Its Practice Generally Of Charging Inactivity Fees During The Period Of Time From 2004 To The Present.** ......................30

**CONCLUSION** ..................................................................................30

# TABLE OF AUTHORITIES

**United States Supreme Court Cases:**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................................2


**United States Appellate Court Cases:**

*Albarran v. New Form, Inc.* (*In re Barboza*), 545 F.3d 702 (9th Cir. 2008) ..................................2

*Bishop v. National Health Ins. Co.*, 344 F.3d 305 (2d Cir. 2003) ..................................................20

*Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775 (2d Cir. 2003) .........................................12

*Douglas v. U.S. Dist. Court for Cent. Dist. of California*, 495 F.3d 1062
    (9th Cir. 2007) ...................................................................................................................4, 7, 16

*Treiber & Straub, Inc. v. United Parcel Serv., Inc.*, 474 F.3d 379 (7th Cir. 2007) ........................5

*Shroyer v. New Cingular Wireless Srvs, Inc.*, 498 F.3d 976 (9th Cir. 2007) .................................15


**United States District Court Cases:**

*Ace Am. Ins. CO. v. Wendt, LLP*, 724 F. Supp. 2d 899 (N.D. Ill. 2010) ........................................5

*Am. Dredging Co. v. Plaza Petroleum, Inc.*, 799 F. Supp. 1335 (E.D.N.Y. 1992) ....................9, 10

*First Nat'l. Mortg. Co. v. Fed. Realty Inv. Trust*, No. C-03-02013 RMW,
    2006 WL 2228941 (N.D. Cal. Aug. 3, 2006) .........................................................................19

*Hugger-Mugger, L.L.C. v. Netsuite, Inc.*, No. 2:04-cv-592, 2005 WL 2206128
    (D. Utah Sept. 12, 2005) .........................................................................................................5

*In re Fountinebleau Las Vegas Contact Litig.*, 716 F. Supp. 2d 1237
    (S.D. Fla. 2010) .....................................................................................................................20

*Koffler Elec. Mechanical Apparatus Repair, Inc. v. Wartsila N. Am., Inc.*,
    No. C-11-0052, 2011 WL 1086035 (N.D. Cal. Mar. 24, 2011) .........................................4, 9

*Krystaltech Int'l Inc. v. Am. Int'l Freight, Inc.*, No. 99 CIV. 2863,
    2000 WL 502865 (S.D.N.Y. Apr. 26, 2000) ..........................................................................8

*Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656 (S.D.N.Y. 1991) ....................................24

*PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193 (2d Cir. 1996) .............................................................4

*Owusu v. New York State Ins.*, 655 F.Supp.2d 308 (S.D.N.Y. 2009) .............................................4

*Rainey v. Am. Forest & Paper Ass'n, Inc.*, 26 F. Supp. 2d 82 (D.D.C. 1998) ..............................28

*Regency Photo & Video, Inc. v. America Online, Inc.*, 214 F. Supp. 2d 568
    (E.D. VA 2002) .......................................................................................................................5

*Salemo v. E\*TRADE Securities, LLC*, No. S-04-0196, 2005 WL 6124833
    (E.D. Cal. May 9, 2005) ..............................................................................9

*Sea Trade Co. Ltd. v. FleetBoston Fin. Corp.*, No. 03 CIV. 10254 (JFK),
    2007 WL 1288592 (S.D.N.Y. May 1, 2007) ..............................................9

*Stone v. Golden Wexler & Sarnese, P.C.*, 341 F. Supp. 2d 189 (E.D.N.Y. 2004) .........................15

*TradeComet.com LLC v. Google, Inc.*, 693 F.Supp 2d 370 (S.D.N.Y. 2010) ................................4

## State Supreme Court Cases

*Bay Cities Paving v. Lawyers' Mutual Ins. Co.*, 5 Cal. 4th 865 (Cal. 1993) ...........................20, 21

*Hartford Acc. & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169 (N.Y. 1973) ......................................23

## State Appellate Court Cases

*Badie v. Bank of America*, 67 Cal. App. 4th 779 (Cal. Ct. App. 1998) ...................................15, 16

*Beacon Terminal Corp v. Chemprene, Inc.*, 429 N.Y.S.2d 715 (N.Y. App. Div. 1980) ...............12

*Chiacchia v. Nat'l Westminister Bank USA*, 507 N.Y.S.2d 888 (N.Y. App. Div. 1986) ................9

*Hudson-Port Ewen Associates, L.P. v. Kuo*, 566 N.Y.S.2d 774 (N.Y. App. Div. 1991)
    *aff'd sub nom. Hudson-Port Ewen Associates, L.P. v. Chien Kuo*, 578 N.E.2d
    435 (1991) ................................................................................................19

*Ranieri v. Bell Atl. Mobile*, 759 N.Y.S.2d 448 (N.Y. App. Div. 2003) ......................................16

*Szetela v. Discover Bank*, 97 Cal. App. 4th 1094 (Cal. Ct. App. 2002) .....................................15

*Waller v. Truck Ins. Exch., Inc*, 11 Cal. 4th 1 (Cal. Ct. App. 1995) .........................................20

*Whitney Inv. Co. v. Westview Dev. Co.*, 273 Cal. App. 2d 594 (Cal. Ct. App. 1969) ..................24

*Winet v. Price*, 4 Cal. App. 4th 1159 (Cal. Ct. App. 1992) .....................................................19

## Federal Rules

Fed. R. Civ. P. 56 ...................................................................................................1

Fed. R. Civ. P. 56(c) ...............................................................................................2

Fed. R. Civ. P. 56(d) ...............................................................................................2

## State Statutes

N.Y. C.P.L.R. § 213(2) ..........................................................................................25

# INTRODUCTION

As this Court is unquestionably aware, this case challenges E*TRADE's practice of charging its customers "inactivity fees" that, according to the Plaintiffs, E*TRADE had no contractual right to charge. Seeking to avoid Plaintiffs' pending Motion for Class Certification as well as merits discovery, E*TRADE moves for summary judgment, arguing that it is entitled to judgment as a matter of law.

According to E*TRADE, the record requires the Court to find, as matters of law (1) that the Brokerage Customer Agreement ("BCA") incorporated the Retail fee schedule "clearly and unequivocally" and "beyond any doubt", and (2) that E*TRADE gave proper notice of its fee increases. E*TRADE asserts that because it had the contractual authority under the Retail fee schedule to charge Plaintiffs Roling and Landvater, their individual claims cannot continue.

Fortunately for the Plaintiffs and the thousands of other E*TRADE customers who were improperly charged inactivity fees, E*TRADE's arguments fail for at least three reasons. First, E*TRADE's Motion is replete with genuine issues of material fact. The Parties plainly dispute, among other matters:

- The date that E*TRADE first posted to its website a modified schedule allowing for $40 inactivity fees;

- The date the "bug" first started effecting search results;

- Whether the "bug" was the only way the BrownCo. schedule was available to Retail customers; and

- Whether only unreasonable customers would use the search terms that would trigger the bug in the first place.

Despite E*TRADE's attempt to gloss over these issues, they are material and prevent summary judgment in E*TRADE's favor.

Second, contrary to the requirements of Rule 56, E*TRADE's conclusions require the Court to view the evidence in a light most favorable to E*TRADE. For example, E*TRADE's assertion that the BCA properly incorporated the Retail fee schedule overstates the efficacy of posting the fee schedule on its website and overlooks critical evidence regarding the confusing way E*TRADE set up its website. Similarly, E*TRADE asks the Court to weigh the BrownCo.

1   fee schedule and Retail fee schedule against each other and hold as a matter of law the Retail

2   schedule applied to the Plaintiffs. Because the facts must be viewed in a light most favorable to

3   the Plaintiffs, summary judgment cannot be granted.

4         Third, and E*TRADE's failure to produce critical discovery or competently prepare its

5   Rule 30(b)(6) witnesses aside, Plaintiffs can articulate in accordance with Rule 56(d) the discovery

6   they need to oppose Summary Judgment and the reasons why Plaintiffs do not have such evidence

7   at this stage in the case, including E*TRADE's refusal to produce such information. Therefore,

8   regardless of whether the Court determines no genuine issue of material fact exists for trial,

9   Summary Judgment is not appropriate at this time.

10         Ultimately, E*TRADE seeks to have its cake and eat it too—denying Plaintiffs the

11   opportunity to obtain discovery relevant to their claims while arguing that the record evidence

12   produced to date entitles E*TRADE to judgment as a matter of law. As a result, this Court should

13   see through E*TRADE's tactics and deny E*TRADE's Motion for Summary Judgment so that the

14   Court may properly consider Plaintiffs' pending Motion for Class Certification.

15   **ARGUMENT**

16         Summary judgment may be granted where "the pleadings, depositions, answers to

17   interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

18   genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

19   of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine if there is evidence for a reasonable jury

20   to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986)

21   Evidence and reasonable inferences must be viewed and drawn in the light most favorable to the

22   nonmoving party. *See id.* at 255 ("Credibility determinations, the weighing of the evidence, and

23   the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whe[n]

24   he is ruling on a motion for summary judgment . . . The evidence of the non-movant is to be

25   believed, and all justifiable inferences are to be drawn in his favor."); *Albarran v. New Form, Inc.*

26   *(In re Barboza),* 545 F.3d 702, 707 (9th Cir. 2008).

27         As set forth below, this Court should deny E*TRADE's Renewed Motion for Summary

28

Judgment for two primary reasons. First, genuine issues of material fact prohibit finding as a matter of law that E*TRADE unambiguously incorporated the Retail fee schedule throughout the time the Plaintiffs were E*TRADE customers. Second, and to the extent the Court determines that no genuine issues exist on the present record, the Plaintiffs are able, in accordance with Rule 56(d), to specify the reasons they cannot produce any essential facts and the discovery needed to reveal them. Summary judgment is thus demonstrably improper at this time.

**I.      E*TRADE'S ARGUMENTS OVERLOOK GENUINE ISSUES OF MATERIAL FACT REGARDING E*TRADE'S INCORPORATION OF THE RETAIL FEE SCHEDULE, POSTING OF ITS FEE SCHEDULES, NOTICE OF INCREASES, AND BUG IN ITS WEBSITE PROGRAMMING.**

Summary judgment is improper because Plaintiffs genuinely dispute several of E*TRADE's factual and legal conclusions, including that E*TRADE incorporated the Retail fee schedule into its Brokerage Customer Agreement ("BCA") clearly and conspicuously and beyond any doubt, that E*TRADE's increase to $40 inactivity fees was properly reflected in a modified schedule posted to its website, and that E*TRADE provided sufficient notice of the increase. Additionally, Plaintiffs dispute E*TRADE's assertions regarding the availability and materiality of the BrownCo. Addendum, and its application to this case. Contrary to Rule 56, E*TRADE asks the Court to view both the Retail and BrownCo. Schedules—as well as the ways customers could access them—in a light most favorable to E*TRADE.

In the end, and as explained further below, E*TRADE cannot demonstrate that it is entitled to judgment as a matter of law on any of the Plaintiffs' claims.

**A.      With Respect to Plaintiffs (And The Entire Class), E*TRADE Cannot Show As A Matter Of Law That It Properly Incorporated The Retail Fee Schedule "Clearly And Conspicuously" And "Beyond Any Doubt."**

Plaintiffs claim that E*TRADE failed to properly incorporate the Retail Fee Schedule into the BCA, meaning that no fee schedule allowed E*TRADE to charge inactivity fees. (SAC ¶¶ 50-55) (Dkt. 155.) E*TRADE seeks summary judgment arguing that the BCA sufficiently incorporated the Retail fee schedule because it was "easily available" by visiting E*TRADE's website as well as "upon request" by calling E*TRADE directly. (Def. Mot. 20.) According to

1  E*TRADE, these methods demonstrate proper incorporation as a matter of law. (*Id.*) As explained

2  below, this argument fails under both New York and California law.

3       Under New York law, extrinsic documents "are incorporated as terms of the contract when

4  they are specifically referenced in the contract." *Owusu v. New York State Ins*., 655 F.Supp.2d

5  308, 323 (S.D.N.Y. 2009); *citing PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996)

6  (New York follows that common law rule by "requir[ing] that the paper to be incorporated into a

7  written instrument by reference must be so referred to and described in the instrument that the

8  paper may be *identified beyond all reasonable doubt*.") (emphasis in original). Under California

9  law, incorporated documents must be referenced "clearly and unequivocally." *Koffler Elec.*

10 *Mechanical Apparatus Repair, Inc. v. Wartsila N. Am., Inc.*, No. C-11-0052, 2011 WL 1086035,

11 at *4 (N.D. Cal. Mar. 24, 2011).

12      As explained below, the present record does not support a finding – as a matter of law –

13 that E*TRADE incorporated the Retail fee schedule. E*TRADE overstates both the legal

14 sufficiency and factual underpinnings of its supposed methods for locating the Retail fee schedule

15 while ignoring critical facts that cast doubt on its incorporation.

16          **1.   E*TRADE overstates the sufficiency of its "methods" for locating
                   the Retail fee schedule.**

17

18      First, E*TRADE insists that fee schedules were incorporated as a matter of law because

19 E*TRADE made the Retail fee schedule available on its website within "two clicks" away from "a

20 customer's account page" or "the main page without logging in," and because copies were made

21 available "upon request" by contacting E*TRADE. (Def. Mot. 5.) These methods are insufficient.

22      As an initial matter with respect to the general ability of customers to locate the Retail fee

23 schedule on E*TRADE's website, E*TRADE's argument fails at least with respect to the increase

24 to $40 because contractual provisions that allow for unilateral changes are unenforceable where

25 they do not require "reasonable notice." (Dkt. 63 (citing *TradeComet.com LLC v. Google, Inc.*,

26 693 F.Supp 2d 370, 374 (S.D.N.Y. 2010)); *see also Douglas v. U.S. Dist. Court for Cent. Dist. of*

27 *California*, 495 F.3d 1062, 1066-67 (9th Cir. 2007). As explained fully in Section B(2) below,

28 however, any notice sent by E*TRADE that referenced the $40 fee increase—sent before

1    E*TRADE posted a modified fee schedule but after the "Effective Date" of the change—was

2    unreasonable. Thus, E*TRADE's first three methods of access—each of which require customers

3    to scour the website to determine what changes may have been made—do not demonstrate

4    incorporation of the Retail fee schedule as a matter of law.[1] For now, E*TRADE exaggerates the

5    factual underpinnings and legal sufficiency of each method, as explained below.

6                    a.    *E*TRADE incorrectly asserts that the website Help Center*
                          *allows any website visitor to click on an FAQ "which directly*
7                         *linked to the Fee Schedule applicable to his account."*

8         E*TRADE's first method for locating the fee schedule is through the website "Help

9    Center." (Def. Mot. 5.) E*TRADE's primary witness on this issue, Frank Gutierrez[2], swears that

10   "Any visitor to the E*TRADE website can immediately navigate to the main Customer Service

11   page from any page on the E*TRADE website by "clicking" on the "Customer Service" hyperlink

12   at the top of the page (formerly "Help Center")." (Gutierrez Decl. ¶ 7 (Dkt. 126).)

13        E*TRADE makes two false assertions regarding this method. First, E*TRADE incorrectly

14   states that customers could use the Help Center to locate FAQs, "one of which directly linked to

15   the Fee Schedule[.]" (Def. Mot. 5.) Second, E*TRADE falsely claims that the Retail fee schedule

16   was "two clicks" away from the main page. (*Id.* at 5) Mr. Gutierrez testifies that a website visitor

17   _____

18   [1]      E*TRADE's "numerous examples" of where incorporation was held proper where the
     agreements were available via a company website are not analogous. *Treiber & Straub, Inc. v.*
19   *United Parcel Serv., Inc.*, 474 F.3d 379, 385 (7th Cir. 2007) found UPS's Terms of Service
     incorporated because they were available on the company website. No dispute was raised
20   regarding the document's availability or that it was in any way confusing. Moreover, the Plaintiffs
     in this case, unlike the Plaintiffs that sued UPS, do not dispute that their underlying agreement was
     applicable—Roling and Landvater take issue with the BCA's incorporation of a separate
21   document, the availability of which is not, as E*TRADE claims, without ambiguity. Reliance on
     *Ace Am. Ins. CO. v. Wendt, LLP*, 724 F. Supp. 2d 899, 902 (N.D. Ill. 2010) is misplaced for
22   similar reasons—website terms were clearly incorporated into a written purchase order and there
     was no dispute as to which terms applied. *Hugger-Mugger, L.L.C. v. Netsuite, Inc.*, No. 2:04-cv-
23   592, 2005 WL 2206128 (D. Utah Sept. 12, 2005) likewise lends no help to E*TRADE. The Terms
     of Service at issue in that case were clearly referenced by name and the Court affirmatively
24   acknowledged an exception for incorporation where the contract is one of adhesion. *Id.* at *5.
     Finally, in *Regency Photo & Video, Inc. v. America Online, Inc.* incorporation of "Shopping
25   Terms" was upheld given the specific naming of the document together with the ability to request
     it in writing. 214 F. Supp. 2d 568 (E.D. VA 2002). As explained, Plaintiffs contest the sufficiency
26   of E*TRADE's names for the Retail fee schedule and E*TRADE deleted its customers' ability to
     request the fee schedule from its BCA.
27   [2]      Mr. Gutierrez was not one of E*TRADE's Rule 30(b)(6) designees. As set forth in Section
     II below, Plaintiffs need to depose Mr. Gutierrez and/or obtain additional discovery to see if the
28   "Help Center" was actually available to all visitors when Plaintiffs were E*TRADE customers.

must first click on "Help Center," then on "What are your commissions and fees?," and then on another link in a "pop up window" to reach the schedule (Gutierrez Decl. ¶¶ 7-9.) Once the Retail fee schedule is actually reached, an optional fourth link appears at the top of the page leading to Account Activity Fees. (*See*, *e.g.*, SAC Ex. B, 1 (Dkt. 155-2) (displaying "optional" link to "Account Activity Fees").) Thus, E*TRADE's first method requires clicking between three and four times—not two. Also, there is thus no "direct[] link[] from an FAQ" as E*TRADE represents – as described, the FAQ leads "directly" to a "pop up window," not a fee schedule.

As a result, finding that E*TRADE incorporated the Retail fee schedule as a matter of law based on this first method requires viewing the facts in a light most favorable to E*TRADE.

> b.   *E*TRADE's Pricing Tab Did Not Provide Immediate Access to the fee schedule.*

Relying again on the Gutierrez declaration, E*TRADE's second method for locating the Retail fee schedule also involves navigating its website, through the "Pricing" tab at the top of the page. Again, Plaintiffs should be allowed to depose Mr. Gutierrez on this method. But even if his testimony is accepted on faith, E*TRADE's statement that the Retail fee schedule would have been "immediately access[ible]" (Def. Mot. 5) is not true. The "Pricing" tab actually leads to a page *that leads* to the fee schedule. (*Id.* at 5 (customers are routed "to a page with a link" to the schedule).) Further, and as described in Section A(2) below, this method is less intuitive than other methods – such as a hyperlink from the BCA, properly titling the fee schedule, or placing a link on the Customer Account Agreements page – would have been.

E*TRADE additionally cites the depositions of Mr. Gandhi and Ms. Kimberly Walton to argue that the Pricing tab would lead to a website with a link that would lead to the applicable fee schedule. (Def. Mot. 5.) Reliance on Ms. Walton's testimony does not help E*TRADE. In fact, nowhere in the transcript pages that E*TRADE cites does Ms. Walton ever mention the Pricing tab as a method for locating the Retail fee schedule. As for Mr. Gandhi, he was not prepared to

1   discuss this topic.[3] (*See* Ghandi Dep. Tr. ("Gandhi Tr.") 20:6-18, Ex. A (incorrectly testifying that
2   the home page has "a link to the fees and commissions").)

3        Plaintiffs thus contest E*TRADE's characterization of this method as being either
4   "immediate" or sufficient as a matter of law. Accordingly, this Court should reject E*TRADE's
5   argument that it is entitled to summary judgment because its Pricing tab would lead to a page that
6   contained a link that lead to the Retail fee schedule.

7                    *c.      Plaintiffs contest the functionality and legal import of E*TRADE's*
                              *website search platform.*
8
9        Even without considering the "bug" analyzed further below, E*TRADE cannot rely on the
10  fact that its website had a search box as evidence that it "clearly and unequivocally" and "beyond
11  doubt" incorporated the Retail Fee Schedule into the BCA. Again, merely making a document
12  available on the company website is insufficient. *Douglas*, 495 F.3d at 1066-67. Indeed,
13  E*TRADE cites no authority for the premise that requiring customers to search for documents in a
14  search box on a company website (especially one as complex as E*TRADE's) demonstrates
15  incorporation as a matter of law.

16       The search box by no means provided a clear path for Retail customer to access the Retail
17  schedule. As explained in Section C(1) below, E*TRADE's data regarding search terms reveals
18  that, even though ████████ were certainly the most popular searches, customers or other
19  website visitors used myriad terms to locate the fee schedule applicable to their accounts. (Dkt.
20  Iqbal Decl., Ex. 2 (Dkt. 115-2).) Moreover, it is unclear what fee schedules these other terms
21  would produce prior to the time the BrownCo. schedule became available. Accordingly, that
22  customers could "go fish" using the website search box does not support a finding that the BCA
23  incorporated the Retail fee schedule as a matter of law.

24
25
26
27  ─────────────────────
    [3]      Unless otherwise noted, all referenced exhibits are attached to the Declaration of Steven L.
28  Woodrow ("Woodrow Decl."), filed contemporaneously with this brief.

        d.    *E*TRADE actually deleted language stating that the fee schedule*
              *was "available upon request" from its BCA starting in 2002.*

As its fourth method for reaching the fee schedule, E*TRADE claims that incorporation was effective because the Retail fee schedule was supposedly "available upon request." (Def. Mot. 5, 21.) Once again, E*TRADE is on the wrong side of both the law and the facts.

Despite E*TRADE's assertion that "[b]oth versions of the BCA said that the Fee Schedule was 'available upon request'" (Def. Mot. 21), starting at least as early as February 2002, E*TRADE actually removed the language notifying customers that the fee schedule applicable to their accounts was "available upon request" from the BCA. (Woodrow Decl. ¶ 4.) The 2005 BCA, attached as Exhibit A to the SAC, instead tells customers that the then-current fee schedule is "posted" or "available" on the website. (SAC, Ex. A, 6 (¶4(b)).) Thus, having expressly removed the "available upon request" language from its BCA, E*TRADE's assertion that "both versions" of its BCA allowed for such a method seriously mischaracterizes the facts.

E*TRADE claims that contract language aside, when Roling called E*TRADE regarding the fees, a customer service representative "walked Roling through the steps to pull up the Fee Schedule on his computer." (Def. Mot. 22.) E*TRADE ignores the substance of the so-called "steps", which directed Roling to use the website search function. (*See* Transcript from Customer Service Call, ETS 002196, Ex. B.) E*TRADE's email to Roling in 2007 likewise instructed him to use the search box, or enter a URL address (that differs from the address E*TRADE supposedly identified in its February 2005 notice of the fee increase). (Customer Service Email, ETS 000454, Ex. C.) That E*TRADE responded to Roling in this manner, in 2007 no less, cannot support a finding that the Retail fee schedule was incorporated into the BCA as a matter of law.

E*TRADE's authorities in support of its premise that contracts incorporate another document by merely stating that the document is "available upon request" are thus inapposite. (*See* Def. Mot. 22 n.6.) Two cases do not even reference a document that is merely "available upon request." *See Krystaltech Int'l Inc. v. Am. Int'l Freight, Inc.*, No. 99 CIV. 2863, 2000 WL 502865, at *2 (S.D.N.Y. Apr. 26, 2000) (incorporating "Official Freight Tariff Manual," which was "available at Miami International Airport, AIA's website, and at all points where freight

1   transportation or shipments are accepted by AIA"); *Salemo v. E\*TRADE Securities, LLC*, No. S-

2   04-0196, 2005 WL 6124833, at \*1 (E.D. Cal. May 9, 2005) (incorporated "E\*TRADE

3   CUSTOMER AGREEMENT" to be received by customer "UPON ACCOUNT ACTIVATION").

4   The other two cases allow extrinsic documents to be incorporated because the documents are

5   clearly identified by name. *See Am. Dredging Co. v. Plaza Petroleum, Inc.*, 799 F. Supp. 1335,

6   1338 (E.D.N.Y. 1992) *vacated in part sub nom. Am. Dredging Co. v. Plaza Petroleum Inc.*, 845 F.

7   Supp. 91 (E.D.N.Y. 1993) (incorporating "Terms and Conditions of Sale of Petroleum Products"

8   because document was "described in the contract so that the referenced document may be

9   identified beyond doubt"); *Koffler Elec.*, 2011 WL 1086035, at \*4 (incorporating "Wartsila's

10  General Terms and Conditions" because reference is "clear and unequivocal"). This is not the case

11  with the regard to E\*TRADE's BCA, which refers to "a fee and commission table" or "then-

12  current fee schedule" without identifying any document. (*See* SAC, Ex. A, 6 (¶4(b)).)

13  E\*TRADE's footnoted string-cites are thus unavailing.

14          Finally, without citing anything, E\*TRADE claims that it provided hyperlinks to the Retail

15  fee schedule in subsequent communications with Roling. (Def. Mot. 5.) As explained in Section

16  B(1), *infra*, E\*TRADE has offered nothing to prove that the links were active at the time the

17  communications were sent or to show to what pages these links lead customers.

18          Accordingly, E\*TRADE seriously overstates the law and the facts surrounding its methods

19  for making the Retail fee schedule available. These exaggerations are even more pronounced when

20  viewed against additional facts calling E\*TRADE's methods into doubt.

21              **2.      Additional factual considerations cast further doubt on the sufficiency
                          of E\*TRADE's methods for locating the Retail fee schedule.**

22          E\*TRADE's methods further ignore key facts regarding the language of the BCA and the

23  way E\*TRADE structured its website. First, incorporation requires generally that the title of the

24  document be set forth in the contract. *Sea Trade Co. Ltd. v. FleetBoston Fin. Corp.*, No. 03 CIV.

25  10254 (JFK), 2007 WL 1288592, at \*4 (S.D.N.Y. May 1, 2007) (general reference to a bank's

26  "rules" and "regulations" is insufficient as a matter of law to incorporate the bank's "Terms and

27  Conditions"); *see also Chiacchia v. Nat'l Westminister Bank USA*, 507 N.Y.S.2d 888, 889-90

28

1   (N.Y. App. Div. 1986) (agreement with no direct reference to second document did not

2   incorporate that document); *Am. Dredging*, 799 F.Supp. 1335 (finding that extrinsic document was

3   incorporated where document title appeared in contract).

4           In this case, E*TRADE' s BCA does not refer to the Retail fee schedule by title. The BCA

5   uses "Fee and commission table" (2000 BCA) and "then-current fee schedule" (2005 BCA),

6   neither of which appear as the title of *any* E*TRADE fee schedule. (*See* Woodrow Decl. ¶ 5.)

7   Moreover, the BCA does not provide any detailed description regarding the schedule or the

8   schedule's terms or otherwise identify the schedule. Indeed, a review of both contracts shows that

9   no version of the BCA refers to the "Retail Fee Schedule" or the "Main Street Investor Schedule"

10  or any of the other names or titles—public or private—that E*TRADE called it. To be sure, no

11  version of the Retail Fee Schedule offered in support of E*TRADE's Motion for Summary

12  Judgment contains any title, let alone "fee and commission table" or "then-current fee schedule."[4]

13  (*See* Renga Decl., Exs. 2 (Dkt. 125-2) ($15 schedule titled "Pricing Information" and "Opening an

14  Account") and 3 ($40 schedule, untitled) (Dkt. 125-3).)[5]

15          Further adding to this ambiguity, there is no direct hyperlink from the BCA to the fee

16  schedule or even a page containing links to the Retail fee schedule. (Woodrow Decl. ¶ 6.) Such

17  features would have reduced ambiguity regarding which of the five fee schedules that E*TRADE

18  had in force during the relevant period—all "posted" and "available" on E*TRADE's website—

19  was actually incorporated into the BCA.

20          Likewise, navigating to the Retail fee schedule on E*TRADE's website is far from

21  intuitive. Despite the presence of a hyperlink styled "Customer Account Agreements" on the

22  bottom of every page on E*TRADE's website, clicking on that link does not pull up the Retail Fee

23  Schedule. (Woodrow Decl. ¶ 22.) Rather, the link produces a "Forms and Applications" page that

24  contains "Account Agreements & Disclosures" for E*TRADE's various account types. (*See*

---

25  [4]      E*TRADE's "then-current" designation just confuses matters, as all versions of

26  E*TRADE's fee schedules when viewed online bear the current date and time. (*See*, *e.g.*, SAC Ex
    B.)

27  [5]      Although not offered in support of its Motion for Summary Judgment, Plaintiffs
    acknowledge that E*TRADE produced versions of the Retail fee schedule bearing the title "View

28  Commissions and Fees"—the *same* title as shown on the BrownCo. schedule.

1    Forms and Applications, Ex. D.) While the customer contracts and accompanying fee schedules

2    are made accessible for E*TRADE Bank customers and E*TRADE Financial Sweep Deposit

3    Accountholders, for brokerage customers, the agreement and other disclosures are present—but a

4    link to the fee schedule is conspicuously absent. (Ex. D.) This forces customers to dig and

5    obscures any supposed clarity to which E*TRADE could point.

6        Moreover, E*TRADE fails to point to, and has never produced, a copy of the fee schedule

7    that it supposedly posted and made available on its website allowing it to charge $25 inactivity

8    fees.[6] The *only* evidence that presently exists to show that E*TRADE ever made available a $25

9    Retail Fee Schedule is the declaration of Eric Renga. (*See* Renga Decl. ¶ 24 (Dkt. 125).) As

10   explained more fully in Plaintiff's concurrently filed Motion to Strike Declaration of Eric Renga,

11   this Court should refuse to consider his testimony at this time. E*TRADE failed to properly

12   disclose him as a witness[7] and cannot now use Mr. Renga to cure its own failure to properly

13   prepare its Rule 30(b)(6) designees.[8] Furthermore, Mr. Renga did not participate in either the

14   preparation or signing of E*TRADE's discovery responses—despite the fact that E*TRADE

15   apparently believes he is qualified to provide most of its key testimony in support of its motion for

16   summary judgment.[9]

17       Although, Mr. Renga testifies that in his experience, E*TRADE would have posted a $25

18

19   [6]    Plaintiffs' counsel requested that E*TRADE's lawyers confirm that E*TRADE possessed
     no other copies of any Retail fee schedules—which E*TRADE's lawyers did, first in a meet and
20   confer letter and then later when appearing before Magistrate Spero. (Woodrow Decl. ¶ 8.)
     [7]    E*TRADE first listed Mr. Renga in supplemental discovery responses in August 2011
21   along with over 70 other current and former employees. (Woodrow Decl. ¶ 9.) E*TRADE stated
     his title as "position unknown" (a designation that E*TRADE had never corrected) and indicated
22   that Mr. Renga has general knowledge supposedly relevant to E*TRADE's inactivity fees. (*Id.*)
     [8]    To be sure, when Plaintiffs' counsel requested the opportunity to depose Mr. Renga,
23   E*TRADE refused, stating "Judge Spero denied Plaintiffs' request to extend the discovery period,
     which closed earlier this month (other than two specific depositions that he allowed to be
24   completed by month end). The parties are not authorized to conduct additional depositions, and
     E*TRADE will not do so outside the rules." (Woodrow Decl. ¶ 10.)
25   [9]    That Plaintiffs should have anticipated that it was this witness who would be able to
     provide details regarding the posting and availability of E*TRADE's fee schedules and related
26   notices— especially where E*TRADE designated two different witness, Jay Reckart and Neil
     Gandhi (whose knowledge, as revealed during their respective depositions, was limited at best), to
27   testify regarding those issues—would have required Plaintiffs to have deposed all 108 identified
     witnesses—hardly an efficient use of the Parties' and Court's resources and contrary to both the
28   purpose of Rule 30(b)(6) and E*TRADE's insistence that discovery be cost-effective.

1    fee schedule when the fee was raised in 2002, (Renga Decl. ¶ 24) he does not attach any "fee and

2    commission table" allowing for a $25 inactivity fee. Without producing the $25 Retail fee

3    schedule, E*TRADE cannot show as a matter of law that it was incorporated into the BCA.[10]

4           In light of these issues, the BCA cannot be said to incorporate by reference any fee

5    schedule "clearly and conspicuously" and "beyond any reasonable doubt." (*See* Woodrow Decl. ¶¶

6    5-6.) The Court should therefore refuse to award summary judgment in E*TRADE's favor.

7    Additionally, and as explained below, genuine issues regarding the timing of E*TRADE's posting

8    of modified schedules to it website, E*TRADE's notices, and a "bug" in E*TRADE's website

9    programming cast significant further doubt on the issue of whether the BCA incorporated the

10   Retail schedule "clearly and conspicuously" and "beyond any reasonable doubt."

11        **B.**    **For Plaintiff Roling (And The Increased Fee Subclass), Genuine Issues Of**
             **Material Fact – Regarding The Date E*TRADE Posted A Modified Schedule**
12           **Allowing For $40 Inactivity Fees And Whether E*TRADE's Notices Allowed**
             **Customers To Reject The Change – Preclude Entering Summary Judgment In**
13           **E*TRADE's Favor.**

14          Roling's claims challenging E*TRADE's inactivity fee increase to $40 in 2005 survive

15   summary judgment as well. Contrary to E*TRADE's assertions, serious doubt surrounds whether

16   E*TRADE posted an updated fee schedule on its website allowing for the increased $40 inactivity

17   fees prior to charging customers the increased amounts in May and June 2005. Likewise,

18   E*TRADE's notices were deficient because they did not allow customers to reject the change.

19        **1.**    **The Parties dispute whether E*TRADE charged $40 inactivity fees**
             **prior to posting a modified fee schedule allowing it to do so.**
20
            The Parties dispute when E*TRADE first posted a modified fee schedule permitting the
21
22   increased $40 inactivity fees on its website. The timing is undoubtedly material—the *only* notice

23   _____

     [10]      E*TRADE has argued that given applicable statutes of limitations, whether E*TRADE
24   actually ever posted a $25 (or $15) fee schedule is a time barred issue. Plaintiffs do not seek to
     hold E*TRADE liable for charging the $15 or $25 fees; rather, whether the fee schedule was
25   actually ever posted implicates whether E*TRADE had established a pattern or practice sufficient
     to incorporate the Retail Fee Schedule. For example, if E*TRADE timely posted the increase from
26   $15 to $25, Plaintiff Roling and other Retail customers would have a reasonable expectation that
     posting a revised schedule was the accepted method for effectuating a change to the fee schedule.
27   *See e.g. Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003) (discussing
     course of conduct's impact on contract modification); *see also Beacon Terminal Corp v.*
28   *Chemprene, Inc.*, 429 N.Y.S.2d 715, 718 (N.Y. App. Div. 1980) (fact that plaintiff paid bills
     charging higher rate did not demonstrate mutual assent to higher rate).

1  or method set forth in the BCA for modifying the fee schedule is by "posting a modified schedule

2  on the E*TRADE Web Site." (SAC, Ex. A, 6 (¶4(b)).) If E*TRADE charged an increased $40 fee

3  amount without first posting a modified schedule, the increased fees were improper.

4  During discovery Plaintiffs' requested information relating to all modifications and

5  changes to each of E*TRADE's various fee schedules. E*TRADE responded by producing CVS

6  logs for services or "change logs," which E*TRADE claims reflect all changes to its fee

7  schedules. (*See* E*TRADE's Suppl. Resp. to Pl. Roling's First Interrogs.,  No. 9, Ex E.)

8  E*TRADE's change logs indicate that ███████████████████████████████

9  ████████████████████████████████████████ (Retail Fee Schedule Change

10  Logs, at ETS 002303, Ex. F.) Critically, this date was *after* E*TRADE had already charged the

11  increased amount twice—once on March 22, 2005 and again on June 22, 2005.[11]

12  Without mentioning the change logs, E*TRADE attempts to imply a date when the

13  schedule was first posted through the Renga declaration. Even if his declaration is allowed, unlike

14  the fee schedule allowing for the initial increase to $25 – for which Mr. Renga (without providing

15  the schedule itself) is able to state the supposed date E*TRADE posted it to the website (by

16  February 21, 2002) (Renga Decl. ¶ 24) – Mr. Renga cannot provide the date when the $40 fee

17  schedule was posted. Instead, Mr. Renga vaguely testifies that "[i]n March 2005, E*TRADE

18  increased the amount of the AMF from $25 to $40. This change was reflected in a new version of

19  the Main Street Investor Schedule posted to the E*TRADE website . . . " (*Id.* at ¶ 30.) This seems

20  to imply that the $40 fee schedule was posted at some point in March 2005, but leaves the issue

21  truly unanswered. To be sure, however, the *only* definite date comes from E*TRADE's assurance

22  that the $40 fee schedule was posted on the website by April 2006. (*Id.* ¶ 11.)

23  Thus, even if the Renga declaration is not stricken, there remains a genuine issue of

24  material fact regarding when the $40 fee schedule was first posted because Mr. Renga does not

25  actually provide the date. Moreover, his implications, to the extent there are any, cannot be

26

---

27  [11]   E*TRADE's counsel confirmed in a letter dated December 15, 2011, that E*TRADE possessed no earlier versions of the change logs and that E*TRADE's production on this issue was complete. (Woodrow Decl. ¶ 8.)

28

1    allowed on summary judgment to trump, as a matter of law, the dates set forth objectively in

2    E*TRADE's change index logs. (*See* Ex. F, at 2303) ████████████████████████████

3        Apart from Mr. Renga's declaration, E*TRADE cites its placement of a hyperlink in its

4    February 11, 2005 Notices to class members as evidence that the schedule permitting the $40

5    increase was posted on the website in a timely fashion. (Def. Mot. 24.) Putting aside the fact that a

6    non-descriptive hyperlink is a poor substitute for the actual content of the webpage it links to,

7    E*TRADE offers no evidence that the link in the notice was actually live when the notices were

8    sent, or that the hyperlink would lead to a modified fee schedule containing a $40 inactivity fee.

9    Instead, E*TRADE points to a supposed copy of the operative version of the Retail fee schedule

10   itself, which is undated, contains no URL or title, is missing graphics, and otherwise reveals

11   nothing about when E*TRADE posted it to its website. (Renga Decl. Ex. 3.)

12       Accordingly, the Parties genuinely dispute when the $40 fee schedule was first posted and

13   made available on E*TRADE's website to Retail customers. As explained in Section II below,

14   merits discovery—which should include Mr. Renga's deposition—will ultimately reveal why the

15   change index logs reflect a ██████████████████ Ex. F, ETS 002303) together with

16   other evidence regarding the actual date that E*TRADE posted the modified schedule. Thus,

17   summary judgment cannot be granted in E*TRADE's favor on Plaintiffs' claims challenging

18   E*TRADE's increase to $40 inactivity fees.

19               **2.      The Parties disagree as to whether E*TRADE's notices properly**
20               **afforded customers the ability to reject the increase to $40.**

         The Parties further disagree as to whether E*TRADE's notices provided customers the
21
     ability to reject the $40 increase. Plaintiffs argue, and the evidence supports, that notices were not
22
     sent out until more than 15 days *after* January 1, 2005, the effective date of the change as stated in
23
     E*TRADE's notice of the increase. Thus Plaintiffs did not have an opportunity to reject the
24
     increase short of cancelling the service, rendering the increase procedurally unconscionable.
25
         First, E*TRADE's February 2005 notices specifically state that the $40 increase is
26
     "effective January 1, 2005." (Renga Decl. Ex. 11.) As of February 2005, E*TRADE's BCA
27

28

provided that customers only have fifteen (15) days after a change in the service to close their account, and thus reject the change. Specifically, the BCA stated:

> I agree that use of the Service after a change to the Service or notice of a change to this Agreement, or if I do not close my Account within fifteen (15) calendar days of the change to the Service or notice of a change to the Agreement, means that I accept the change, whether or not I actually know of it.

(Woodrow Decl. ¶ 7; SAC, Ex. A, 26 (¶12(e).). However, E*TRADE does not claim that it sent notice of the fee increase until February 11, 2005—more than one month *after* the increase came into effect and 27 days *after* the date for closing accounts had expired. (*See* Def. Mot. 15; Internal E*TRADE Emails Concerning 2005 Fee Increase, Ex. G; Woodrow Decl. ¶ 11.) Accordingly, a reasonable trier of fact could find that by not providing at least 15 days notice prior to the effective date of the change (January 1, 2005), E*TRADE improperly stripped its customers of their ability to opt out of or reject the change. *See, e.g., Badie v. Bank of America*, 67 Cal. App. 4th 779 (Cal. Ct. App. 1998); *Stone v. Golden Wexler & Sarnese, P.C.*, 341 F. Supp. 2d 189, 196 (E.D.N.Y. 2004).

Further confusing the issue is that the notices provide that the fee increase went into effect on January 1, 2005, but the BCA states that changes to the fees became effective when they posted to E*TRADE's website. (*See* SAC, Ex. A, 6 (¶4(b) (stating that fee schedules may be modified "by posting a modified schedule on [the] website").) As explained in detail above, evidence suggests that the fee statement did not post on E*TRADE's website until June 23, 2005. If true, the notices mislead consumers as to the date the fee increase went into effect and their ability to cancel.

Second, the notices themselves are deficient to support summary judgment because they do not allow customers the right to reject the fee increase short of canceling service. This is procedurally unconscionable under California law. *See Szetela v. Discover Bank,* 18 Cal. Rptr. 2d 862 (Cal. Ct. App. 2002) (finding procedural unconscionability where a bank provided customers with amendments to their cardholder agreements in the form of bill stuffers, which customers were deemed to have accepted if they did not close their account); *Shroyer v. New Cingular Wireless Srvs, Inc.*, 498 F.3d 976, 985 (9th Cir. 2007) ("[A] contract may be procedurally unconscionable

1    under California law when the party with substantially greater bargaining power "presents a 'take-

2    it-or-leave it' contract to a customer-even if the customer has a meaningful choice as to service

3    providers"); *see also Badie*, 67 Cal. App. 4th at 805-806 (finding bill stuffer insufficient to allow

4    imposition of contract changes where contract merely called for "notice" to customers).

5         Even under New York law (which governed the BCA starting November 2005), additional

6    discovery is required to determine if the increase was unconscionable. E*TRADE may argue that

7    procedurally unconscionability cannot stand under New York law because the Plaintiffs had

8    market alternatives. *Douglas*, 495 F.3d at 1068 (citing *Ranieri v. Bell Atl. Mobile,* 759 N.Y.S.2d

9    448, 449 (N.Y. App. Div. 2003)). This argument is unavailing. E*TRADE has admitted that "fees

10   like the AMF—for low activity or no activity accounts without significant assets—were the norm

11   within the brokerage industry." (Def. Mot. 6.) As explained in Section II below, merits discovery

12   would determine whether this was also true at the time of E*TRADE's increase to $40 in 2005

13   and, thus, whether Plaintiffs had market alternatives at that time.

14        Thus, E*TRADE's notices of the increase to $40 were not, as a matter of law, sufficient to

15   effectuate the modification or, at a minimum, additional discovery is required to determine

16   whether Plaintiffs had market alternatives to E*TRADE's BCA. Accordingly, E*TRADE is not

17   entitled to summary judgment on this issue either.

18        **C.     The Plaintiffs (And The Conflicting Fee Schedule Subclass) Genuinely
                    Dispute Both The Availability And Materiality Of The BrownCo. Fee
19                  Schedule.**

20        The Parties also genuinely dispute whether the BrownCo. fee schedule was available to

21   Retail customers and, if so, its materiality to the case. Plaintiffs claim that the BrownCo. schedule,

22   which posted to E*TRADE's website after E*TRADE acquired BrownCo., created ambiguity

23   because it reflected that E*TRADE would not charge inactivity fees and was—as required by the

24   BCA—"posted" and "available" to Retail customers on the E*TRADE website. (*See* SAC ¶¶ 94-

25   106.) E*TRADE's position is that any discussion of the BrownCo. schedule is immaterial

26   because, according to E*TRADE, the only way a Retail customer could have viewed the

27   BrownCo. schedule was through the "bug" uncovered by this lawsuit and that the searches that

28

1   would have triggered the bug—"inactivity" "activity fee" and "inactivity fee"—were so "obscure"

2   that the Court can find as a matter of law that only unreasonable customers would have ever used

3   them. (Def. Mot. 17-18, 27.) E*TRADE further posits that any legal theory involving the

4   BrownCo. schedule is "hypothetical" because the Plaintiffs admit they never viewed it prior to the

5   lawsuit. (*Id.* at 27.) Third, E*TRADE argues that, even if the BrownCo. schedule is considered, no

6   ambiguity results. (*Id.* at 28.) E*TRADE's assertions fall apart, or at a minimum, are inappropriate

7   for summary judgment.

8          **1.      The Court should not adopt E*TRADE's position that the BrownCo.**
9                  **schedule was only available to Retail customers due to the "bug" and**
                  **that only unreasonable customers, using "obscure" search terms, would**
10                **have triggered the bug in the first place.**

11          Viewing the facts in the light most favorable to itself, E*TRADE asserts that the

12   BrownCo. schedule is immaterial and shouldn't be considered because: (1) the "glitch" was the

13   only way Retail customers could have viewed the BrownCo. schedule, and (2) the three search

14   terms that would have produced the BrownCo. schedule in search results were "a speculative

15   needle in a haystack," and not "ordinary" or "reasonable." (Def. Mot. 27 ("Thus, a reasonable

16   Retail customer would never view the BrownCo. Addendum")).) These arguments do not

17   withstand scrutiny. In addition to ignoring the ways E*TRADE made the BrownCo. schedule

18   available, E*TRADE improperly requires the court to assume the jury's task of weighing the

19   reasonableness of search terms used by thousands of customers. Put simply, the Court should not

20   decide what search terms are "reasonable" under the circumstances as a matter of law.

21          First, the Parties dispute the ways E*TRADE made the BrownCo. schedule available on its

22   website. E*TRADE ignores the broader effects of the way it structured its website agreements—

23   especially the impact on searches using Google and other popular search engines. For example,

24   entering "etrade fees " into Google's search bar produces four Google-suggested search terms—

25   including "etrade fees inactivity." (Google Screenshot, Ex. H.) Upon selecting that search

26   phrase—as the top non-sponsored search result—a link directly to the Brown Co. fee schedule

27   appears, along with a brief description indicating that E*TRADE does not charge inactivity fees to

28   brokerage customers. (Google Search Results, Ex. I.) Thus, and contrary to E*TRADE's assertion

1   that there was no other "way someone (other than a BrownCo. Customer) could have potentially

2   seen any fee schedule other than the Retail fee schedule," (Def. Mot. 18), a simple Google search

3   for "etrade fees" both suggest "inactivity" as a term and leads any internet user to the BrownCo.

4   schedule. The Parties thus genuinely dispute whether the "bug" was the only way customers could

5   locate the BrownCo. schedule.

6          Second, the facts don't support E*TRADE's statement that "the glitch very rarely

7   occurred." (Def. Mot. 18.) As a preliminary matter, this argument is irrelevant: the question is

8   whether the BrownCo. schedule was available—not how frequently it appeared in search results.

9   (*See* SAC, Ex. A, 6 (¶4(b)) ("A schedule of the current fees and commissions is available on the

10  E*TRADE Securities Web site").) Even if the frequency of the searches were material, however,

11  reasonable jurors could disagree with E*TRADE's labeling of them as "obscure" or

12  "unreasonable." According to E*TRADE's own search-tracking statistics ███████████████

13  ████████████████████████████████████████████████████████████████████████

14  ███ Decl. of Zafar Iqbal ("Iqbal Decl."), Ex. 1 (Dkt. 115).) Thus, the data shows that visitors to

15  E*TRADE's website used the three search terms approximately ████████████████. At that rate,

16  █████████ of additional customers used those terms going back to early 2006 (before E*TRADE

17  started keeping track of searches) when Plaintiffs allege the bug would have made the Brown Co.

18  schedule available for the first time in search results. (*See* SAC, ¶ 98.) Moreover, and as explained

19  above, Google automatically suggests "etrade fees inactivity" and directs customers to the

20  BrownCo. schedule. (Ex. H.) Hence, while E*TRADE is free to describe the thousands of its

21  customers/website visitors who have used such terms – and Google – as being unreasonable, a

22  reasonable trier of fact could disagree—prohibiting summary judgment.

23         Hence, record evidence contradicts E*TRADE's dual assertions that the glitch was the

24  only way to locate the BrownCo. schedule and that the glitch was only triggered through

25  "obscure" and "rare" search terms that no reasonable customer would ever have used. (*See* Def.

26  Mot. 18.) The Parties dispute these facts. Because a reasonable juror could disagree with

27  E*TRADE and find the BrownCo. schedule was reasonably available to Retail customers on the

28

1  E*TRADE website such that it fell within the terms of the BCA, this Court should refuse to grant

2  summary judgment in E*TRADE's favor.

3          **2.      E*TRADE's argument that any affect the bug had on search results
                      is merely "hypothetical" ignores the fact that none of the Plaintiffs'
4                     claims requires proof of reliance or a review of their subjective intent.**

5          E*TRADE further asserts that any discussion of the BrownCo. schedule is supposedly

6  immaterial because neither of the Plaintiffs saw the schedule prior to the lawsuit. (Def. Mot. 25-

7  27.) According to E*TRADE, the Court would have to strain to find an ambiguity that is both

8  "hypothetical" and something none of the Parties intended. (*Id.*) E*TRADE's argument fails

9  because whether any of the Plaintiffs ever viewed the BrownCo. schedule is irrelevant.

10         First, none of Plaintiffs' legal claims contains any element of reliance. Mr. Landvater's

11  claim in the FAC for fraudulent misrepresentations under the UCL § 17200 has been removed

12  from the SAC. As a result, neither Plaintiff is required to show they relied on the BrownCo.

13  schedule to prove *any* of their claims. (*Compare* FAC, ¶¶75-84 (Dkt. 14) *with* SAC.)

14         Undeterred, E*TRADE, citing authorities that follow Professor Corbin's subjective

15  approach to contract interpretation, argues that "[n]o contract should ever be interpreted and

16  enforced with a meaning that neither party gave it." (Def. Mot. 25.) But this overlooks that

17  contract interpretation is objective under both California law, *see First Nat'l. Mortg. Co. v. Fed.*

18  *Realty Inv. Trust*, No. C-03-02013 RMW, 2006 WL 2228941 (N.D. Cal. Aug. 3, 2006)

19  ("subjective intent of the parties is irrelevant to determining the meaning of contractual

20  language"); *Winet v. Price*, 4 Cal. App. 4th 1159, 1166 n.3 (Cal. Ct. App. 1992); as well as under

21  New York law, *see Hudson-Port Ewen Associates, L.P. v. Kuo*, 566 N.Y.S.2d 774, 777 (N.Y.

22  App. Div. 1991) *aff'd sub nom. Hudson-Port Ewen Associates, L.P. v. Chien Kuo*, 578 N.E.2d 435

23  (1991) ("express provisions of the contract must prevail over the conclusory allegations of either

24  party, whose subjective intent is irrelevant"). Hence, E*TRADE's acknowledgement that the

25  Plaintiffs are bound by the contract whether they read it or not cuts both ways—Plaintiffs need not

26  have reviewed any agreement for E*TRADE to claim it is the version that applies, nor were

27  Plaintiffs required to have reviewed the BrownCo. schedule for it to have applied (or rendered the

28

contract ambiguous). Rather, the issue is a matter of contract interpretation, and here the contract purports to incorporate the fee schedule that is "posted" and made "available" on E*TRADE's website. (SAC, Ex. A, 6 (¶4(b)).). Given Google's suggested searches, the bug, and potential other avenues that further merits discovery may uncover still, the BrownCo. schedule, which was unquestionably "posted on" the website, was also "available" to Retail customers.

E*TRADE's authorities for its argument that any ambiguity here is merely "hypothetical" or "in the abstract" (Def. Mot 26-27) are inapposite. For example, in *Bishop v. National Health Ins. Co.*, 344 F.3d 305, 308 (2d Cir. 2003) the Court rejected the argument of a motorist, who had been denied coverage under his insurance policy's intoxication exclusion, that the exclusion—by referring to a level of intoxication as defined by state law—was ambiguous given the various Connecticut statutes defining intoxication. The Second Circuit explained that the question was not whether the "policy is ambiguous in a hypothetical sense, but whether there is any question that [the motorist] . . . was intoxicated within the policy's definition when his accident occurred." *Id*. at 309. Because the motorist "was intoxicated under any definition in any of the Connecticut statutes," the ambiguity that hypothetically could have arisen had his conduct not satisfied one of the statutory definitions was not before the Court.

*In re Fountinebleau Las Vegas Contact Litig.*, 716 F. Supp. 2d 1237, 1252 (S.D. Fla. 2010) is also off point. That court considered whether its interpretation of the term "fully drawn" in a credit agreement would render the term ambiguous in other contexts. Relying on *Bishop*, the Court merely observed that "[a]n ambiguity does not exist by virtue of the fact that one of a contract's provisions could be ambiguous under some other circumstances." *Id.* The opinion in *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18-19 (Cal. Ct. App. 1995) likewise offers no help to E*TRADE. The *Waller* court simply stated it would not strain to extend coverage under an insurance contract's "bodily injury" policy for economic damages arising out of a shareholder dispute. *Id.* Finally, the case of *Bay Cities Paving v. Lawyers' Mutual Ins. Co.*, 5 Cal. 4th 865, 867 (Cal. 1993) does little to suggest the Plaintiffs' claims are hypothetical. The Court in that case had to determine whether a professional liability insurance contract's use of the term "related" was

1   ambiguous when deciding whether a per-claim limitation applied to a suit against an attorney. *Id.*

2   Given the word "related" is susceptible to varying meanings dependent on the context, the Court

3   observed that it must read the term within the context of the contract, as opposed to in the abstract.

4   *Id.*

5         Accordingly, if Plaintiffs were to argue that there was ambiguity as to which fee schedule

6   applied because, hypothetically, a fee schedule that contradicted the Retail Fee Schedule *could*

7   *have been made available* and posted on E*TRADE's website, then E*TRADE's ambiguity

8   argument would have some persuasive value. Here, this is not a hypothetical situation—the record

9   shows that the Brown Co. schedule was posted and made available, possibly going back to

10  March/April 2006, creating legitimate ambiguity. (BrownCo. Fee Schedule Change Logs, Ex. J.)

11  Thus, this is not a case where the alleged ambiguity is hypothetical or abstract.

12        **3.**    **The Court can only enter judgment in E*TRADE's favor with respect**

13                      **to E*TRADE's side-by-side comparison if the facts are viewed most**
                    **favorably to E*TRADE.**

14        E*TRADE argues that even if the BrownCo. schedule were "posted" and "available" on its

15  website (therefore meeting the requirements for being the applicable fee schedule under the plain

16  terms of the BCA), it can't apply to the Plaintiffs as a matter of law when viewed alongside the

17  Retail schedule. (Def. Mot. 28.) Judge Patel's analysis when denying E*TRADE's Motion to

18  Dismiss Plaintiffs Breach of Contract claim is particularly instructive here:

19        Plaintiffs' fee schedule contains four discrete sections: Transactional Pricing,
      Margin Rates, Account Activity Fees and Special Request Fees. Plaintiffs' Fee

20        Schedule at 1. The limiting statement in plaintiffs' fee schedule appears only
      within the Transactional Pricing section. Id. This section is composed of different

21        sub-headings. The limiting statement appears directly below the first sub-heading,
      which reads "Brown Co. Special Pricing." *Id.* Immediately after the Brown Co.

22        Special Pricing sub-heading and its accompanying limiting statement, the fee
      schedule lists prices for various types of trades. Id. Immediately following this

23        pricing, the second sub-heading reads "Complex Options." *Id*. Both sub-headings,
      as well as all the other sub-headings in the Transactional Pricing section, are set in

24        the same typeface, font, color and size, which could create the impression that
      each sub-heading refers to the pricing that follows immediately thereafter. Thus, a

25        reasonable person could conclude that the special pricing for former Brown
      Company customers includes only those fees listed in the Transactional Pricing

26        section, or only the Transaction Pricing and Margin Rates sections, as the
      prohibition on charging inactivity fees appears under the "Account Activity Fees"

27        section. *Id*. ("No inactivity fees. E*TRADE Securities will not charge fees when
      your account is inactive for a period of time.").

28

However, a reasonable person could also conclude that the limiting statement applies to the entirety of plaintiffs' fee schedule because the limiting language is an overarching substantive provision in plaintiffs' fee schedule. This conclusion is strengthened if the main street investor schedule ("MSI fee schedule"), which authorizes E*Trade to charge the $40 dollar fee in question, is also considered. Docket No. 21 (Somvichian Dec.), Exh. 2 (MSI Fee Schedule).3 Because there are two reasonable interpretations of this provision, the contract is ambiguous. Since no extrinsic evidence can be considered at this stage, the motion to dismiss the breach of contract claim must be denied. *Granite Partners, L.P. v. Bear, Stearns & Co Inc.*, 17 F. Supp. 2d. 275, 304-05 (S.D.N.Y. 1998); *see also Weiss v. Weinreb & Weinreb.*, 793 N.Y.S.2d 100, 100 (App. Div. 2005) ("Since the provision in question was susceptible to two different interpretations, the resolution of this ambiguity was for the trier of fact and may be based on extrinsic evidence.")

E*Trade claims that only the MSI fee schedule, and not plaintiffs' fee schedule, applies to plaintiffs. Consideration of the MSI fee schedule, which is similar to plaintiffs' fee schedule, except that it authorizes the fee, does not compel a different result. It appears that E*Trade intended the MSI fee schedule to apply to plaintiffs; however, E*Trade's intent is not determinative here. Although the MSI fee schedule demonstrates weaknesses in plaintiffs' allegations and bolsters the possibility that the limiting statement applies to the entirety of plaintiffs' fee schedule, it does not conclusively demonstrate, at this stage, that plaintiffs' fee schedule is without ambiguity. For instance, it does not specify that it, and only it, applies to all non-Brown company investors.

(Dkt. 63, 9-10.) Thus, as Judge Patel aptly assessed, a side-by-side comparison does not, as a matter of law, dispel any ambiguity regarding the BrownCo. schedule's application. Aside from E*TRADE's supposed "methods" for locating the Retail fee schedule that Plaintiffs have already discounted above, E*TRADE has not come forward with any additional information to show that the existence or availability of the MSI schedule defeats any ambiguity in the BrownCo. schedule's application to Plaintiffs' brokerage accounts as a matter of law.

Perhaps most revealing is that E*TRADE tried to design its website search functionality specifically to restrict Retail customers from being able to access the Brown Co. schedule and other fee schedules that E*TRADE wanted to keep exclusively relevant to other customer segments. (E*TRADE Resp. to Pl. Roling's First Interrog., No. 9, Ex. K.) These safeguards—including "Do Not Crawl" lists, synonym applications, and managed search results—were intended to ensure that the Brown Co. Addendum would not be made available to customers. (Iqbal Decl. ¶¶ 4-7, 10-11.) This evidences an understanding on E*TRADE's part that which schedule applied might be rendered unclear (and that its contractual authority could be called into

1    question) if the BrownCo. schedule were made available to Retail customers.

2         Moreover, none of E*TRADE's notices reference either schedule by name, and, as

3    explained above, E*TRADE cannot show that any link from any notice actually led to the Retail

4    fee schedule. Weighing these schedules against each other is thus best left for the jury. *Hartford*

5    *Acc. & Indem. Co. v. Wesolowski,* 33 N.Y.2d 169, 172 (N.Y. 1973) (Under New York law, "where

6    an ambiguity cannot be resolved solely by reference to the document itself, determination of the

7    contracting parties' intent is for resolution by the trier of fact.").

8              **4.    The Parties genuinely dispute when the BrownCo. addendum first
                       became available to Retail customers.**

9

10        The Parties also contest when the BrownCo. schedule posted to E*TRADE's website and

11   when the so-called "bug" took effect. First, E*TRADE, through the Mr. Renga's declaration,

12   states that the BrownCo. schedule was first posted on May 5, 2006. The change logs for the

13   BrownCo. schedule do not support this. (*See* Ex. J, at ETS 002257-58.) Rather, they show a likely

14   posting date of ▮▮▮▮▮▮▮▮, (*see id.* at ETS 002258), and say nothing of any changes or events

15   occurring on ▮▮▮▮▮▮ (*see id.* at ETS 002257). Further, Plaintiffs contend that the BrownCo.

16   schedule was immediately available to Retail customers upon posting. (SAC ¶¶ 98-100.) Thus, the

17   date the schedule was first posted is both material and in genuine dispute.

18        Second, the Parties dispute the date the so-called "bug" began causing the BrownCo.

19   schedule to appear in search results on E*TRADE's website. Plaintiffs believe that the "bug"

20   existed going back to the time that E*TRADE first posted the BrownCo. schedule on the

21   E*TRADE website. (*See id.*) As this Court stated in its January 24, 2012 Order, "In November

22   2011, E*Trade learned that the [Brown Co.] addendum was in fact available prior to June 2010 as

23   a result of a 'bug' on its website." (Dkt. 144, 3 n. 2.) Mr. Iqbal, in his post-deposition declaration,

24   likewise states that "[t]he problem appears to have arisen before the migration [in June 2010], and

25   it continued after the migration until it was corrected in 2011." (Iqbal Decl., ¶ 19). In its Renewed

26   Motion for Summary Judgment, however, E*TRADE argues (as it did in its initial Motion for

27   Summary Judgment) that no issue of fact is present because there is "no record evidence that . . .

28   searches in 2009 or earlier using the three search terms would actually generate the BrownCo.

1    Addendum." (Def. Mot. 33.) This Court should reject E*TRADE's reliance on the absence of such

2    proof. Taking all reasonable inferences in a light most favorable to the Plaintiffs—as the Court

3    must on summary judgment—both Google searches and the "bug" could have made the BrownCo.

4    fee schedule available on E*TRADE's website to Retail customers when the schedule was first

5    posted in March 2006, or, at the very least, prior to 2010. Viewing the record in a light most

6    favorable to E*TRADE is improper.

7         Should the Court disagree that this evidences an issue of material fact, as explained in

8    Section II(A) below and as this Court recognized might be the case when denying Plaintiffs'

9    Motion for Relief from Non-Dispositive Order of Magistrate Judge, (Dkt. 173), the Plaintiffs need

10   to review the code that E*TRADE claims to have preserved regarding its search results and

11   functionality, which E*TRADE has refused to provide. Summary judgment on this claim fails.

12        **D.      The Plaintiffs Have Not, As A Matter Of Law, Waived Their Claims.**

13        Finally, E*TRADE cannot prove that, as a matter of law, either Roling or Landvater

14   waived their breach of contract claims.[12] As demonstrated by E*TRADE's own supporting

15   authorities, claim waiver requires two elements: First, a party must have "*actual knowledge* of

16   another party's breach." *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 675 (S.D.N.Y.

17   1991) (emphasis added) (citing collected cases); *accord Whitney Inv. Co. v. Westview Dev. Co.*,

18   273 Cal. App. 2d 594, 603 (Cal. Ct. App. 1969) (waiver requires actual knowledge of breach).

19   Second, and as E*TRADE notes, a party must "stay[] silent" and continue "to perform under and

20   accept[] the benefits of the contract" in the face of the purported breach. *Id.*; (Def. Mot. 29.) Stated

21   otherwise, it is "well-settled that a party to an agreement who believes it has been breached may

22   elect to continue to perform the agreement rather than terminate it, and later sue for breach . . .

23   where notice of the breach has been given to the other side." *Nat'l Westminster Bank*, 130 B.R. at

24   675 (citing collected cases).

25

26   ――――――――――――――――
     [12]    E*TRADE also argues that any claims for charges or conduct from prior to 2004 is barred
27   under New York's 6 year statute of limitations. To the extent they have not already done so by
     virtue of their Second Amended Complaint, Plaintiffs withdraw any claims they have for charges,
28   increases, or other conduct prior to 2004.

1    Addressing Mr. Landvater first, E*TRADE admits (as it must) that Landvater had *no*

2 *actual knowledge* of E*TRADE's purported breach "during [the] six quarters that he was paying

3 the AMF." (Def. Mot. 15.) Rather, Landvater first learned he was assessed an inactivity fee "about

4 two weeks before his . . . securities were liquidated" in late 2008.[13] (*Id.* at 16.) Importantly,

5 Landvater was *not thereafter charged* any inactivity fees—i.e., all future interactions between

6 Landvater and E*TRADE did not implicate the conduct challenged here. (*See id.* at 16.)

7 Accordingly, it is of no consequence that Landvater "knew about the fee in 2008, but did not

8 complain until he joined the lawsuit in late 2010," (*Id.* at 30), because at no point did he "silently

9 and knowingly accept" E*TRADE's purportedly unlawful conduct. Landvater's choice to sue in

10 2010 was his to make, and well within New York's six-year statute of limitations. *See* N.Y.

11 C.P.L.R. § 213(2).

12    With respect to Roling, a cursory review of the record shows that Roling *immediately*

13 contested E*TRADE's right to assess inactivity fees after "he first found out [about the fee] in

14 2003." (Def. Mot. 11.) Far from "calling . . . for unrelated reasons," (*id.*), Roling called

15 E*TRADE's customer support line to specifically "inquire[] about" the inactivity charges he had

16 just then-discovered. (Roling Dep. Tr. ("Roling Tr.") 93:14 – 94:1, Ex. L.) Over the course of that

17 phone call, Roling asserted that he never "agree[d]" to the inactivity fee program and demanded

18 that the fees be refunded. (*Id.* at 94:2 – 95:8.) Subsequently, Roling did not close his account or

19 take other action, knowing that "if [he] closed the account . . . it would be a done deal and

20 E*TRADE would . . . have all the fees that [he] did not agree to." (*Id.* at 96:10-20.) As such,

21 Roling's *immediate* act of calling E*TRADE in 2003 and notifying it of his dispute (and

22 E*TRADE's purported breach) readily shows that he did not "stay silent" in the face of a

23 purported breach and, consequently, did not waive his claims for breach of contract. *See Nat'l*

24 *Westminster Bank*, 130 B.R. at 675.

25    Thus, a reasonable trier of fact could readily find that Plaintiffs did not waive their

26 respective claims for breach of contract. Landvater never *knowingly* accepted E*TRADE's

27 _____

28 [13]    E*TRADE's passing comment that Landvater "should have known about the fee in 2007"
is unavailing, as there is no dispute about what he *actually* knew at that time. (*See* Dkt. 171, 30.)

1   purportedly unlawful conduct, and brought suit only two years after that conduct stopped. Roling

2   immediately inquired about and contested E*TRADE's right to charge inactivity fees in 2003,

3   and, accordingly, had no duty to thereafter sell his holdings, close his account, or continually re-

4   assert his complaints as E*TRADE assessed subsequent inactivity fees against his account.

5   **II.    TO THE EXTENT DISPUTED FACTUAL ISSUES ARE NOT EVIDENT BASED
        ON THE PRESENT RECORD, PLAINTIFFS CAN, UNDER RULE 56(D),**

6   **ARTICULATE THE REASONS AND DISCOVERY THEY NEED THAT WOULD
        REVEAL A GENUINE ISSUE OF MATERIAL FACT FOR TRIAL.**

7
        Should the Court determine that there are no genuine issues of material fact that preclude

8   summary judgment in E*TRADE's favor, Plaintiffs can readily articulate the additional evidence

9   needed oppose summary judgment, which they expect to obtain through additional merits

10  discovery. Merits discovery—which is presently set to commence for a period of three months

11  following the Court's ruling on Plaintiffs' Supplemental Motion for Class Certification—would

12  include the depositions of Eric Renga and Frank Gutierrez and the re-deposing of Mr. Iqbal on his

13  supplemental declaration, and would ultimately reveal: (1) E*TRADE's computer code,

14  evidencing search functionality and potential results prior to 2010, or at least going back as far as

15  E*TRADE has preserved such information (as E*TRADE represented to Magistrate Judge Spero)

16  (*See* Dkt. 117, 13:23 – 14:7), (2) native data for E*TRADE's "Do Not Crawl" list, such as the

17  application's activity log, that would show when any updates were made to listed URLs and who

18  made them, (3) E*TRADE's Retail Fee Schedules, if it has them, allowing for $25 inactivity fees,

19  (4) the date E*TRADE first posted the Retail Schedule allowing for $40 inactivity fees, (5) the

20  identities of further E*TRADE personnel with actual knowledge regarding E*TRADE's change

21  logs and the posting of E*TRADE's fee schedules to its website, and (6) to the extent relevant,

22  whether E*TRADE's competitors also charged inactivity fees in 2005 when E*TRADE purported

23  to raise the amount of the fee. Through this information—which E*TRADE has failed to provide

24  up to this point—Plaintiffs would be able to show the existence of genuine issues of material fact

25  for trial such that judgment as a matter of law is inappropriate.

26

27

28

**A.**   **Discovery Would Reveal E\*TRADE's Computer Code—That E\*TRADE's Lawyers Represented To Judge Spero Had Been Preserved—From Which Plaintiffs Can Discern The Date The "Bug" Began Affecting Search Results..**

As this Court is aware, the Parties disputed several discovery issues before Magistrate Judge Spero, including E\*TRADE's failure to provide information regarding the "bug." (*See* Dkt. 117, 20:17 – 22:24; *see also* Woodrow Decl. ¶ 12.) During the hearing, the issue was raised as to whether E\*TRADE should be made to produce relevant computer code that it claims to have preserved regarding its search functionality. (*See* Dkt. 117, 13:23 – 14:7.)

In seeking relief from Magistrate Judge Spero's Order denying Plaintiffs the ability to access such code until merits discovery (which does not begin until after class certification is decided), the Plaintiffs argued that they had asked for such code since the beginning of discovery. (Dkt. 153, 1-3.) Plaintiffs further explained that E\*TRADE, through its initial Motion for Summary Judgment, had attempted to have its cake and eat it too—refusing to produce further discovery related to the "bug" but asserting a "lack of record evidence" entitling the company to summary judgment. (*Id*. at 4-5.) In denying the Motion for Relief, this Court stated:

> First, E\*Trade has withdrawn its motion for summary judgment. Second, even if E\*Trade ends up filing a new motion for summary judgment, it is not clear that E\*Trade will be making the same exact arguments as made in its prior motion. Third, even if E\*Trade makes the same or similar arguments as before, and Plaintiffs believe they need discovery related to the bug to defend the motion, Plaintiffs have a means by which to ask for discovery, i.e., Federal Rule of Civil Procedure 56(d).

(Dkt. 173, 4.) As explained above in Section I(C)(4), the code shouldn't be needed to defend against summary judgment here given Mr. Iqbal's admission that the "bug" appears to have arisen prior to the June 2010 migration. (Iqbal Decl. ¶15.) It is a genuinely disputed issue as to whether the "bug" affected search results going back to 2006 when the BrownCo. schedule was initially posted on E\*TRADE's website.

Nevertheless, to the extent this Court disagrees, E\*TRADE's code would provide further information regarding how far back in time E\*TRADE understands the "bug" to have gone. (Woodrow Decl. ¶ 13.) E\*TRADE's lawyers made clear to Judge Spero they had met their client's "obligation to archive and preserve all of the source code and the data and the search applications

that we did, which we can produce to them if they had asked for it, which they have not. Now that discovery is closed, this is the first I'm hearing that they want the source code." (Dkt. 117, 14:2-7.) Plaintiffs have asked for all documents regarding E*TRADE's search results for specific terms going back to their first issued discovery. (Woodrow Decl. ¶ 13.) Accordingly, this Court should not allow E*TRADE to obtain summary judgment on the issue of when the "bug" began affecting search results by citing to a lack of evidence, while at the same time refusing to produce the code.

**B.     Native Data For E*TRADE's "Do Not Crawl" List And A Follow Up Deposition If Mr. Iqbal On His Supplemental Declaration Would Show What Additional Information E*TRADE Has Regarding The Bug's Affect On Website Searches.**

Also with respect to the "bug," to the extent Plaintiffs must show a genuine issue of material fact remains, the Plaintiffs should be allowed to depose Mr. Iqbal related his supplemental declaration. (Woodrow Decl. ¶ 16.) Parties cannot supplement Rule 30(b)(6) deposition testimony to force a trial by ambush. *See Rainey v. Am. Forest & Paper Ass'n, Inc.*, 26 F. Supp. 2d 82, 94-95 (D.D.C. 1998). E*TRADE cannot cite a supposed lack of questions at Mr. Iqbal's deposition as a basis for allowing him to supplement or explain his testimony. E*TRADE's lawyers failed to ask any questions during the deposition that would have elicited such information, and E*TRADE cannot seriously blame the Plaintiffs for not uncovering the information contained in Mr. Iqbal's declaration during his deposition. Up to the day of his deposition, E*TRADE, in its sworn answers to written discovery, had never disclosed the "bug." (*See* Woodrow Decl. ¶ 12.) Instead, E*TRADE represented that the company's June 2010 migration to a new search platform was the cause of the BrownCo. schedule being made available to Retail customers. (*Id.*) Thus, unlike E*TRADE's lawyers, Plaintiffs had no reason to come to Mr. Iqbal's deposition prepared to ask questions regarding a bug on E*TRADE's website.

Critically, in his declaration, Mr. Iqbal testifies that the affected "Do Not Crawl" list does not indicate when changes were made to it. (Iqbal Decl. ¶ 17.) But that does not necessarily foreclose the possibility that other employees at E*TRADE recall who was responsible for updating and maintaining that particular Do Not Crawl list and whether that person(s) can shed further light on the date the transposed URL address for the BrownCo. schedule was entered onto

1  the list. (Woodrow Decl. ¶ 14.) Discovery will likely show when the list was first generated and

2  that it had not been updated until this lawsuit uncovered the "bug"—meaning the "bug" would

3  have affected search results going back to 2006 when the BrownCo. schedule was originally

4  posted. (Woodrow Decl. ¶ 15.) Accordingly, summary judgment is not appropriate.

5
6
7

   **C.  The Deposition Of Mr. Renga Will Allow Plaintiffs To Learn Whether E*TRADE Can Produce Copies Of The Retail Fee Schedule Allowing For $25 Inactivity Fees And Whether E*TRADE Can Provide A Definitive Date For When E*TRADE Posted The Schedule Reflecting The Increase To $40 On Its Website.**

8  Given that Mr. Renga testifies regarding the $25 fee schedule (as well as the single $15 fee

9  schedule produced through discovery, which is outside the scope of E*TRADE's Retail Fee

10 Schedule Change Logs), his deposition would likely uncover why E*TRADE is unable to provide

11 copies of the $25 fee schedule, what the $25 fee schedule looked like, and where copies of the $25

12 fee schedule may reside (along with particular information relating to the $15 schedule).

13 (Woodrow Decl. ¶ 17.) Likewise, Mr. Renga provides a certain date (May 5, 2006) for the posting

14 of the BrownCo. schedule despite conflicting evidence from the BrownCo. Fee Schedule Change

15 Logs. Thus, he would best be able to explain the discrepancy. (Woodrow Decl. ¶ 18.)

16 Furthermore, and not to belabor the point, Mr. Renga fails to provide the date that the $40

17 fee schedule was first posted to E*TRADE's website. (*See* Renga Decl. ¶ 30.) Again, the exhibit

18 he attaches contains no date or title. (Renga Decl. Ex. 3.) Thus, his deposition is needed to learn

19 why he is unable to provide a specific date, why the change logs reveal a date of ██████,

20 and whether Plaintiff Roling and the Increased Fee Subclass members were charged $40 inactivity

21 fees prior to the time that E*TRADE posted a modified schedule on its website as required by the

22 BCA. (Woodrow Decl. ¶ 18.) As a result, granting summary judgment in E*TRADE's favor

23 without allowing Plaintiffs to depose Mr. Renga would be improper.

24
25

   **D.  Further Discovery Will Identify Individuals At E*TRADE With Relevant Knowledge Of Key Issues, Including The Dates That Modified Fee Schedules Were Posted To The Website And E*TRADE's Change Logs.**

26 None of E*TRADE's Rule 30(b)(6) designees could competently testify regarding

27 E*TRADE's change logs. (Woodrow Decl. ¶¶ 24, 27.) E*TRADE's discovery responses state that

28

1  the change logs contained all of the relevant information regarding changes to E*TRADE's fee

2  schedules, but it is unclear how the reports produced in discovery were generated. (*See* Ex. K, No.

3  9; Ex. F; Ex. J.) Further explanation of the change logs could reveal why the Retail fee schedule's

4  log provides ███████████████████████████, (Ex. F) and why no record of any activity

5  is logged for the BrownCo. schedule's change log on ███████████, (Ex. J)—despite that being the

6  date Mr. Renga avers the BrownCo. schedule was first posted (Renga Decl. ¶ 16).

7      Consequently, further discovery will reveal personnel who can competently testify to the

8  outstanding genuine issues of material fact.

9      **E.     Discovery Will Reveal Further Information Regarding The Online Securities Brokerage Industry And Its Practice Generally Of Charging Inactivity Fees During The Period Of Time From 2004 To The Present..**

10

11     In the event the Court finds that the record is incomplete with respect to whether Plaintiff

12  Roling had market alternatives when E*TRADE increased the fee to $40, discovery will show

13  whether other online brokerage companies were charging inactivity fees in 2005. Given that Mr.

14  Renga opines on this issue for E*TRADE, his deposition would likely reveal information

15  regarding the marketplace as it existed in 2005. (*See* Renga Decl. ¶ 5.)

16     Accordingly, to the extent the Court does not deny E*TRADE's Motion for Summary

17  Judgment outright, the Plaintiffs request that the Court postpone consideration of E*TRADE's

18  motion, allow for discovery, and provide any other relief necessary under Rule 56(d).

19  **IV.    CONCLUSION**

20     This Court should deny summary judgment. Genuine issues of material fact regarding the

21  BCA's incorporation of the Retail fee schedule, the date when E*TRADE posted a modified

22  schedule on its website allowing for the increase to $40, the sufficiency of E*TRADE's notices,

23  and the timing of when the BrownCo. schedule was first posted to the website and when it became

24  available to Retail customers all prohibit summary judgment against the Plaintiffs[14] at this time. In

25  the event this Court disagrees, Plaintiffs are able to articulate the discovery they would anticipate

26  receiving during the merits phase that would reveal a genuine issue for trial.

27  ―――――――――――――――
[14]     That these factual issues are common to every Class and Subclass member is the subject of

28  Plaintiffs' pending Motion for Class Certification. (Dkt. 169.)

1    WHEREFORE, the Plaintiffs, Joseph Roling and Alexander Landvater, respectfully

2    request that this Court deny E*TRADE's Motion for Summary Judgment and award such

3    additional relief as this Court deems necessary and just.

4    Dated:  February 24, 2012                **JOSEPH ROLING** and **ALEXANDER**

5                                             **LANDVATER**  individually, and on behalf of
                                             all others similarly situated,

6

7                                            By:    /s/ Steven L. Woodrow
                                                    One of His Attorneys
8

9    Jay Edelson (Admitted *Pro Hac Vice*)
     Steven L. Lezell (Admitted *Pro Hac Vice*)
10   Rafey S. Balabanian (Admitted *Pro Hac Vice*)
     Ari J. Scharg (Admitted *Pro Hac Vice*)
11   Benjamin S. Thomassen (Admitted *Pro Hac Vice*)
     Edelson McGuire, LLC
12   350 North LaSalle, Suite 1300
     Chicago, IL 60654
13   Tel: (312) 589-6370
     Fax: (312) 589-6378
14   jedelson@edelson.com
     slezell@edelson.com
15   rbalabanian@edelson.com
     ascharg@edelson.com
16   bthomassen@edelson.com

17   Sean Reis (SBN 184044)
     Edelson McGuire, LLP
18   30021 Tomas Street, Suite 300
     Rancho Santa Margarita, CA 92688
19   949-459-2124 (phone)
     949-459-2123 (fax)
20   sreis@edelson.com

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

    I, Sean Reis, an attorney, hereby certify that on February 24, 2012, I served an un-redacted

3

version of *Plaintiffs' Opposition to E*TRADE's Motion for Summary Judgment*, on counsel for
Defendant E*TRADE by electronic mail.

4

5

WHITTY SOMVICHIAN (wsomvichian@cooley.com)
COOLEY LLP

6

101 California Street, Fifth Floor
San Francisco, California 94111-5800

7

Telephone: (415) 693-2000
Facsimile: (415) 693-2222

8

9

DOUGLAS P. LOBEL (dlobel@cooley.com)
DAVID VOGEL (dvogel@cooley.com)

10

MOSHE ROTHMAN (mrothman@cooley.com)
HILARIE LAING (hlaing@cooley.com)

11

COOLEY LLP
11951 Freedom Drive, Suite 1600

12

Reston, Virginia 20190
Telephone: (703) 456-8000

13

Facsimile: (703) 456-8100

14

                                        /s/ Sean Reis

15

16

17

18

19

20

21

22

23

24

25

26

27

28