UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH ROLING, *et al.*, | No. C-10-0488 EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT** |
| E*TRADE SECURITIES LLC, | |
| Defendant. | **(Docket No. 171)** |
| _____/ | |

Plaintiffs Joseph Roling and Alexander Landvater have filed a class action against E*Trade Securities, LLC, asserting that it unlawfully charged and collected account inactivity fees – also known as account maintenance fees ("AMFs") or account service fees ("ASFs") – from its customers. Currently pending before the Court is E*Trade's renewed motion for summary judgment on Plaintiffs' second amended complaint ("SAC"). E*Trade's motion deals with Plaintiffs' claims as individuals only as there has been no class certification as of yet.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** E*Trade's motion.

## I. FACTUAL & PROCEDURAL BACKGROUND

As stated above, there are two individual plaintiffs in this case: Mr. Roling and Mr. Landvater.

Mr. Roling opened his brokerage account with E*Trade in 2001. *See* SAC ¶ 21 (alleging that Mr. Roling opened his brokerage account with E*Trade in or around February 2001); Mot. at 1

(stating that Mr. Roling opened his account in 2001). As of February 3, 2004 – the earliest date for which Mr. Roling seeks relief – E*Trade charged a quarterly inactivity fee of $25. *See* Docket No. 172 (Lobel Decl., Ex. 1) (Gandhi Depo. at 154) (stating that the AMF increased from $15 to $25 in March 2002). The inactivity fee would not be charged if, *e.g.*, a customer had a certain minimum balance or had executed a certain number of trades. *Cf.* Docket No. 125 (Renga Decl., Ex. 3-4) (fee schedules for 2005 and 2006).[1]

In 2005, the inactivity fee was increased to $40 per quarter. *See* Docket No. 172 (Lobel Decl., Ex. 1) (Gandhi Depo. at 165) (stating that notice of the increase to $40 was sent out in February 2005); Docket No. 172 (Lobel Decl., Ex. 5) (Reckart Depo. at 63) (stating that notices of the increase to $40 were sent out in February and March 2005). Mr. Roling continued to be a customer of E*Trade during this time.

As for Mr. Landvater, he became a customer in April 2006, when the $40 inactivity fee was still being assessed. *See* SAC ¶ 31 (alleging that Mr. Landvater opened his brokerage account with E*Trade in or around April 2006); Mot. at 2 (stating that Mr. Landvater opened his account in April 2006). The inactivity fee appears to have been discontinued in 2010. *See* Docket No. 196 (Lobel Reply Decl., Ex. 2) (response to Interrogatory No. 15) (stating that fees were discontinued as of March 23, 2010).

Plaintiffs' position is that neither should have been charged any inactivity fee at all, whether $25 or $40, because the Brokerage Customer Agreements ("BCAs") they entered into with E*Trade did not allow E*Trade to charge an inactivity fee – more specifically, because the BCAs did not effectively incorporate the fee schedule containing the inactivity fee.

Plaintiffs have taken the alternative position that, even if the BCAs allowed E*Trade to charge an inactivity fee, Mr. Roling at least should not have been subjected to an increased fee (from $25 to $40) because he was not given adequate notice that E*Trade was increasing the fee and he was not given an adequate opportunity to reject the change in the fee schedule.

---

[1] Plaintiffs have moved to strike the Renga declaration. However, it does not appear that Plaintiffs dispute that the inactivity fee would not be assessed under these circumstances.

Finally, Plaintiffs have taken another alternative position that, even if the BCAs allowed E*Trade to charge an inactivity fee, a document available on E*Trade's website – known in this litigation as the Brown Co. Addendum – actually stated that no inactivity fees would be charged.

In its motion, E*Trade argues that it is entitled to summary judgment under each of Plaintiffs' positions. For example, E*Trade contends that the BCAs did include reference to the inactivity fee, stating that, if the account is inactive, then E*Trade "may charge additional fees" and that "[a]ccount maintenance fees are described in the schedule of fees on the E*Trade securities website." Docket No. 126 (Gutierrez Decl., Ex. 7) (2005 BCA § 4(b)). E*Trade further argues that Plaintiffs have waived their right to challenge the inactivity fees.

## II. DISCUSSION

A. Legal Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

Where the plaintiff has the ultimate burden of proof, as here, the defendant may prevail on a motion for summary judgment simply by pointing to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). However, where a defendant moves for summary judgment based on an affirmative defense for which it has the burden of proof, the defendant "must establish beyond peradventure all of the essential elements of the . . . defense to warrant judgment in [its] favor." *Martin v. Alamo Cmty. College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003) (internal quotation

marks and emphasis omitted); *see also Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006) (noting that a defendant bears the burden of proof at summary judgment with respect to an affirmative defense).

B. <u>Statute of Limitations</u>

Before discussing the merits of Plaintiffs' claims, the Court addresses first an issue that informs the scope of Plaintiffs' claims – *i.e.*, the statute of limitations.

Based on the allegations in the SAC, it appears that Mr. Roling is seeking relief starting from February 3, 2004. *See* SAC ¶ 40 (defining class as "[a]ll persons in the United States who were E*Trade Brokerage Account Customers and were charged at least one quarterly inactivity fee any time from February 3, 2004 through the present"). Presumably, Mr. Roling has asked for relief as of this date because New York has a six-year statute of limitations for breach of contract. *See* N.Y. C.P.L.R. § 213(2). The problem for Mr. Roling is that, based on the evidence of record, the first BCA that included a New York choice-of-law provision is the BCA effective from May to October 2005. *See* Gutierrez Decl., Ex. 7 (2005 BCA § 12(m)). The otherwise applicable California limitation period is four years. *See* Cal. Code Civ. Proc. § 337(1) (providing for a four-year limitations period for an action upon a contract). Therefore, Mr. Roling may seek relief only back to May 2005.

As for Mr. Landvater, he did not become an E*Trade customer until April 2006. Therefore, presumably, he seeks relief as of April 2006 and on.

C. <u>Waiver</u>

E*Trade argues first that, under any of Plaintiffs' positions as stated above, it is entitled to summary judgment on their individual claims for relief because both Mr. Roling and Mr. Landvater waived their right to challenge E*Trade's charging and collecting of the AMFs by continuing to perform under the BCAs. There seems to be no dispute that waiver is an affirmative defense. *See, e.g.*, Docket No. 71 (in answer to first amended complaint, asserting as the sixth affirmative defense the doctrine of waiver).

Under New York law, a waiver involves a knowing relinquishment.[2] *See New York v. State*, 40 N.Y.2d 659, 669 (1976) (stating that "[a] waiver is the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it") (internal quotation marks omitted). The same is true under California law.[3] *See Harvard Investment Co. v. Gap Stores, Inc.*, 156 Cal. App. 3d 704, 711 n.6 (1984) (stating that "a waiver of rights generally involves a clear, voluntary, intentional, and knowing expression"). Furthermore, under both New York and California law, where a plaintiff has knowledge of the defendant's breach and continues to perform under the contract and/or accepts the defendant's performance without notifying the defendant of the breach, a waiver is fairly implied. *See National Westminster Bank v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991) (stating that, "where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach"; adding that "a party to an agreement who believes it has been breached may elect to continue to perform the agreement rather than terminate it, and later sue for breach; this is true, however, only where notice of the breach has been given to the other side"); *A.B.C. Distrib. Co. v. Distillers Distrib. Corp.*, 154 Cal. App. 2d 175, 187 (1957) (stating that "plaintiff waived such alleged breaches of contract by continued performance on its part without any claim of breach by defendant").

Given the standard articulated above – which Plaintiffs do not dispute in their opposition – the Court concludes that, as a matter of law, both Mr. Roling and Mr. Landvater waived their right to challenge E*Trade's conduct. That is, a reasonable jury could not find in favor of Plaintiffs on the issue of waiver.

With respect to Mr. Roling, Plaintiffs concede that he knew about the inactivity fees – more specifically, as of 2003. Among other things, there is no dispute that the quarterly statements from

---

[2] The parties dispute whether a waiver must be based on actual knowledge or whether constructive knowledge is sufficient. Even assuming actual knowledge, Plaintiffs still have a waiver problem as discussed *infra*.

[3] The Court addresses California law out of an abundance of caution. Although Plaintiffs have suggested in their SAC that California law should apply (*i.e.*, the New York choice-of-law provisions in the BCAs are unconscionable), they have presented no such argument in conjunction with the summary judgment briefing.

E*Trade show the inactivity fee charged as a debit. *See* Docket No. 125 (Renga Decl., Ex. 23) (quarterly account statements for Mr. Roling reflecting AMFs); *see also* Docket No. 126 (Renga Decl., Ex. 24) (quarterly statements for Mr. Landvater reflecting AMFs). Plaintiffs' position is that, once he learned about the fees, "[Mr.] Roling *immediately* contested E*TRADE's right to assess inactivity fees" by calling the customer support line, *i.e.*, he did not silently sit back and do nothing. Opp'n at 25 (emphasis added). The problem for Plaintiffs is that the transcript of the telephone call shows that Mr. Roling did not make any claim of breach to the customer service representative[4]:

> I just noticed that so far I've lost $505 with you guys just by not trading, *which I understand*. But I'm just wondering, is there any way you guys can slash that for me or give me some sort of a discount on that amount? 'Cause it's such a huge amount, it's half of everything I invested.

Docket No. 124 (Lobel Decl., Ex. 3) (Tr. at 2) (emphasis added). In other words, while Mr. Roling expressed unhappiness with the amount of the fee assessment, he never alerted E*Trade to the fact that he was disputing its legal right to charge the fees in the first place. In short, he did not assert the fees were in breach of the contract. *See National Westminster Bank*, 130 B.R. at 675 (stating that, "[h]aving failed to notify the Bank of any breach of the Loan Agreements and having continued to accept the benefits of the agreement in the form of continuing advances from the Bank, RPC is now precluded from asserting any such breaches"); *cf. Whitney Inv. Co. v. Westview Dev. Co.*, 273 Cal. App. 2d 594, 603 (1969) (noting that, "[w]hile a notice of termination or cancellation of a contract for breach need not be formal and explicit, it should clearly indicate to the defaulting party that the injured party considers the contract terminated"). Indeed, the fact that Mr. Roling asked if he could be given a discount is an implicit concession that E*Trade was within its legal right in charging the fees.

As for Mr. Landvater, Plaintiffs admit that he knew about the inactivity fees in 2008. They argue, however, that he cannot be said to waived any right because, after he learned about the fees in 2008, he was not thereafter assessed any such fees; thus, "at no point did he 'silently and knowingly accept' E*TRADE's purportedly unlawful conduct." Opp'n at 25. This argument misses the point.

---

[4] Notably, in their opposition, Plaintiffs repeatedly cite Mr. Roling's deposition testimony about the telephone call and not the telephone call itself. *See* Opp'n at 25.

6

After learning of the fees, Mr. Landvater was not subsequently charged any fees *because he complied with E\*Trade's rules and made the necessary trades to avoid being charged the fees*. *See* Docket No. 124 (Lobel Decl., Ex. 4) (Landvater Depo. at 179, 183, 187). He thus accepted performance of the contract terms without claiming a breach. This constitutes a waiver under *National Westminster Bank* and *A.B.C. Distribution Co.*

Accordingly, the Court finds, as a matter of law, that both Mr. Roling and Mr. Landvater waived their right to contest E\*Trade's charging and collecting of the inactivity fees. In light of the waiver, E\*Trade is entitled to summary judgment on the individual plaintiffs' claims for relief. Because the Court finds waiver, Plaintiffs' motion to strike the Renga declaration is moot. Plaintiffs take issue with the Renga declaration based on issues not related to that of waiver. Similarly, Plaintiffs' Rule 56(d) request is moot. Plaintiffs have not identified a need for any discovery with respect to the issue of waiver in order to oppose E\*Trade's motion for summary judgment.

D.  Alternative Rulings

Although the Court grants E\*Trade's motion based on waiver, it shall still address E\*Trade's additional arguments in support of its motion for summary judgment. The Court does so not only to provide alternative grounds for its ruling but also to give guidance to the parties in the event Plaintiffs may seek to join a new plaintiff and potential class representative in the case. As noted above, Plaintiffs have offered three legal theories in support of their case: (1) that no inactivity fees should have been assessed because the BCAs did not allow for the assessment of such fees; (2) that Mr. Roling at least should not have been subjected to a fee increase from $25 to $40 because he was not given advance notice of the fee increase and/or an adequate opportunity to reject it; and (3) that even if the BCAs did allow for the assessment of inactivity fees, a document available on E\*Trade's website – known in this litigation as the Brown Co. Addendum – actually stated that no inactivity fees would be charged. E\*Trade attacks each of these legal theories as discussed below.

1.  Incorporation by Reference

Plaintiffs' first position is that they never should have been charged any inactivity fees because BCAs they entered into with E\*Trade did not allow E\*Trade to charge such fees.

7

For purposes of the summary judgment, given the applicable limitations period, the relevant BCAs are those in effect for (1) the period May to October 2005 ("2005 BCA"); and (2) the period November 2005 to November 2006 ("2005-2006 BCA"). *See* Docket No. 126 (Gutierrez Decl. ¶¶ 18, 20, 22 & Exs. 6-8). Both BCAs contained the following term on fees and commissions:

> 4. ACCOUNT PROVISIONS
>
> . . . .
>
> (b) Fees, Commissions and Account Minimums
>
> I agree promptly to pay brokerage commissions, charges and other fees as set forth in E*TRADE Securities' then-current fee schedule and as applicable to my Account and the transactions and services I may receive. . . . A schedule of the current fees and commissions is available on the E*TRADE Securities Web site. . . . *If my Account's value falls below the minimum balance or my Account is inactive, E*TRADE Securities may charge additional fees or, if it deems appropriate in its discretion, close my account. Account maintenance fees are described in the schedule of fees on the E*TRADE Securities Web site.*

Docket No. 126 (Gutierrez Decl., Ex. 7) (2005 BCA ¶ 4(b)) (emphasis added); Docket No. 126 (Gutierrez Decl., Ex. 8) (2005-2006 BCA ¶ 4(b)) (emphasis added).

Plaintiffs acknowledge the above provision but argue that any fee schedule available on E*Trade's website should be considered extrinsic to the BCAs because the fee schedule was not properly incorporated by reference. More specifically, Plaintiffs maintain that the fee schedule was too hard to find on the website. The Court does not agree. That is, as a matter of law, the Court concludes that the fee schedule was properly incorporated by reference.

Under New York law, "[t]he doctrine of incorporation by reference requires that the paper to be incorporated into a written instrument by reference must be so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt." *Chiacchia v. National Westminster Bank*, 507 N.Y.S.2d 888, 890 (1986). California law has a similar requirement. *See DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697, 713 (2009) (noting that, under California law, for purposes of incorporation by reference the reference be "clear and unequivocal"). In the instant case, the BCAs clearly identified the "document" that was being incorporated – *i.e.*, E*Trade's website. The incorporation of the specifically identified document –

the E*Trade website – was "clear and unequivocal" and identification was "beyond all reasonable doubt."

Plaintiffs contend, however, that the fee schedule could not easily be located on E*Trade's website, either through browsing or the search box available on the website. The Court acknowledges that Plaintiffs' argument is not without any legal basis. Under California law, incorporation by reference requires that "the *terms* of the incorporated document . . . be known or easily available to the contracting parties." *Baker v. Osborne Development Corp.*, 159 Cal. App. 4th 884, 895 (2008) (internal quotation marks omitted) (emphasis added). E*Trade does not dispute that a similar requirement would be imposed under New York law. The problem for Plaintiffs is that, based on the evidence of record, no reasonable jury could find that the fee schedule (the term at issue) was not "easily available."

E*Trade has presented evidence showing that the fee schedule could be located on its website through at least three different means:

(1)     through the Help Center/Customer Service page (accessible from the home page and all other pages on the website).

(2)     through the Pricing page (accessible from the home page); and

(3)     through a search box (accessible from the home page and all other pages on the website).

*See* Docket No. 126 (Gutierrez Decl. ¶¶ 7-16).

The Court concludes that, as a matter of law, each of these means constituted an easy way for an E*Trade customer, including Plaintiffs, to find the fee schedule. Plaintiffs' criticisms of these means lack merit.

For example, Plaintiffs point out that a customer would have to click three to four times to get to the fee schedule through the Help Center/Customer Service page and two times to get to the fee schedule through the Pricing page. This navigation, however, is far from excessive; it is only a handful of clicks, and the sequence of clicks was reasonably intuitive. Notably, a customer has an incentive to make at least a few clicks given the explicit notice in the BCAs that inactivity fees may be charged and that account maintenance fees could be found on the website. Finally, and most importantly, the navigation is neither counterintuitive, difficult, nor confusing. At the very least,

1 accessing through the Pricing page seems obvious. Tellingly, Plaintiffs did not present any evidence
2 that any customer was actually confused by the website and unable to locate the fee schedule.
3 While, as Plaintiffs argue, E*Trade could also have made the fee schedule available through other
4 intuitive means such as putting a link to the fee schedule on the online version of the BCA, the fact
5 that E*Trade could have made the schedule more easily available (and thus minimize the legal risk it
6 has incurred here) does not negate the fact that the fee schedule was nonetheless "easily available."

7 As for the search box, Plaintiffs concede that the fee schedule would be produced as a search
8 result if a customer were to type in "fee" or "fees" or "commissions" in the search box. Plaintiffs
9 also concede that "fee" or "fees" "were certainly the most popular searches." Opp'n at 7. While
10 customers may have used other terms to search for the AMF (*e.g.*, "fee schedule," "inactivity,"
11 "inactivity fee," or "inactivity fees"), *see* Docket No. 115 (Iqbal Sur-Reply Decl., Ex. 2) which may
12 or may not have led to the fee schedule (the record is not clear), the statistics provided by E*Trade
13 indicate that those numbers were dwarfed by the numbers using "fee" or "fees."[5] *See* Docket No.
14 115 (Iqbal Sur-Reply Decl., Ex. 2) (indicating, *e.g.*, that, for the month of March 2009, more than
15 20,000 searches were done for "fee" or "fees," while only 286 searches were done for "fee
16 schedule," "inactivity," "inactivity fee," or "inactivity fees").

17 The Court further notes that the record evidence establishes that the commission rates for
18 trading were also listed on the same schedule of fees and found on the same E*Trade website as the
19 AMF. As E*Trade pointed out at argument, it cannot seriously be contended that trade commission
20 rates are not incorporated into the BCA. Yet Plaintiffs fail to make a convincing argument that
21 AMFs on the same fee schedule as commission rates are not incorporated into the BCA whereas the
22 commission rates are.

23 The Court thus concludes that E*Trade is entitled to partial summary judgment on Plaintiffs'
24 first theory for relief. To the extent Plaintiffs have made a Rule 56(d) request, asking for permission
25 to take the deposition of Mr. Gutierrez (*i.e.*, the E*Trade witness who provided the critical testimony

---

[5] Plaintiffs' reliance on *Douglas v. United States District Court*, 495 F.3d 1062 (9th Cir. 2007), is unavailing. There, the Ninth Circuit simply held that, without advance notice, "a service provider may not change the terms of its service contract by merely posting a revised contract on its website." *Id.* at 1065.

about how the fee schedule was available to customers on the website), *see* Opp'n at 5 n.2 (stating that "Plaintiffs need to depose Mr. Gutierrez and/or obtain additional discovery to see if the 'Help Center' was actually available to all visitors when Plaintiffs were E*TRADE customers"); Opp'n at 6 (stating that "Plaintiffs should be allowed to depose Mr. Gutierrez on this method [of accessing the fee schedule through the Pricing button]"), the request is denied. Plaintiffs have not demonstrated that they exercised due diligence in conducting discovery on this matter. *See Freeman v. ABC Legal Servs., Inc.*, No. C-11-3007 EMC, 2011 U.S. Dist. LEXIS 129840, at *10 (N.D. Cal. Nov. 9, 2011) (noting that "cases in this jurisdiction suggest that unless plaintiffs failed to exercise due diligence in conducting discovery, . . . the request is generally granted with liberality"). Clearly, the navigability of E*Trade's website has been an issue since the inception of this case. Moreover, Mr. Gutierrez's declaration was first filed on January 17, 2012. *See* Docket No. 126 (Gutierrez declaration). Plaintiffs did not make any request to take Mr. Gutierrez's deposition until more than a month later as part of their opposition brief (*i.e.*, on February 24, 2012).

    2.    <u>Notice and Opportunity to Reject Fee Increase</u>

Plaintiffs' second position focuses on the fee increase to which Mr. Roling was subjected in 2005 – *i.e.*, the increase in the AMF from $25 to $40. According to Plaintiffs, even if the BCAs allowed E*Trade to charge an inactivity fee, Mr. Roling at least should not have been subjected to an increased fee because he was not given adequate notice that E*Trade was increasing the fee and he was not given an adequate opportunity to reject the change in the fee schedule.

    a.    <u>Notice</u>

Plaintiffs' claim that Mr. Roling was not given adequate notice of the fee increase is not borne out by the evidence of record. The evidence of record indicates that, in *advance* of being charged the inactivity fee in March 2005, Mr. Roling was notified of the fee by direct mail in February 2005, *see* Docket No. 172 (Lobel Decl., Ex. 1) (Gandhi Depo. at 165), and by a statement insert in February 2005. *See* Docket No. 172 (Lobel Decl., Ex. 5) (Reckart Depo. at 63).

To the extent Plaintiffs argue that the only way E*Trade could give notice was by posting the fee schedule on its website, that argument is without merit. The BCAs simply state that E*Trade *may* modify the fee schedule by posting. *See* Docket No. 126 (Gutierrez Decl., Ex. 7) (2005 BCA ¶

1 4(b)) ("E*TRADE Securities may modify the fee structure anytime by posting a modified schedule
2 on its Web site."); Docket No. 126 (Gutierrez Decl., Ex. 8) (2005-2006 BCA ¶ 4(b)) (same).

    b.  Opportunity to Reject

    Plaintiffs do not argue only inadequate notice; they also argue that, even if notified, Mr. Roling was not given an adequate opportunity to reject the fee increase prior to the fee being charged. Defendants maintain that Mr. Roling, as well as all customers, were given an adequate opportunity to reject the fee increase because all customers were notified at least thirty days prior to the fee first being charged at the end of March 2005. *See* Mot. at 24.

    In response, Plaintiffs do not dispute that notice was given at least thirty days prior to the first charge. Plaintiffs point out, however, that the fee became *effective* as of January 1, 2005 (*i.e.*, the first fee charged in March 2005 covered the January-March 2005 period). According to Plaintiffs, under the BCAs, a customer only has fifteen days after a change in service to reject the change and close his account. Here, because the change in service went into effect on January 1, 2005, a customer only had until January 16, 2005, to close his account. Thus, when the notice of the fee increase went out in February 2005, it was too late for a customer to close his account. Plaintiffs assert that E*Trade should have provided the notice at least fifteen days before the change in service went into effect on January 1, 2005.

    The Court finds Plaintiffs' argument unconvincing. Even if the first fee charged covered the period starting on January 1, 2005, the fact remains that no fee was actually charged until March 2005, which was well after the advance notice was given. Thus, a customer would have an opportunity to act before being charged. There is nothing in the record to indicate that, *e.g.*, a customer would be charged the inactivity fee or a pro rata fee if the customer terminated his or her brokerage account before the assessment in March.

    Moreover, Plaintiffs have not adequately taken into account the BCAs' terms. Paragraph 12(e) of both the 2005 BCA and 2005-2006 BCA provided:

> I agree that use of the Service after a change to the Service *or notice of a change to this Agreement*, or if I do not close my Account within fifteen (15) calendar days of the change to the Service *or notice of a change to the Agreement*, means that I accept the change, whether or

> not I actually know if it, except that changes required by law will be effectively immediately.

Docket No. 126 (Gutierrez Decl., Ex. 7) (2005 BCA ¶ 12(e)) (emphasis added); Docket No. 126 (Gutierrez Decl., Ex. 8) (2005-2006 BCA ¶ 12(e)) (emphasis added). In other words, under the BCAs, a customer would have fifteen days to act upon receiving *notice* of a change such as a fee increase. Thus, under the terms of the BCA itself, Mr. Roling had an opportunity to reject the fee increase after receiving notice. Given the above, the Court concludes that, as a matter of law, Mr. Roling was given an adequate opportunity to reject the fee increase.

Plaintiffs make the additional argument that, timing issues aside, the notices were also deficient in that they do not allow customers to reject the fee increase short of canceling service. Plaintiffs argue that this rendered the fee increase procedurally unconscionable. *See*, *e.g.*, *Szetela v. Discover Bank*, 97 Cal. App. 4th 1094, 1100 (2002) (finding procedural unconscionability where plaintiff "received the amendment to the Cardholder Agreement in a bill stuffer, and under the language of the amendment, . . . was told to 'take it or leave it,'" thus leaving as "[h]is only option, if he did not wish to accept the amendment, [the] clos[ing] [of] his account"). The problem for Plaintiffs is that, even if there is procedural unconscionability, they are still required to show, in addition, substantive unconscionability in order to sustain an unconscionability argument. *See Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 10 (1988) (noting that "[a] determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made"); *Armendariz v. Foundation Health Psychcare Servs.*, 24 Cal. 4th 83, 114 (2000) (noting that a finding of unconscionability requires "a 'procedural' and a 'substantive' element, the former focusing on 'oppression' or 'surprise' due to unequal bargaining power, the latter on 'overly harsh' or 'one-sided' results"). Plaintiffs have made no argument as to how the fee increase was substantively unconscionable. AMFs appear to have been charged because E*Trade provided services such as quotes, independent research, and customer service to its customers. *See* Docket No. 172 (Lobel Decl., Ex. 4) (Walton Depo. at 29-30).

### c. Posting of March 2005 Fee Increase

For the reasons discussed above, Plaintiffs' alternative theory that Mr. Roling should not have been subjected to the fee increase is without merit, and partial summary judgment might well be appropriate but for one final argument made by Plaintiffs.

That is, Plaintiffs now seem to arguing that Mr. Roling (and other customers) should not have been subjected to the fee increase from $25 to $40 on at least two specific occasions. This argument is predicated on the fact that, under the BCA, E*Trade could not actually charge a fee until it posted the fee change on its website. *See* Docket No. 126 (Gutierrez Decl., Ex. 7) (2005 BCA ¶ 4(b) (providing that "E*TRADE Securities may modify the fee structure anytime by posting a modified schedule on its Web site"); Docket No. 126 (Gutierrez Decl., Ex. 8) (2005-2006 BCA ¶ 4(b) (same). Plaintiffs claim that a change log produced by E*Trade shows that the March 2005 fee increase was not posted on E*Trade's website until June 23, 2005 – which was *after* the inactivity fee had been charged two times (in March and June 2005). *See* Docket No. 184 (Woodrow Decl., Ex. F) (ETS 002303).[6] Plaintiffs further point out that the Renga declaration does not state exactly when the March 2005 fee increase posted. Accordingly, Plaintiffs maintain that there is a genuine issue of material fact precluding summary judgment.

Putting aside the fact that the statute of limitations allows Mr. Roling to seek relief based on conduct as of May 2005 only, E*Trade argues in response that Plaintiffs

> fundamentally misunderstand the nature of the log. E*TRADE's change logs only go back to June 2005, when E*TRADE first began tracking changes to the fee schedules. The entry Plaintiffs rely on is the date the $40 fee schedule was *first entered* into E*TRADE's document repository, not the date it went live on the website.

Reply at 6-7 (emphasis in original); Docket No. 198 (Gutierrez Reply Decl. ¶¶ 3, 5-6). E*Trade also provides a reply declaration from Mr. Renga providing a concrete date for the posting of the fee increase. *See* Docket No. 197 (Renga Reply Decl. ¶ 4) (testifying that the fee increase was posted no later than February 11, 2005).

---

[6] Exhibit F is the change log for the fee schedule for retail customers. The first entry in the log is dated June 23, 2005, with the comment "Initial check-in." All other entries on the log post-date June 23, 2005.

14

1   While E*Trade may well be accurate in its explanation, the Court concludes that Plaintiffs
2   should have, at the very least, an opportunity to test the evidence E*Trade submits in support of the
3   above argument in its reply papers. E*Trade suggests that Plaintiffs could have asked about the
4   change logs – but did not – when they deposed its technical witnesses (Mr. Hiltbrand and Mr. Raj).
5   *See* Reply at 7 n.5. The problem with this position is that E*Trade did not submit a declaration from
6   either Mr. Hiltbrand or Mr. Raj about the change logs. Rather, it submitted a declaration from an
7   entirely new witness (*i.e.*, Mr. Gutierrez). As for the Renga reply declaration, the Court shall not
8   consider the testimony on the date the March 2005 fee increase was posted because Mr. Renga could
9   have, but failed to, provide that testimony in his initial declaration.

10   The Court thus concludes that, while E*Trade is entitled to summary *adjudication* on the
11   issues of notice and opportunity to reject, there is still a potentially viable theory that E*Trade
12   breached the BCAs by charging the increased fee two times in 2005 before actually posting the fee
13   increase on the website. While the first charge – in March 2005 – may be barred by the statute of
14   limitations, the second charge – in June 2005, would not be.

15   3.   Brown Co. Addendum

16   Finally, Plaintiffs contend that, even if the fee schedule was properly incorporated by
17   reference, another fee schedule – *i.e.*, the Brown Co. Addendum – was also available on E*Trade's
18   website, and the Brown Co. Addendum actually stated that no inactivity fees would be charged. *See*
19   Docket No. 126 (Renga Decl., Ex. 5) (Brown Co. Addendum) (stating, *inter alia*, "No Inactivity
20   Fees" and "E*TRADE Securities will not charge fees when your account is inactive for a period of
21   time"); *see also* Docket No. 181 (SAC, Ex. B) (Brown Co. Addendum) (stating the same).

22   While the Court does not find all of E*Trade's arguments in relation to this theory
23   persuasive, there is one that is convincing – *i.e.*, that, if the Brown Co. Addendum was easily
24   available, then a customer would have access to both the Addendum *and* the regular retail customer
25   fee schedule, in which case that would give rise to an ambiguity in the BCA as to which fee
26   schedule should apply. Judge Patel explicitly raised this point in her order granting in part and
27   denying in part E*Trade's Rule 12(b)(6) motion. *See* Docket No. 63 (Order at 8-10). In fact, in her
28   order, Judge Patel indicated that a side-by-side comparison of the Addendum and the regular fee

15

1  schedule would "strengthen[]" a conclusion that the Addendum was applicable only to former
2  Brown Co. customers. Docket No. 63 (Order at 9).

3  In their opposition, Plaintiffs argue that, even if there is an ambiguity, "E*TRADE has not
4  come forward with any additional information to show that the existence or availability of the [retail
5  customer fee] schedule defeats any ambiguity in the BrownCo. schedule's application to Plaintiffs'
6  brokerage account as a matter of law." Opp'n at 22. This is not true. E*Trade has provided
7  evidence that it was the industry practice during the relevant period to charge an AMF. *See* Docket
8  No. 125 (Renga Decl. ¶ 5) (testifying that, "[b]eginning in or around 2000, it became standard
9  industry practice for brokerage firms to assess Account Maintenance Fees for inactive or low
10 activity accounts similar to E*TRADE's AMF"). *See, e.g.*, *Lopez v. Consolidated Edison Co. of N.*
11 *Y.*, 40 N.Y.2d 605, 609 (1976) (indicating that, where contract terms were ambiguous, parol
12 evidence of custom and practice was properly admitted to show parties' intent); *407 East 61st*
13 *Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 281 (1968) (indicating that contract was "not
14 so free from ambiguity to preclude extrinsic evidence" of industry "custom and usage" that would
15 "establish the correct interpretation or understanding of the agreement as to its term"). Notably, this
16 is exactly the type of evidence that Judge Patel contemplated in her order on the motion to dismiss.
17 *See* Docket No. 63 (Order at 17 n.4) (noting that "[e]xtrinsic evidence [to resolve ambiguity] may
18 include evidence of trade usage").

19 The Court acknowledges that Plaintiffs have not had an opportunity to depose Mr. Renga on
20 this specific matter. But, as E*Trade points out, if Plaintiffs had acted reasonably diligently, then
21 they would have been prepared to address this argument without needing to depose Mr. Renga –
22 particularly because Judge Patel called out this issue in her order on the motion to dismiss. Instead,
23 Plaintiffs produced no contrary evidence on this point.

24 Moreover, there is a legal argument in E*Trade's favor that ultimately renders extrinsic
25 evidence of industry practice unnecessary. That is, as a canon of construction, the Court must
26 interpret the BCA to give effect to both the Brown Co. Addendum and the fee schedule. *See Galli v.*
27 *Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (stating that, "Under New York law an interpretation of a
28 contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not

preferred and will be avoided if possible'[;] [r]ather, an interpretation that 'gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect'"); Cal. Civ. Code § 1641 (providing that "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other"; Cal. Civ. Code § 1643 (providing that "[a] contract must receive such a interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties"). The only way to do so is to interpret the Addendum as being applicable to only former Brown Co. customers. Otherwise, the AMF fee schedule would be meaningless.

The Court thus finds that partial summary judgment on the Brown Co. Addendum theory is appropriate.[7]

### III. CONCLUSION

For the foregoing reasons, the Court grants E*Trade's motion for summary judgment. More specifically, the Court rules as follows:

(1) E*Trade is entitled to summary judgment on all of Plaintiffs' individual claims for relief based on waiver. In light of this ruling, Plaintiffs' motion to strike the Renga declaration is moot.

(2) Alternatively, E*Trade is entitled to partial summary judgment on (a) Plaintiffs' first theory for relief (*i.e.*, allegedly improper incorporation by reference) and (b) Plaintiffs' third theory for relief (*i.e.*, accessibility of the Brown Co. Addendum). E*Trade is further entitled to summary adjudication on the issues of notice and opportunity to reject, as related to Plaintiffs' second theory for relief (*i.e.*, allegedly improper fee increase from $25 to $40). However, Plaintiffs may have a potentially viable theory that E*Trade breached the BCAs by charging the inactivity fee at least one time (within the statute of limitations) in 2005 before actually posting the fee schedule on its website. With respect to the Court's alternative rulings, Plaintiffs' motion to strike the Renga

---

[7] Plaintiffs have also argued that summary judgment on the Brown Co. Addendum-based claim is inappropriate because there is a genuine dispute as to when the Addendum was available – *i.e.*, March 16, 2006 (Plaintiffs' position) or May 5, 2006 (E*Trade's position). This argument has little merit because, even if it is a genuine dispute of fact, it is not a dispute as to a *material* fact, at least not for purposes of the summary judgment motion and the arguments made in conjunction with the motion.

declaration is denied. Plaintiffs take issue with three paragraphs in the Renga declaration (¶¶ 16, 24, and 30). Two of the paragraphs are essentially immaterial (*i.e.*, the paragraphs as to when the Brown Co. Addendum was posted and when the March 2002 fee increase (from $15 to $25) was posted). With respect to the last paragraph (*i.e.*, when the March 2005 fee increase posted), there is nothing to strike because Mr. Renga does not provide any testimony as to when the fee increase was posted. To the extent Mr. Renga tries to rectify that deficiency in his reply declaration, Plaintiffs' objection is sustained. Mr. Renga could have provided that testimony in his initial declaration but failed to do so. In addition, Plaintiffs' objection to Mr. Gutierrez's reply declaration is sustained in part. As discussed above, Plaintiffs should be given an opportunity to test Mr. Gutierrez's testimony related to the change logs.

        The only issue remaining for the Court is how to proceed given its rulings above. Because the Court has granted summary judgment to E*Trade based on waiver, Plaintiffs' individual claims have been disposed of in their entirety. There are no other individual plaintiffs in this case; thus, there is no one who can proceed with the class claim. Even assuming that counsel for Plaintiffs asks for leave to join a new plaintiff and proposed class representative and the Court grants that request for relief (the Court notes that previously it denied Plaintiffs' motion to amend to add Mr. Gogulski to the case, *see* Docket No. 144 (Order at 4-5)), the Court's alternative rulings above on Plaintiffs' individual claims substantially narrows the legal claims available to any new plaintiff and proposed class representative.

        Given this situation, the Court concludes that the best way to proceed is to vacate all pending deadlines and hearings, including but not limited to those related to Plaintiffs' motion for class certification. The Court shall hold a status conference on April 13, 2012 at 10:30 a.m. to discuss

///
///
///
///
///
///

with the parties how this litigation should proceed. The parties should be prepared to discuss, *inter alia*, whether counsel for Plaintiffs should be given an opportunity to join a new plaintiff and proposed class representative and, if so, what legal theories a new litigant would or would not be precluded from making in light of the Court's alternative rulings above. A joint status conference statement shall be filed one week prior to the conference.

      This order disposes of Docket No. 171.

      IT IS SO ORDERED.

Dated: March 27, 2012

_____
EDWARD M. CHEN
United States District Judge